UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Georges F. de Laire

    v.                              Civil No. 21-cv-131-JD

Gary Michael Voris, et al.

O R D E R

    The Very Reverend Georges F. de Laire, J.C.L. brought
claims for defamation against Gary Michael Voris, Anita Carey,
and St. Michael's Media, Inc. a/k/a Church Militant.  In
support, de Laire alleges that the defendants have published
defamatory articles and a video about him that arose from a
doctrinal dispute between a religious group and officials of the
Catholic Church.  The defendants move to compel additional
discovery from de Laire, and he objects.

Standard of Review

    Under the federal rules, "[p]arties may obtain discovery
regarding any nonprivileged matter that is relevant to any
party's claim or defense and proportional to the needs of the
case."  Fed. R. Civ. P. 26(b)(1).  After providing notice and
making the necessary effort to resolve the discovery issue, a
party may move to compel another party to produce requested
information or documents.  Fed. R. Civ. P. 37(a)(1) &

37(a)(3)(B).  The moving party bears the burden of making an
initial showing that the requested documents are relevant, and
if that showing is made, the opposing party bears the burden of
showing that the requested production is improper.  Philips Med.
Sys. P.R., Inc. v. Alpha Biomedical & Diagnostic Corp., 2021 WL
150411, at *4 (D.P.R. Jan. 15, 2021); Caouette v. OfficeMax,
Inc., 352 F. Supp. 2d 134, 136 (D.N.H. 2005).  The court has
broad discretion in managing discovery disputes and may decline
to compel discovery when appropriate.  Heidelberg Ams., Inc. v.
Tokyo Kikai Seisakusho, Ltd., 333 F.3d 38, 41 (1st Cir. 2003).

     To prove a claim for defamation under New Hampshire law
when the plaintiff is not a public figure, a plaintiff must
"'show that the defendants[s] failed to exercise reasonable care
in publishing a false and defamatory statement of fact about
[the plaintiff] to a third party.'"  Automated Transactions, LLC
v. Am. Bankers Assoc., 172 N.H. 528, 532 (2019) (quoting Cluff-
Landry v. Roman Catholic Bishop of Manchester, 169 N.H. 670, 678
(2017)); see also Martin v. Mooney, 448 F. Supp. 3d 72, 84
(D.N.H. 2020).  A false statement is defamatory if it "tend[s]
to lower the plaintiff in the esteem of any substantial and
respectable group, even though it may be quite a small
minority."  Thomson v. Cash, 119 N.H. 371, 653 (1979); see also
Gray v. St. Martin's Press, Inc., 221 F.3d 243, 250 (1st Cir.
2000) (applying New Hampshire law).  Further, a false statement

is defamatory per se if it would tend to injure the plaintiff in his trade or profession.  MacDonald v. Jacobs, 171 N.H. 668, 674 (2019); Krishnan v. Blueprint Healthcare LLC, 2021 WL 4255359, at *8 (D. Mass. Sept. 17, 2021) (applying New Hampshire law); Martin v. Mooney, 448 F. Supp. 3d 72, 84 (D.N.H. 2020).


## Background

Church Militant is identified as a Michigan not-for-profit corporation that posts articles, videos, and podcasts on a website, churchmilitant.com.  Gary Michael Voris is the president of Church Militant.  Anita Carey was a staff reporter for Church Militant from March of 2017 to November of 2019.

De Laire is a priest in the Catholic Church and the pastor of a parish in Manchester, New Hampshire.  He also serves as the Judicial Vicar and the Vicar for Canonical Affairs for the Diocese of Manchester.  De Laire and the Bishop of Manchester together form the Tribunal.  De Laire oversees matters brought before the Tribunal that are generally challenges to the canonical validity of marriages but also include other matters. He also has the responsibility of promoting and protecting the rights of the faithful in the Diocese of Manchester.  In those roles, de Laire's duties have included interaction with the religious group known as the Slaves of the Immaculate Heart of Mary, which is incorporated as the Saint Benedict Center, Inc.

