# EXHIBIT C

REV. GEORGE F. DE LAIRE, J.C.L.
October 13, 2021

```
            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW HAMPSHIRE


VERY REVEREND GEORGES F. )
de Laire, J.L.C.         )
                         )
     Plaintiff,          )
                         )
v.                       ) No. 1:21-CV-00131-JD
                         )
GARY MICHAEL VORIS,      )
ANITA CAREY,             )

ST. MICHAEL'S MEDIA AKA  )

CHURCH MILITANT,         )

     Defendants.         )

_____)


        DEPOSITION OF:   REV. GEORGES F. DE LAIRE, J.C.L.


        TAKEN BY:        DEFENDANTS


        PLACE:           HELD REMOTELY


        DATE:            OCTOBER 13, 2021

                         Commencing at 11:11 a.m. EST


        REPORTED BY:     CATHERINE BURNS

                         Notary Public

                         Commonwealth of Massachusetts
```

REV. GEORGE F. DE LAIRE, J.C.L.
October 13, 2021

Page 114

1  Q   Okay.  And to purchase the house in Amherst, you
2  borrowed the money, is that correct?
3  A   Yes, I did borrow the money.
4  Q   Okay.  And what was that loan secured by?
5  A   My own assets.
6  Q   Okay.  And what is the extent of your asset
7  portfolio in American dollars today?  A rough estimate.
8      MR. COOPER:  I object on relevance grounds and
9  instruct you not to answer that question.
10     MS. KLAUS:  Well, it has to do with the source of
11 the funds that you claim is defamatory.
12     MR. COOPER:  Which is two and a half years ago.
13 So why don't you ask him for --
14     MS. KLAUS:  So are you -- are you instructing him
15 not to answer that question?  Howard?
16     MR. COOPER:  On his assets today, I am
17 instructing you not -- I'm instructing him not to answer.
18 If you ask --
19     MS. KLAUS:  Okay.
20     MR. COOPER:  -- a question that has relevance, I
21 will not instruct him not to answer.
22 BY MS. KLAUS:
23 Q   What was the extent of your holdings in 2012,
24 when you purchased the property?
25 A   I do believe that that information -- well, no.

Page 115

1  I do not know specifically.
2  Q   And who would know?
3  A   The person at the bank who manages my family's
4  assets.
5  Q   Was it -- were you personally worth more than $10
6  million in 2012 when you purchased the property?
7  A   Was I personally worth more than -- I don't know
8  that --
9  Q   Total amount.
10 A   Was I -- was I personally worth more than $10
11 million at the time of the purchase of my property?  I do
12 believe that my life is worth more than $10 million, yes.
13 Q   Yeah, okay, that's very clever, Father, but I'm
14 asking whether the extent of your assets were worth more
15 than $10 million.  Of your holdings.
16 A   Were my assets greater than $10 million at the
17 time of the purchase of my house?  No.
18 Q   No.  Was it worth more than -- was the extent of
19 your holdings more than $5 million at the time you
20 purchased the house?
21 A   I do not believe so.
22 Q   And until your mother -- your mother lives in
23 that house part-time, correct?
24 A   That is correct.
25 Q   And where does she live when she's not living in

Page 116

1  that house?
2  A   She lives at -- she lives in Normandy.
3  Q   How often does she live in that house?  How many
4  months out of the year.
5  A   My mother lives -- it varies from year to year,
6  because she suffers from Alzheimer's, and it depends on the
7  care that we are able to provide in one location versus the
8  other.
9  Q   In 2019 how many -- how much time did she spend
10 in your house?
11 A   In which house?
12 Q   Your house in Amherst.
13 A   2019 my mother spent, if I recall --
14     Eight month.  A little bit over eight month.
15 Q   Did you have full-time care for her at that
16 house?
17 A   In 2019?  No.
18 Q   Yes.  No?
19     Did you have part-time care?
20 A   Yes.
21 Q   Was there somebody with her any time you were not
22 there?
23 A   There were -- no, in 2019, majority of the time
24 she was by herself.
25 Q   And until your mother moved in, who lived in the

Page 117

1  house in Amherst?
2  A   Till my mother moved in who lived in my house?
3  Q   Yes.
4  A   I use my house for my days off and some of my
5  vacation time.
6  Q   Did anybody other than you live there until your
7  mother moved in with you?
8  A   And by "living there" you don't mean visiting?
9  Q   Correct.  For longer than two weeks.
10 A   Yeah, nobody.
11 Q   Okay.  And why did you buy the house in Amherst?
12 A   Because it was something that had been agreed
13 upon with my father, before his passing, that we would care
14 for my mother and make sure that we cared for my mother,
15 and it was evident at that point that -- in 2012, 2013, it
16 was evident that my mother was not going to be able to live
17 by herself any more, and so I built my house in
18 anticipation of her moving in.  And -- and to provide for
19 my siblings and nieces and nephews, to become more of a
20 family house for the whole of the family.
21 Q   When did your mother first move into the house?
22 A   My mother moved in in the winter of 2019.  Or,
23 I'm sorry.  Before Christmas -- before Christmas of 2018.
24 Q   And you purchased the house in 2012?
25 A   I purchased the property -- was it '12 or '13?