A doctrinal dispute arose in 2016 between the Saint Benedict Center and the Diocese of Manchester about the Center's interpretation of the phrase "extra ecclesiam nulla salus."[1]  As a result, the Congregation for the Doctrine of the Faith in Rome declared the Saint Benedict Center's interpretation unacceptable.  Effective January 7, 2019, de Laire placed restrictions ("precepts") on the Saint Benedict Center because of their failure to follow the decisions made by the Congregation for the Doctrine of the Faith, which included prohibiting the Center from using any reference to itself as associated with the faithful in the Roman Catholic Church, from using the name Catholic, and from having any sacramental celebrations at the Center.  De Laire continued to work with the Saint Benedict Center and offered to have a priest in good standing provide ministry there.

Church Militant published an article about de Laire dated January 17, 2019, that addressed de Laire's role in the church's interactions with the Saint Benedict Center.[2]  The article featured a photograph of de Laire and is titled "NH Vicar Changes Dogma into Heresy" with a subtitle of "Fr. George de

---

[1] In a video published by Church Militant, Voris translated the dogma to mean "outside the Church there is no salvation."

[2] The article does not identify its author, but de Laire alleges that Voris wrote the article.

Laire cracks down on Saint Benedict Center." In the article, Vrois claims that "work colleagues" of de Laire said he was emotionally unstable and that he was using the St. Benedict Center dispute to repair his image. The article also said that there had been three complaints lodged against de Laire over several years which alleged corruption, abuse of office, violations of the law, and incompetence. Voris claimed to have learned that de Laire was outsourcing his work and that he was vindictive and manipulative.

In the last paragraph of the article, Voris wrote that "[a]dditional questions are raised" by de Laire's property. Voris stated that while Pope Francis was living at a hotel rather than the Apostolic Palace, de Laire was living at an estate near Manchester, New Hampshire, that he recently purchased. Voris stated that the estate is valued at 1.5 million dollars.

After that article was published, Voris travelled to New Hampshire in April of 2019 to interview members and supporters of the Saint Benedict Center about de Laire's actions and made a video about de Laire. Church Militant published the video on April 15, 2019, which de Laire contends includes defamatory statements about him. The video is titled "Attacking the Good Guys Who Are Fighting Back" and was published on Church Militant's website and then was published on other websites.

In the video, Voris stated that the diocese of Manchester was attacking the Saint Benedict Center because of their adherence to a dogma known as "Extra Ecclesiam Nulla Salus" that Voris translated as "outside the Church there is no salvation." Voris identified de Laire as the person who was responsible for attacking the Saint Benedict Center. Voris stated that "Diocesan insiders tell Church Militant the attacks are designed in part by de Laire to improve his image in Rome so he can climb the ladder and be promoted. So he whipped up some spurious claims of heresy against the community and began hurling weighty canonical measures against its members in an effort to gain attention." www.churchmilitant.com/video/episode/vortex-attacking-the-good-guys (last visited Aug. 9, 2021). Voris stated that de Laire took advantage of a "misunderstanding" and issued a letter "stripping the [Saint Benedict Center] of its ability to have a dioscesan-approved priest offer daily Mass, which had been the case for close to a decade." Id.

On June 25, 2019, Church Militant published another article, which was written by Anita Carey. Carey reported on the demolition of a church in Laconia, New Hampshire, which had been approved by de Laire. Carey stated that de Laire had previously targeted the Saint Benedict Center. Carey repeated that complaints had been lodged against de Laire which alleged corruption, abuse of office, violations of the law, and

6

incompetence.  Carey also repeated that de Laire owned an

expensive home and added that a tax lien had been placed on it.