REV. GEORGE F. DE LAIRE, J.C.L.
October 13, 2021

Page 270
1  You say, "It is the embarrassment I feel with colleagues."
2  BY MS. KLAUS:
3      Q    So who's colleague do you feel -- what colleagues
4  do you feel embarrassed with?
5      A    I can give you the same names that I gave you
6  earlier as to members of the administration of the Diocese
7  of Manchester with whom I related.  And who are dependent
8  upon my knowledge of canon law for their ability to execute
9  their own offices.
10     Q    Anybody else?  Other than the ones you named
11 earlier?
12     A    I -- uhm --
13          I think it is fair for me to say that it is just
14 about everybody that works in the administration building.
15 And I know that that information is available to you at the
16 Diocesan website, because that is obviously where people
17 got -- turn to in order to provide names of folks who may
18 have information as to my incompetence in canonical
19 matters.
20     Q    Okay.
21     A    So --
22     Q    Do you have personal communications with Damien
23 Fisher?  Things unrelated to church matters?
24     A    No.
25     Q    So the only communications you have with him

Page 271
1  relate to church matters?
2      A    Communications that are related to -- to
3  conversations or to communications on church matters, yes.
4      Q    Okay.  Nothing other than that?
5      A    I think you've already asked me whether I
6  socialize with the man, you've asked me whether I interact
7  with the man, and I think I've already answered to you
8  that, no, I do not.
9      Q    Do you text with him?
10     A    Excuse me?
11     Q    Do you text -- t-e-x-t -- do you text with him?
12     A    I think that there have been some texts between
13 Mr. Damien -- Mr. Fisher and I.
14     Q    Okay.  And what's the number you text him from?
15 Your number.
16          And this can be AEO, if you want.  "Attorneys
17 Eyes Only."  I just want -- for purposes of checking.
18     A    It's the same telephone number
19
20          MS. ELOVECKY:  And we will mark that "Attorneys
21 Eyes Only."  Thank you.
22          MS. KLAUS:  Okay.
23          Though we're excused to answer.
24          MS. ELOVECKY:  All right.  I may have a couple
25 questions.  I would like to just take three minutes to

Page 272
1  review my notes --
2          MS. KLAUS:  Okay.
3          MS. ELOVECKY:  -- to confirm.  Okay?
4          THE VIDEOGRAPHER:  Okay.  So we're going to go
5  off the record.  The time is now 2239 UTC.
6  [OFF THE RECORD]
7  [ON THE RECORD]
8          MS. ELOVECKY:  All right.  So I'm going to share
9  one of the documents.  I think that you provided this but
10 I'm not sure that you showed it.
11         THE VIDEOGRAPHER:  I'm sorry, we're not on the
12 record as of yet.  Are you ready at this time to continue
13 or --
14         MS. ELOVECKY:  Yes.
15         MS. KLAUS:  Yes.
16         THE VIDEOGRAPHER:  Okay.  Catherine, are you
17 ready as well?
18         THE REPORTER:  Yes.
19         THE VIDEOGRAPHER:  Okay.  Pause for three seconds
20 in order to resume the recording.
21         Okay.  We're now back on the record.  The time is
22 now 2243 UTC.
23         MS. ELOVECKY:  Thank you.
24         As I said before we were on the record, I do have
25 probably less than five questions for Father de Laire.  So

Page 273
1  first, I'm going to share my screen.
2                      CROSS-EXAMINATION
3  BY MS. ELOVECKY:
4      Q    Father de Laire, I've just shared a document on
5  the screen.  Do you see the document in front of you?
6      A    Yes, I do.
7      Q    Prior to today, have you seen this document?
8      A    No.
9      Q    This document states at the top that it is from
10 the Amherst Police Department, is that correct?
11     A    That is what I can read.
12     Q    And there is a date that is in red that says
13 January 23, 2019.  Do you see that?
14     A    Yes.
15     Q    And was that the date that you spoke with
16 someone, as you testified to earlier, at the Amherst Police
17 Department?
18     A    So I don't have a specific recollection of the
19 date, but if that is how it has been recorded by the police
20 department, I will accept that.
21     Q    Okay.  So I wanted -- well, first of all, I just
22 want to bring your attention at the top of the document,
23 where it says "call reason," and it states in bold, "walk
24 in, dash, give advice," do you see that?
25     A    Yes.