## Discussion

The defendants move to compel additional responses to

certain discovery requests:  Interrogatory 2, Interrogatory 5,

Document Request 1, Document Request 2, Document Request 4, and

Document Request 5.[3]  De Laire objects to the interrogatories and

requests and the motion to compel on a number of grounds.


### A.  Identification of Persons Whose Opinions of de Laire Were Damaged by Defendants' Statements - Interrogatory 2

Interrogatory 2 asked:

Identify each person whose view or opinion of you was
damaged or impaired after reading any of the articles
identified in your Complaint. For each person identified,
provide the person's name, address, email address and phone
number.

Doc. no. 28-2, at *3.  De Laire responded:

Father de Laire objects to Interrogatory No. 2 on
the grounds that it is overbroad, unduly burdensome,
and not proportionate to the needs of this litigation,
and not relevant to the claims and defenses of the
parties. Notwithstanding and without waiving the

---

[3] In the motion, the defendants seek to compel responses to
the listed discovery requests.  In the supporting memorandum,
however, the defendants abandon that straightforward approach
and combine the requests into categories.  To avoid the
confusion generated by the defendants' presentation of the
issues, the court will address the discovery requests
individually, based on the list in the defendants' motion.

foregoing objections, Father de Laire responds as
follows:

The articles, videos and internet postings about me
that were published on churchmilitant.com, and in some
instances re-posted on other forums, resulted in
hundreds of comments made by members of the public.
Those articles, including the comments sections, are in
the possession, custody, or control of Defendants, and
also are publicly available.  While I do not have the
name, address and phone number of those commenters, many
of them expressed their belief in the statements made in
the article and expressed negative views as a result of
that article.  By way of example, a commenter who
identified himself as "Clifton Webb" stated in response
to a prior comment from a supporter, "Your loyalty of
Fr. De laire is admirable.  Yet others, some of whom are
in the clergy, are saying his competence is troubling.
I'll pray for [you] along with those he seems to have
attacked less Christian like."  This comment reflects
that the untrue content of the article, which was
attributed to members of the clergy within the article,
impacted the public's opinion of me, my competence, and
my actions as having "attacked" the members of the St.
Benedict Center.  Another commenter, who identified
themselves as "squire98" stated "Arrogance, insolence
and intentional ignorance are some of the hallmarks of
an unduly ambitious person.  He seems to qualify for the
grade.  In the priesthood, this can mean putting aside
dogma for the sake of heresy in order to grab a seat at
the head of the table."  This person, with whom to my
knowledge I am not acquainted, clearly came to these
conclusions about me as a result of the January 2019
article, to which this comment responded.  Another
commenter, identified as "Dan Knight," stated in the
comments to the January 2019 article:  "Botched? ... or
deliberately mangled. Circumstantially, it would appear
that Father Georges de Laire, the 'canon' lawyer, is
really just a 'fixer.'  Likely for the Lavender Mafia.
Just sayin' ... that's what it looks like."  Once again,
to my knowledge, I am not acquainted with "Dan Knight,"
but he drew conclusions about me as a result of the
churclimilitant.com article to which this comment
responds. Multiple additional comments reflect similar
sentiments.
Further, I have received email communications from
members of the public (as my email address and work

> address were made public in the churchmilitant.com postings), which will be produced pursuant to Fed. R. Civ. P. 34 and are incorporated herein by reference. I further believe that several other readers of the articles and postings also developed a negative view of me, as a result of the untrue statements, despite the fact that they chose not to comment.
>
> In early 2019, I was informed by a seminarian at the diocese of Manchester that he had been approached by a seminarian in another diocese who had inquired about my character due to concerns resulting from the article published by churchmilitant.com on January 19, 2019. I was not provided with this seminarian's name or contact information.
>
> The damage caused to me by being libeled is insidious. It is like I am walking around with a scarlet letter. I never know with any certainty what others are thinking of me. It is an uncomfortable or angry look from another in a public place. A turn of the eyes away from me. It is body language I encounter. It is the embarrassment I feel with colleagues including those who find it necessary to try and comfort me. While all of the people who now dislike me or worse cannot be known with precision, the ridicule and scorn I have been subjected to on the Internet alone is clear evidence of the damage to my reputation in the eyes of many.

Id. at *3–*5. De Laire states that he also responded to the interrogatory by providing documents with hundreds of statements from members of the public about their belief in the defendants' statements and their resulting disapproval of de Laire.

The defendants are not satisfied with de Laire's responses. In support of their motion to compel, the defendants argue that the names, addresses, email addresses, and telephone numbers of each person whose opinion of de Laire was damaged by the defendants' statements is necessary to ascertain his damages. The defendants state: "Either his reputation was damaged or it

wasn't.  If it was, he should be able to identify at least one person to support that allegation."  Doc. no. 28-1, at *5.

De Laire has identified many people who meet the defendants' description.  The defendants have access to contact information for the remarks that were published on the Church Militant website.  De Laire represents and the defendants do not dispute that he provided information about the statements he received from members of the public.  The defendants cite no authority to support their request for specific identifying information in these circumstances.  They have not shown why that information is needed in light of the discovery already produced or why they are unable to find the information they need through their own investigation.  See Fed. R. Civ. P. 26(b)(2)(C).  Further, de Laire stated in his response to the interrogatory that he does not have the requested information about members of the public who have made comments.[4]

To the extent the defendants argue that de Laire must demonstrate the defamatory meaning of their statements through the opinions of third parties, they are wrong.  The defamatory

_____

[4] A party is entitled to discovery of information and documents that are in an opposing party's possession, custody, or control.  See Fed. R. Civ. P. 34(a)(1).  The defendants do not cite authority to show that they are entitled to compel de Laire to find the information they are seeking, particularly when at least some of the information is in the defendants' possession.

meaning of a statement is proven if the challenged statement
<u>tends</u> to lower the plaintiff in the esteem of a sufficient
group.  Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 507 (1st
Cir. 2002) (applying New Hampshire law).  Defamatory meaning
must be apparent from the statement itself, taken in the context
of the publication, that is, a meaning that would be understood
"by hearers of common and reasonable understanding." Thomson,
119 N.H. at 373.  Therefore, evidence of specific individuals'
reactions to the statements may be evidence of defamatory
meaning but is not required to prove defamatory meaning.

     Further, as is noted above, a false statement that tends to
injure the plaintiff in his profession is defamatory per se.
MacDonald, 171 N.H. at 674.  No proof of specific damages is
required when a jury could find defamation per se.  <u>Id.</u>
Instead, "the plaintiff 'can recover as general damages all
damages which would normally result from such a defamation, such
as harm to his reputation.'" Krishnan v. Blueprint Healthcare
LLC, 2021 WL 4255359, at *8 (D. Mass. Sept. 17, 2021) (quoting
Chagnon v. Union Leader Co., 103 N.H. 426, 441 (1961)).

     In their reply, the defendants argue that they are entitled
to the identifying information because de Laire will have to
prove damages caused by the alleged defamation.  They argue that
they must have identifying information about the people whose
opinions were negatively affected, particularly the seminarian

mentioned by de Laire, to assess his damages.  In support, the
defendants rely on Merullo v. Greer, 2012 WL 832832, at *2
(D.N.H. Feb. 10, 2012).

The plaintiff in Merullo was seeking enhanced compensatory
damages for defamation, which puts the damages issue outside of
the general damages referenced above.  Id.  Further, in Merullo
the court compared that case with the circumstances presented in
Chagnon v. Union-Leader Corp., 103 N.H. 426 (1961), and found
that actual evidence of damages was necessary, which might
consist of evidence of the number of people exposed to the
defamatory statements, among other things.  The court did not
order the plaintiff to produce identification for each person
allegedly affected by the defamatory statements.

Therefore, the defendants have not shown that they are
entitled to have de Laire produce a list of names, addresses,
email addresses, and telephone numbers of persons whose opinion
of de Laire was damaged by the defendants' statements.  On the
other hand, however, if de Laire intends to elicit testimony or
evidence from individuals whose opinions of de Laire have been
damaged by the defendants' statements and video, he is required
to identify those persons as is provided in Federal Rule of
Civil Procedure 26(a).

B.  <u>Information about Canonical Cases – Interrogatory 5</u>

In Interrogatory No. 5, the defendants asked:  "Identify by name and case number each canonical matter to which you were assigned or retained in any capacity in the period 2011 through today and provide a brief description of the nature of the matter and the outcome."  Doc. no. 28-2, at *6.  De Laire responded as follows:

> Father de Laire objects to Interrogatory No. 5 as it
> is overbroad, unduly burdensome, and not proportional
> to the needs of this litigation.  Specifically,
> Interrogatory No. 5 contains no limitation on the
> subject matter and is temporally overbroad.  Father de
> Laire further objects to Interrogatory No. 5 on the
> grounds that it seeks information that is privileged
> and confidential involving third parties that are not
> parties to this litigation.  Interrogatory No. 5 is
> further barred in whole or in part by the
> ecclesiastical abstention doctrine.  In light of the
> foregoing objections, Father de Laire cannot and will
> not respond to Interrogatory No. 5.

Id.  In their memorandum in support of the motion to compel, the defendants limited the request to the years between 2014 and 2020 and to matters addressing "clergy and marriages."  Doc. 28-1, *6.

The defendants argue that de Laire put his skills and reputation as a canon lawyer at issue by challenging their statements as defamatory.  They cite the following four paragraphs of the complaint:

> (1) "Mr. Voris went on to falsely accuse Father
> de Laire of conducting his duties 'with incompetence

13

in canonical matters also apparently well-known and corroborated in the Roman Curia.'"  Doc. 1, ¶ 50.

>     (2)  "Voris then continued with the fabrication that 'de Laire is nicknamed in those halls [of the Roman Curia] <u>un incasinaro</u>, "a troublemaker," owing to his notorious botching of canonical cases involving clergy and other matters.'"  <u>Id.</u>, ¶ 52.

>     (3) "In light of Father de Laire's remarkable record, Mr. Voris's statement that 'multiple independent sources in the Roman Curia say he has repeatedly botched diocesan cases and embarrassed his bishop before the Roman congregations of the Curia' is also false."  <u>Id.</u>, ¶ 54.

>     (4) "Voris published that 'Church Militant has learned he is currently outsourcing work product that he as a canon lawyer is being paid well by the diocese to complete himself.'"  <u>Id.</u>, ¶ 55.

They further argue that they must be allowed to challenge de Laire's contention "that he is a competent and respected canon lawyer."  Doc. 28-1, at *6.

It appears that the defendants again are confused about the elements of the defamation alleged.  To prove his claim, de Laire need not prove he is competent or respected.  Instead, he must prove that the defendants' alleged defamatory statements are false.

The alleged defamatory statements are attributed to third parties.[5]  The defamation is that colleagues in the church have

---

[5] The court previously construed the challenged statements as publication of statements attributed to third parties.  <u>See</u> doc. no. 24, at *13.  The defendants do not contest that determination.

14

reported that de Laire is incompetent and has repeatedly botched cases. De Laire can prove those statements are false by showing that no such statements were made or that the underlying statements are not true. Gray v. St. Martin's Press, 221 F.3d 243, 248 (1st Cir. 2000).

To the extent there is an issue about whether the underlying statements are true, evidence pertaining to de Laire's competence in his professional role as judicial vicar may be relevant to that determination. The relevant period about de Laire's competence ended, however, when the defendants' sources reported his lack of competence. Therefore, the relevant period ended before January of 2019 when the alleged defamatory statements were made. The defendants do not explain why they are seeking cases de Laire handled through 2020.

In addition, the defendants have access to the information about what cases were handled improperly through their sources who made the statements to them. Their sources presumably can provide more specific information about what cases were said to be improperly handled, and the defendants could ask for focused discovery on those cases. De Laire states that during discovery discussions the defendants represented that they wanted information about all of his cases so that they could have an expert comb through the records to determine whether each matter was handled properly. That investigation appears to be far

afield from the pertinent issues in this case, and, as de Laire states, suggests a fishing expedition.

Although the defendants narrowed the request slightly for purposes of the motion to compel, the request remains overly broad and unduly burdensome in the circumstances of this case. See Fed. R. Civ. P. 26(b)(2)(C).

C. Communications with Union Leader – Request 1

In Request 1, the defendants asked de Laire to produce "[a]ll communications between you and any person or agent of the Manchester Union Leader." Doc. 28-2, at *7. De Laire responded as follows:

> Father de Laire objects to Request No. 1 on the grounds that it is overbroad, unduly burdensome and not proportionate to the needs of this litigation. Specifically, Request No. 1 requests all communications over all time, without a limitation as to date or subject matter. In light of the foregoing objections, and absent any agreed-upon revision to the scope of the request, Father de Laire rests on his objections and will not produce the requested documents.

Id. The defendants move to compel de Laire to produce the information they requested on the ground that de Laire is a limited-purpose public figure and that the requested information will allow them "to test exactly how much de Laire has attempted to influence the discussion about Chruch [sic] issues by reviewing his communications with the Union Leader and about Defendnats [sic]." Doc. 28-1, at *8.

16

As the defendants acknowledge, a limited-purpose public figure is an individual who voluntarily injects himself into a specific public controversy that gave rise to the defamation and becomes a public figure, but only for those issues.  McKee v. Cosby, 874 F.3d 54, 61 (1st Cir. 2017).  The defendants' production request has no limit as to subject matter or time frame.  The request is not limited to seeking information about communications with respect to the controversy with the Saint Benedict Center, which gave rise to the allegedly defamatory statements in this case.  Therefore, on its face the request is overbroad, and a response cannot be compelled.

D.  Documents Related to Purchasing Amherst Property – Request 2

In Request 2, the defendants asked for "[a]ll documents related to the purchase of the property at 21 Clark Island Road, Amherst, NH 03031 including the source of funds for that purchase."  Doc. no. 28-2, at *7.  De Laire responded as follows:

> Father de Laire objects to Request No. 2 on the
> grounds that it is vague and ambiguous.  Father de
> Laire further objects to Request No. 2 on the grounds
> that it is overbroad, unduly burdensome, and not
> proportionate to the needs of this litigation.  Father
> de Laire further objects to Request No. 2 to the
> extent that it seeks documents which are subject to
> the attorney-client privilege and/or the work product
> doctrine.  Notwithstanding the foregoing, Father de
> Laire will produce documents sufficient to show the

terms of the purchase of the property at issue, the
ownership of the property, and the source of the funds
for the purchase.

Id. The defendants contend that the document de Laire produced

to show how he paid for the Amherst property "raises more

questions than it answers" and does not explain how he was able

to buy the property. Doc. 28, at *5, n.2. De Laire states in

his objection that the defendants do not understand the document

that he produced, which he contends shows the source of the

money used to purchase the Amherst property.[6]

The document that de Laire produced shows that he had

substantial funds available to purchase the Amherst property.

The defendants now want to know the source of those funds, but

they did not propound an interrogatory asking for that

information. The defendants have not shown that de Laire failed

to provide the information sought in Request 2.


    E.   Income Tax Returns – Request 4

    In Request 4, the defendants asked for de Laire's "federal

income tax returns for the tax years 2011 through 2020 and, when

_____

    [6] An article in the Union Leader reported that de Laire's
family "made a fortune in the French perfume industry." Doc.
no. 44-1, at *9. The defendants' theories that the article will
taint the jury are not persuasive and are not related to the
discovery issues before the court.

18

available, 2021." Doc. no. 28-2, at *8. De Laire responded as
follows:

> Father de Laire objects to Request No. 4 on the
> grounds that it is overbroad, unduly burdensome and
> not proportionate to the needs of this litigation.
> Father de Laire further objects to Request No. 4 on
> the grounds that it is not reasonably calculated to
> lead to admissible evidence. Father de Laire objects
> to Request No. 4 on the grounds that, pursuant to
> applicable law, federal tax returns are subject to a
> qualified privilege. Here, the requested tax returns
> are irrelevant to the action, and Defendants have not
> and cannot demonstrate a substantial a need for said
> documents. Based on the foregoing objections, Father
> de Laire will not produce his tax returns.

Id. The defendants assert that they are entitled to de Laire's
tax returns because de Laire has alleged damage to his
professional reputation and the tax returns will show whether he
has lost work as a result of the defamation. They also seek the
tax returns to get further information about de Laire's finances
with respect to his purchase of the Amherst property.

De Laire contends that the tax returns are irrelevant to
the case because he is not seeking lost income and has so
informed the defendants. He further states that the income tax
returns are irrelevant to the purchase of the Amherst property,
which occurred in 2012, because the source of the funds for the
purchase has been disclosed and is not related to his income.[7]

---

[7] The defendants do not explain the relevance of income tax
returns for years after the property was purchased and before
the alleged defamation occurred.

In their reply, the defendants continue to argue that the tax returns are relevant to the source of funds used to purchase the Amherst property.[8]

The defendants have not shown that de Laire's tax returns for the years between 2011 and 2020 are relevant to any issue in this case.  Therefore, he will not be compelled to produce them.


F.   Communications with Third Parties – Request 5

The defendants requested "[a]ll communications between you and any person other than a civil attorney retained by you concerning any of the Defendants."  Doc. no. 28-2, at *8.  De Laire responded:

> Father de Laire objects to Request No. 5 on the
> grounds that it is overbroad, unduly burdensome, and
> not proportionate to the needs of this litigation.
> Father de Laire further objects to Request No. 5 on
> the grounds that it is not reasonably calculated to
> lead to the discovery of admissible evidence.
> Specifically, Request No. 5 contains no limitations as
> to subject matter or time period. In light of the
> foregoing, and absent an agreed-upon limitation to the
> scope of Request No. 5, Father de Laire will not
> produce documents responsive to Request No. 5.

---

[8] The defendants assert that they are entitled to "exhaustive discovery on the source of de Laire's significant wealth."  Doc. 48, at *2.  If the defendants wanted information about de Laire's wealth and if that information is an appropriate subject for discovery in this case, which has not been shown, they should have propounded requests that focused on those matters.  They did not do that and instead asked for income tax returns, which de Laire has shown are not related to his damages or to the source of the funds used to purchase the Amherst property.

Id. De Laire states in his objection that he has produced his communications concerning the defendants.

The defendants moved to compel de Laire to produce documents in response to Request 5. In their supporting memorandum, however, the defendants only refer to Request 5 in passing as part of their inquiry into whether de Laire is a public figure. That is insufficient to support the motion to compel. In any case, a further response to the request cannot be compelled given the lack of apparent relevance and the obvious overbreadth of the request.

## Conclusion

For the foregoing reasons, the defendants' motion to compel further discovery responses (document no. 28) is denied.

The plaintiff may file a motion for an award of reasonable expenses pursuant to Federal Rule of Civil Procedure 37(a)(5)(B) **on or before December 10, 2021.** The defendants will have fourteen days to respond.

SO ORDERED.

_____
Andrea K. Johnstone
United States District Judge

November 22, 2021

cc:  Counsel of record.