UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Very Reverend Georges F. de Laire, J.C.L.

Civil No. 21-cv-131-JL
v.                                        Opinion No. 2023 DNH 095

Gary Michael Voris, Anita Carey,
St. Michael's Media a/k/a Church Militant,
and Marc Ballestrieri

**MEMORANDUM ORDER**

Resolution of this summary judgment motion turns on the scope and applicability

of the concepts of "limited-purpose public figure" and "actual malice" under the First

Amendment of the United States Constitution. St. Michael's Media, Inc. a/k/a Church

Militant published unflattering articles and a video about the Very Reverend Georges F.

de Laire, J.C.L. that arose from a doctrinal dispute between officials of the Roman

Catholic Church and a small community of Catholics in New Hampshire.[1] Father de

Laire brings defamation claims against St. Michael's Media/Church Militant; its

president, Gary Michael Voris; a reporter, Anita Carey, and the purported author of the

first article, Marc Ballestrieri.[2] The defendants, except defaulted defendant Ballestrieri,

---

[1] J.C.L. stands for Licentiate in Canon Law. Licentiate in Canon Law - Catholic University - Washington DC | CUA https://canonlaw.catholic.edu/academics/degree-programs/jcl/index.html (last visited April 11, 2023).
[2] For reasons explained infra, the identity of the author or authors of the January 17 article may now be in question. The defendants' last representation to the court was that Mr. Ballestrieri was the author of the article. The court will assume, without deciding, that Mr. Ballestrieri was the author, based on the defendants' representation of Mr. Ballestrieri's authorship, but only for purposes of this order on the defendants' motion for

move for summary judgment on the grounds that Father de Laire is a limited-purpose public figure and cannot prove the elements of defamation applicable to a plaintiff with that status.[3] Father de Laire objects, arguing both that he is not a limited-purpose public figure and that there are material factual disputes on the merits of the defamation claim precluding summary judgment, even if the limited-purpose public figure standard applies.

The court has subject matter jurisdiction under 28 U.S.C. § 1332. After reviewing the record and the briefing and considering oral argument and additional court-requested briefing, the court grants the motion in part and denies it in part. The court finds that Father de Laire is a limited-purpose public figure with respect to the dispute between the Saint Benedict Center and Roman Catholic Church governance (the Vatican and the Diocese of Manchester) about "Feeneyism" and the doctrine of *Extra Eccesiam Nulla Salus* or "Outside of the Church There is No Salvation." The court also finds that certain—but not all—of the allegedly defamatory statements are related to Father de Laire's limited-purpose public figure status and that the actual malice standard applies to those statements. The court grants summary judgment as to those issues but otherwise denies the motion.  Marc Balestrieri is defaulted and was not a party to the motion for summary judgment.

## I.  **Applicable standard**

_____

summary judgment. Therefore, references to Mr. Balestrieri as the author of the January 17 article are not findings and are acknowledged to be disputed.
[3]Marc Balestrieri was added as a defendant in the First Amended Complaint but failed to appear. Default was entered against Mr. Balestrieri on October 25, 2022. As a result, he has not moved for summary judgment. The court's references to "defendants" in this order do not include Balestrieri.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute is one that would permit a rational factfinder to resolve the issue in favor of either party, and a material fact is one that has the potential to affect the outcome of the suit under the applicable law." Gattineri v. Wynn MA, LLC, 63 F.4th 71, 85 (1st Cir. 2023). The court draws all reasonable inferences from the record facts in favor of the nonmovant. Id.

## II.  Background

Father de Laire is a parish priest in the Roman Catholic Church in the Diocese of Manchester, New Hampshire.[4]  He also serves as the Judicial Vicar and the Vicar for Canonical Affairs for the Diocese.[5] In his role as Judicial Vicar, Father de Laire and the Bishop (the chief clergyman of the diocese) constitute the Tribunal of the Diocese, that is, its internal judiciary, and Father de Laire supervises the cases and trials brought before the Tribunal.[6] In his role as Vicar for Canonical Affairs for the Diocese, Father de Laire assists the bishop with diocesan governance, an administrative role.[7] As Vicar for Canonical Affairs, Father de Laire addressed matters involving the Slaves of the Immaculate Heart of Mary, a small community comprised of Catholics located in

---

[4] Doc. no. 140-1, ¶¶ 6 & 13.
[5] Id., ¶ 8.
[6] Id., ¶ 10.
[7] Id., ¶ 9

Richmond, New Hampshire, incorporated as the Saint Benedict Center, Inc. ("SBC").[8]

Louis Villarrubia, known as Brother Andre Marie at the SBC, is its prior.[9]

Gary Michael Voris is president of St. Michael's Media, located in Michigan,

which is also known as Church Militant.[10] Mr. Voris operates a website for Church

Militant where he posts articles, videos, and podcasts. Marc Balestrieri is a licentiate in

(in other words is authorized to practice) canon law.[11] Mr. Balestrieri has advised Church

Militant and the SBC on canonical matters, and Mr. Voris was aware that Mr. Balestrieri

advised the SBC as well as Church Militant.[12] Anita Carey was a reporter for Church

Militant when it published articles and a video about Father de Laire.[13]

In 2016, the Congregation for the Doctrine of the Faith, a department of the

Roman Catholic Church in Rome (now known as the Dicastery for the Doctrine of the

Faith and less formally known as the Holy Office),[14] determined that the SBC's position

on a religious doctrine, *Extra Eccesiam Nulla Salus* or "Outside of the Church There is

No Salvation," was unacceptable.[15] According to an article in the <u>Catholic Herald</u> that

---

[8] Id. ¶ 11; doc. no. 138-1, at 2.

[9] Doc. no. 140-2, at 11; doc. no. 138-12, at 5.

[10] The background information about Mr. Voris, Ms. Carey, and St. Michael's Media is taken from the First Amended Complaint. Doc. no. 115.

[11] Canon law is the body of codified ecclesiastical law promulgated by the Roman Catholic Church through its ecclesiastical counsels and the pope.

[12] Doc. no. 138-10, at 131; doc. no. 140-5 at 11; doc. no. 140-6, at 7. Default was entered against Mr. Balestrieri on October 25, 2022 (doc. no. 134).

[13] Doc. no. 117, at 5.

[14] The Congregation/Dicastery/Holy Office exists to promote and defend Church doctrine in faith and morals.

[15] Doc. no. 140-1, ¶ 17; doc. no. 138-1, at 3.

was submitted by the defendants, the SBC's strict interpretation of that religious doctrine is based on the teachings of Father Leonard Feeney and is known as "Feeneyism".[16]

The Church governance's decision that the SBC's position was unacceptable was conveyed to the SBC by Monsignor Giacomo Morandi, who was then the undersecretary of the Congregation for the Doctrine of the Faith.[17] Despite that directive, the SBC continued to adhere to its own interpretation of the doctrine.[18] After consultations with colleagues in the Diocese of Manchester and with officials in Rome, Father de Laire signed a Decree of Precepts on January 3, 2019 (effective January 7, 2019) that set certain obligations and restrictions for the SBC.[19]

The Diocese of Manchester issued a press release on January 8, 2019, and a memorandum to priests on January 9.[20] Father de Laire granted interviews in January of 2019 to The Union Leader; the Catholic Herald, and The Sentinel, the newspaper of record in Keene, New Hampshire, the closest New Hampshire city to the SBC.[21] Father de Laire states that he granted the interviews to make the Catholic faithful aware of the status of the SBC following issuance of the Decree of Precepts.[22] On January 17, 2019, Church Militant published an article constituting the core of this litigation. The January

---

[16] Doc. no. 138-12, at 12.  The Catholic Herald article also states: "'Feeneyism' is the belief that, unless one is baptised with water and the trinitarian formula, there is no hope of going to heaven." Doc. no. 138-12, at 13.

[17] Doc. no. 140-1, ¶ 17.

[18] Id.

[19] Id., ¶¶ 18 & 19.

[20] Doc. nos. 138-8 & 138-9.

[21] Id., ¶ 20.

[22] Id.

17 article, titled "NH VICAR CHANGES DOGMA INTO HERESY," with a subtitle:
"Fr. Georges de Laire cracks down on Saint Benedict Center," contained ten statements
alleged by Father de Laire to be defamatory.[23]  Church Militant did not publish the name
of the author, using only the Church Militant byline, and did not disclose that Mr.
Balestrieri was the author of the article until well into this litigation, after a lengthy
discovery dispute and some eight months after representing in its answer that Mr. Voris
wrote the article.[24]

Mr. Balestrieri's article featured a photograph of Father de Laire, disputed the
Precepts, stated that the SBC was being persecuted by Father de Laire, and included
statements criticizing Father de Laire's competence, integrity, and mental health.[25] Mr.
Voris through Church Militant re-published Mr. Balestrieri's statements in a video titled
"Attacking the Good Guys" published in April of 2019 and in an article authored by Ms.
Carey and published on June 25, 2019.[26]

Father de Laire brought suit against Church Militant, Mr. Voris, and Ms. Carey
alleging that Mr. Balestrieri's statements in the article, repeated in subsequent
publications, were defamatory.[27] Father de Laire filed an amended complaint on June 14,
2022, after it was revealed that the defendants' claim in their original answer that the
January 17 article was authored by Mr. Voris was false and that the actual author was Mr.

---

[23] Doc. no. 115-3.
[24] Doc. no. 101-5; doc. no. 140-4, at 2. y
[25] Doc. 115-3.
[26] Doc. no. 138-1, at 5; Doc. no. 140, at 7 (citing Church Militant website).
[27] Doc. no. 1. The claim for intentional infliction of emotional distress was later
dismissed. Doc. no. 24.

Balestrieri.[28] The amended complaint added Mr. Balestrieri as a defendant. Father de

Laire alleges that the following statements in the defendants' publications are

defamatory:[29]

(1) Father de Laire is said by current work colleagues to be emotionally unstable in his role as chief canonical judge of the diocese and counselor to his bishop.

(2) Father de Laire is said to be desperate to repair his image and save his chances at being promoted as bishop or an official of the Roman Curia.

(3) Father de Laire conducts his duties with incompetence in canonical matters that is also apparently well-known and corroborated in the Roman Curia.

(4) Father de Laire is nicknamed in the Roman Curia as an incasinaro, "a troublemaker," owing to his notorious botching of canonical cases involving clergy and other matters.

(5) Multiple independent sources in the Roman Curia say he has repeatedly botched diocesan cases and embarrassed his bishop before the Roman congregations of the Curia.

(6) Father de Laire is currently outsourcing work product that he as a canon lawyer is being paid well by the diocese to complete himself.

(7) Priests and laity who currently work with him in the diocese say that Father de Laire is a vindictive and manipulative clericalist who pines to be named a bishop or an official of the Congregation for the Doctrine of the Faith.

(8) At least three complaints against de Laire have been filed with the Holy See that together allege corruption, abuse of office, grave violations of the law, and incompetence as a canonist.

(9) Additional questions are raised by his acquisitions. Church Militant has learned that de Laire now frequently resides at an estate located near Manchester that he purchased and that is currently valued at $1.5 million.

(10) Father de Laire, individually, has been responsible for "attacks" against the Saint Benedict Center since shortly after his promotion to Judicial Vicar about two years ago.

---

[28] Doc. no. 113.

[29] The defendants provided a list of defamatory statements taken from the First Amended Complaint as an exhibit to their motion for summary judgment, and Father de Laire agrees that the list is accurate. Doc. no. 138-4, at 2; Doc. 140, at 6. The statements in the defendants' list are provided here with slight editing for syntax.

The court held oral argument on the motion for summary judgment on June 15, 2023. Defaulted defendant Balestrieri notified the court that he planned to attend. After he arrived, counsel for Father de Laire served Mr. Balestrieri with a deposition subpoena. The court then discussed Mr. Balestrieri's default with him. Mr. Balestrieri stated that he intended to move to vacate the default but that he had not retained counsel and had been unable to do so. After the proceeding concluded, Mr. Balestrieri signed an agreement with all counsel to be deposed in person on July 12, 2023, at Father de Laire's counsel's office in Boston.[30] Despite that signed agreement, Mr. Balestrieri did not appear for his scheduled deposition.

On June 26, 2023, the defendants made a supplemental discovery disclosure that included emails from Mr. Balestrieri to Church Militant personnel in which Mr. Balestrieri used the pseudonym "tommoore".[31] Although the defendants represented that the emails were all from 2018, counsel for Father de Laire found a text message (included in the more than 100-page production) from Mr. Voris to Mr. Balestrieri dated June 15 (no year now understood to be 2023). The message stated:

> Marc-you are committing perjury. You know you write that article. What you don't know is this morning we found proof – your digital fingerprints – all totally documented – on that article.
> Remember the email address – TomMoore@Churchmilitant.com? We have all the receipts.
> You go through with this and we will rain down on you publicly.
> You are a liar and a Welch.[32]

---

[30] Doc. no. 148-1.

[31] An apparent reference to St. Thomas More, a Catholic saint who lived in 16th Century England.

[32] Doc. no. 157-10.

Counsel for the defendants later clarified that Mr. Voris sent the text to Mr. Balestrieri on June 15, 2023, the day of oral argument on the motion for summary judgment, after Mr. Balestrieri had been subpoenaed for his deposition, but before the deposition occurred.[33]

As explained above, Mr. Voris initially represented that he wrote the January 17 article but then named Mr. Balestrieri as the author. Mr. Voris's text message to Mr. Balestrieri implies that Mr. Balestrieri denied that he wrote the article. Br. Andre Marie (Louis Villarrubia) testified during his deposition as prior of the SBC that Mr. Balestrieri told him that he did not write the January 17 article and that his impression from Mr. Balestrieri was that the article may have been the result of a collaboration.[34] As a result, the identity of the author (or authors) of the January 17, 2019, article may again be in question.

The defendants recently disclosed that Church Militant loaned Mr. Balestrieri money pursuant to an agreement dated June 4, 2022,[35] in the amount of $54,374.80, without interest on the unpaid principal, to be repaid no later than December 31, 2022.[36] The defendants state that the loan was for the purpose of paying medical expenses for Mr. Balestrieri's mother, but the loan agreement does not state a purpose or reference medical expenses. The loan agreement also provides for additional advances to Mr. Balestrieri for

---

[33] Doc. no. 157, at 6.
[34] Doc. no. 140-2, at 9.
[35] Doc. no. 165, at 2; doc. no. 168-1, at 1.
[36] Doc. no. 168-1, at 1.

up to $10,625.20.[37] The defendants represent that the loan was "alluded to" in the

threatening text that Mr. Voris sent to Mr. Balestrieri on June 15, 2023.[38]

## III. Analysis

The defendants move for summary judgment, asserting that Father de Laire cannot

prove his defamation claim. They contend that Father de Laire is a limited-purpose public

figure, which requires proof that the published statements in question were made with

actual malice. In response, Father de Laire argues that he was not a limited-purpose

public figure with respect to the allegedly defamatory statements and that, even if he

were, he can prove actual malice.

## A. Defamation

"'Modern defamation law is a complex mixture of common-law rules and

constitutional doctrines.'" Cheng v. Neumann, 51 F.4th 438, 443 (1st Cir. 2022) (quoting

McKee v. Cosby, 874 F.3d 54, 60 (1st Cir. 2017)). While the First Amendment protects

most speech, certain exceptions exist, and generally "[f]alse and defamatory statements

of fact . . . have 'no constitutional value.'" Counterman v. Colorado, 143 S. Ct. 2106,

2115 (2023) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974)). In a

diversity case, the forum state provides the common-law rules of defamation. See Currier

v. Town of Gilmanton, --- F. Supp.3d ---, 2022 DNH 131, 2022 WL 11961748, at *3

(D.N.H. Oct. 20, 2022) (McCafferty, C.J.).  "Under New Hampshire law, a plaintiff

proves defamation by showing that the defendant failed to exercise reasonable care in

---

[37] Id., at 2.
[38] Doc. no. 165, at 2.

10

publishing a false and defamatory statement of fact about the plaintiff to a third party."
Id. (internal quotation marks omitted).

Despite the general rule, the First Amendment provides certain safeguards when a plaintiff is a public figure because of the concern that "the uncertainties and expense of litigation will deter speakers from making even truthful statements." Counterman, 143 S. Ct. at 115; McKee v. Cosby, 874 F.3d 54, 60 (1st Cir. 2017) ("Superimposed on any state's defamation law are First Amendment safeguards."). For that reason, "a public figure cannot recover for the injury a [false and defamatory] statement causes unless the speaker acted with 'knowledge that it was false or with reckless disregard of whether it was false of not.'" Counterman, 143 S. Ct. at 2115 (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)).  This standard is known as actual malice. N.Y. Times, 376 U.S. at 280. Whether a defamation plaintiff is a public figure raises a question "of constitutional dimension and, thus, federal law controls." Pendleton v. City of Haverhill, 156 F.3d 57, 68 (1st Cir. 1998).

## B. **Limited-purpose public figure**

The Supreme Court has extended public figure status "to an otherwise private figure who 'voluntary injects himself or is drawn into a particular public controversy,' thus becoming a limited-purpose public figure." Lemelson v. Bloomberg L.P., 903 F.3d 19, 23 (1st Cir. 2018) (quoting Gertz, 418 U.S. at 351). "The critical questions for limited-purpose public figure status are whether a matter of 'public controversy' existed prior to the alleged defamation, and whether the defamed individual deliberately 'thrust [herself] into the vortex' of that controversy or otherwise 'engage[d] the public's attention

in an attempt to influence its outcome.'" McKee v. Cosby, 874 F.3d 54, 61 (1st Cir. 2017) (quoting Gertz, 418 U.S. at 351-52) (brackets inserted in McKee).  That determination presents a legal question for the court. Id. The defendants bear the burden of proving that the plaintiff is a limited-purpose public figure for purposes of the defamation claim. See Franchini v. Bangor Publishing Co., Inc., 560 F. Supp. 3d 312, 326-27 (D. Me. 2021); Wofse v. Horn 523 F. Supp. 3d 122, 134 (D. Mass. 2021).

### 1. **Public controversy**

The first step in a limited-purpose public figure determination requires identification of the public controversy, if any, that relates to the allegedly defamatory statements. Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 13 (1st Cir. 2011). "To rise to the level of a public controversy, the matter must be more than a 'cause célèbre,' Time, Inc. v. Firestone, 424 U.S. 448, 454, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), or 'a matter that attracts public attention,' Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 167, 99 S. Ct. 2701, 61 L.Ed.2d 450 (1979)." Id.  Instead, the defamation defendant must show "that persons actually were discussing some specific question and a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." Id. (cleaned up). In addition, the public controversy must have existed before the allegedly defamatory statements were published. Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 13 (1st Cir. 2011).

The defendants assert that the public controversy that caused them to publish their articles and video about Father de Laire was "the controversy [that] surrounded the SBC's interpretation of a tenant of the Catholic faith known as Extra Ecclesiam Nulla

Salus or 'Outside of the Church There is No Salvation' ('EENS')" and Father "de Laire's treatment of the SBC for its traditional views of Church doctrine."[39] They also argue that Father de Laire expanded the controversy to include "the credibility of the participants and their competing views of their shared faith" and state that the January 17 article "took issue" with Father de Laire's "credibility in issuing the Decree."[40] They cite media coverage to show that a public controversy existed about Father de Laire's treatment of the SBC and the Decree before Church Militant issued its first allegedly defamatory article on January 17, 2019.

Father de Laire does not dispute that a public controversy existed before the January 17 article was published. He identifies the controversy, however, as a matter "between the Saint Benedict Center and the CDF in Rome," and more specifically, the decision by the Congregation for the Doctrine of the Faith that the SBC's interpretation of church doctrine was unacceptable.[41]

The defendants submitted articles that were published in La Salette Journey (a Catholic blog republishing an article from The Union Leader), The Union Leader,  The Sentinel, and the Catholic Herald to show the scope of the public controversy involving Father de Laire.[42] They also submitted a press release and a memo to priests issued by the Diocese about the Decree of Precepts.

---

[39] Doc. no. 138-1 at 3; id. at 7.
[40] Doc. no. 150, at 4.
[41] Doc. no. 140, at 5, 16, 18, & 19.
[42] Doc. nos. 138-12 & 138-8.

The media articles provided by the defendants focus on the SBC's interpretation of the church doctrine, the nature of the dispute between the SBC and Church governance, and the public's reaction to the dispute, arguably including the Southern Poverty Law Center's listing of the SBC as a "hate group." The earliest of the articles submitted by the defendants, dated February 26, 2017, from The Union Leader, is titled "Richmond religious sect rejects 'hate group' label."[43] The article reported that the Southern Poverty Law Center listed the SBC as a hate group because of its anti-Semitic religious beliefs and opposition to homosexuality and that the Roman Catholic Church and the Diocese of Manchester did not recognize the SBC as a religious group because of its interpretation of Church doctrine.[44]  The 2017 article also states that the SBC was founded by Father Feeney who advocated the doctrine of "no salvation outside the Church."[45]

The later media coverage submitted by the defendants, published after the Decree of Precepts issued, are four articles from January 2019, the January 8 press release, and the January 9 memo from the Diocese of Manchester. Those publications state that sanctions (in the Decree of Precepts) were imposed on the SBC because of the SBC's teaching that salvation is only available through the Catholic Church. The articles summarize the sanctions imposed, including that the Decree required the SBC to stop describing itself and its teachings as Catholic.[46] The articles also repeat the Southern Poverty Law Center's hate group listing. As such, the media coverage presented the

---

[43] Doc. no. 138-5, at 2-5.
[44] Id.
[45] Id. at 4.
[46] Doc. no. 138.

doctrinal dispute, the public's reaction to the dispute, and the Church's response through the Decree of Precepts.

To the extent the defendants argue that Father de Laire put his own credibility at issue *as part of the public controversy by creating the doctrinal dispute with the SBC*, the record does not support that theory. The Catholic Herald article submitted by the defendants reported:

> The Saint Benedict Center has a long-standing dispute with the Church hierarchy – not only in New Hampshire, but also in Rome. On October 20, 2016, Mgr Giacomo Morandi, the Undersecretary (and now Secretary) of the Congregation for the Doctrine of the Faith (CDF) wrote to the Slaves' leader, Brother Andre Marie Villarrubia. Morandi called the Slaves' position on extra Ecclesiam nulla alus "unacceptable".[47]

Br. Andre Marie Villarrubia also testified during his deposition on behalf of the SBC about the SBC's difficult relationship with the Diocese over the doctrinal dispute before Father de Laire was appointed as the Vicar for Canonical Affairs.[48] And the Catholic Herald reported that, contrary to the defendants' arguments, Father de Laire did not act alone in drafting and imposing the Decree of Precepts:

> When I asked him about the penalties, Fr Georges de Laire, the vicar for canonical affairs for the Manchester diocese, said that he "met with the [current] Undersecretary of the Congregation for the Doctrine of the Faith [Fr Matteo Visioli] this past May, and upon that conversation the Congregation made recommendations to us for steps that should be imposed upon the Saint Benedict Center and the Slaves of the Immaculate Heart of Mary. These are included in the precepts imposed on Monday, January 7."[49]

---

[47] Doc. no. 138-12, at 13.

[48] Doc. no. 140-2, at 4.

[49] Id. at 14.

As such, the doctrinal dispute existed long before Father de Laire became the Vicar for Canonical Affairs, before he became involved in the dispute, and before he issued the Decree of Precepts.

As explained infra, Father de Laire was quoted in the articles in a way that established his limited-purpose public figure status with respect to the public controversy. See infra, at Part B2. But nothing about the articles, the press release, the memo to priests, or Father de Laire's quotes made his credibility a matter of dispute in the public controversy.  In other words, prior to the January 17 article, the public controversy was not about Father de Laire or his role in issuing the Decree of Precepts but instead was about the SBC's doctrinal dispute with Church governance and the consequences of that dispute. To be sure, as a witness and the subject of the allegedly defamatory statements, Father de Laire's credibility may very well be an issue at trial. But that is a different question altogether than whether his credibility itself was *part of the public controversy setting the parameters of his public figure status*. It was not.

The public controversy that existed before the defendants' allegedly defamatory January 17 article was published was the dispute between the SBC and Roman Catholic Church governance (the Vatican and the Diocese of Manchester) about "Feeneyism" and the doctrine known as *Extra Eccesiam Nulla Salus* or "Outside of the Church There is No Salvation," and the consequences of that dispute.

## 2. **Involvement in controversy**

"Once the court has defined the controversy, it must analyze the plaintiff's role in it." Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 12 (1st Cir. 2011). To analyze the

16

plaintiff's role, the court considers "whether the defamed individual deliberately 'thrust [herself] into the vortex' of that controversy or otherwise 'engage[d] the public's attention in an attempt to influence its outcome.'" McKee, 874 F.3d at 61 (quoting Gertz, 418 U.S. at 352-52 (brackets added in McKee). In rare circumstances, limited-purpose public figure status may also arise involuntarily, that is, when a private individual is drawn into a public controversy "through no purposeful action of his own." Gertz, 418 U.S. at 345.

The defendants contend that Father de Laire thrust himself into the Catholic Church's doctrinal dispute with the SBC through his interviews with the media and by signing and issuing the Decree of Precepts. They further contend that Father de Laire's involvement in the controversy was intended to influence public opinion in favor of the Church and against the SBC. Father de Laire argues that his involvement in the controversy was not voluntary because it was simply part of his professional responsibilities for the diocese. He also argues that he did not and could not influence the outcome of the doctrinal dispute or the sanctions imposed by the Church on the SBC. Neither Father de Laire nor the defendants is completely or precisely correct.

Despite Father de Laire's narrow view of his role in the controversy, he unquestionably attracted public attention about the doctrinal dispute between the SBC and the Church prior to the defendants' allegedly defamatory publications. Father de Laire granted interviews to the media and discussed the dispute. "When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure." McDowell v. Paiewonsky, 769

F.2d 942, 949 (3d Cir. 1985); accord Weiser Law Firm, P.C. v. Hartleib, --- F. Supp. 3d -

--, 2023 WL 2692384, at *13 (E.D. Pa. Mar. 29, 2023). "[P]ublic figures engage 'the

attention of the public in an attempt to influence the resolution of the issues involved' or

use a newsworthy event 'as a fulcrum to create public discussion.'" Lluberes, 663 F.3d at

14 (quoting Wolston v. Reader's Digest Assoc., Inc., 443 U.S. 157, 168 (1979)).

  The statements attributed to Father de Laire in the media explained the SBC's

status with respect to the Church and the effect of the Decree of Precepts. These

explanations alone, but also in addition to his role in issuing the Precepts, established

Father de Laire's status as a limited-purpose public figure.

  Further, Father de Laire added, among other things, that the Precepts prohibited

the SBC from describing itself and its teachings as Catholic, that "[t]hey regularly use

semantics to mislead people," and that the SBC had never been recognized as an official

Catholic organization.[50]  The La Salette Journal reported that Father de Laire said an out-

of-state family contacted the Diocese because their daughter, in her early 20s, had joined

the SBC as a nun and was being held against her will, which prompted the FBI to

interview the woman and determine that she was "there of her own accord."[51] Father de

Laire also stated that the SBC's leader would not accept what the Church has taught and

that the Decree of Precepts precluded priests from performing religious ceremonies at the

SBC because it had used the presence of priests "to falsely claim legitimacy." [52]

---

[50] Doc. no. 138-12, at 2-3
[51] Id., at 2.
[52] Id., at 10.

Correct or not, those statements appear to be aimed at influencing the public's understanding of and opinions about the underlying doctrinal dispute and the sanctions imposed on the SBC in the Decree of Precepts, which he had already issued, and discussed publicly as part of his official diocesan duties. Through his statements to the media, Father de Laire thrust himself into the public controversy. As such he has limited-purpose public figure status with respect to at least some of Church Militant's published statements.

### 3. Statements germane to or related to the public controversy

Identifying a public controversy and the plaintiff's involvement in it does not end the analysis, especially in a case like this alleging a number of different allegedly defamatory statements. A defamatory statement must be germane to or related to the public controversy to require proof of actual malice because limited-purpose public figure status pertains only to "'a limited range of issues' the scope of which is determined by the nature and extent of [the plaintiff's] participation in the particular controversy giving rise to the defamation.'" McKee, 874 F.3d at 61 (quoting Gertz, 418 U.S. at 351-52); see also  Planet Aid, Inc. v. Reveal, 44 F.4th 918, 928 (9th Cir. 2022) (limited-purpose public figure status depends, in part, on "whether the alleged defamation is related to the plaintiff's participation in the controversy"); Berisha v. Lawson, 973 F.3d 1304, 1310 (11th Cir. 2020) (limited-purpose public figure status depends, in part, on whether "the alleged defamation was germane to the individual's role in the controversy"); Kahl v. Bur. of Nat'l Affairs, Inc., 856 F.3d 106, 115 (D.C. Cir. 2017) ("the defamatory statement must be germane to the plaintiff's participation in the

controversy"); [Armstrong v. Shirvell](), 596 F. App'x 433, 445 (6th Cir. 2015); [LaRavia v. Cerise](), 462 F. App'x 459, 463 (5th Cir. 2012).  The defendants argue that all ten of the allegedly defamatory statements are related to Father de Laire's role in the public controversy and are protected by the First Amendment's "actual malice" requirement. Father de Laire contends that at most, one of the defendants' allegedly defamatory statements is related to his role in the controversy.

Father de Laire signed and issued the Decree of Precepts as "Episcopal Vicar for Canonical Affairs."[53] His role as Episcopal Vicar implicates his work as a canonist, licentiate, and adjudicator involving both Church doctrine and canon law. Statements solely about Father de Laire's personal integrity and mental health are not related to his role as Episcopal Vicar. The allegedly defamatory statements that are related to the public controversy (the doctrinal dispute or Father de Laire's role in implementing its resolution by Vatican officials) and will require proof of actual malice are the following:

> (1) Father de Laire is said by current work colleagues to be emotionally unstable in his role as chief canonical judge of the diocese and counselor to his bishop.
> (3) Father de Laire conducts his duties with incompetence in canonical matters that is also apparently well-known and corroborated in the Roman Curia.
> (4) Father de Laire is nicknamed in the Roman Curia as an incasinaro, "a troublemaker," owing to his notorious botching of canonical cases involving clergy and other matters.
> (5)  Multiple independent sources in the Roman Curia say he has repeatedly botched diocesan cases and embarrassed his bishop before the Roman congregations of the Curia.
> (6)  Father de Laire is currently outsourcing work product that he as a canon lawyer is being paid well by the diocese to complete himself.

---

[53] Doc.  no. 138-7.

(8)  At least three complaints against de Laire have been filed with the Holy See that together allege . . . incompetence as a canonist.[54]

(10) Father de Laire, individually, has been responsible for "attacks" against the Saint Benedict Center since shortly after his promotion to Judicial Vicar about two years ago.

The remaining allegedly defamatory statements will not require proof of actual malice and instead will be subject only to the standard for proving defamation under New Hampshire law:

(2) Father de Laire is said to be desperate to repair his image and save his chances at being promoted as bishop or an official of the Roman Curia.

(7)  Priests and laity who currently work with him in the diocese say that Father de Laire is a vindictive and manipulative clericalist who pines to be named a bishop or an official of the Congregation for the Doctrine of the Faith.

(8)  At least three complaints against de Laire have been filed with the Holy See that together allege corruption, abuse of office, [and] grave violations of the law . . . .[55]

(9) Additional questions are raised by his acquisitions. Church Militant has learned that de Laire now frequently resides at an estate located near Manchester that he purchased and that is currently valued at $1.5 million.

## C. **Actual malice**

Under the First Amendment standard, a limited-purpose public figure must prove "with convincing clarity" that the defendants published a defamatory statement about him with actual malice. Sindi v. El-Moslimany, 896 F.3d 1, 14 (1st Cir. 2018). The

---

[54] Statement 8 includes three separate allegedly defamatory parts and is divisible. Only the part of statement 8 that the complaints allege Father de Laire's incompetence as a canonist is related to his limited-public figure status and only that part requires proof of actual malice.

[55] Id.

defendants argue that Father de Laire cannot meet that burden of proof. Father de Laire

contends that he can prove actual malice and cites evidence in the record to do so.

Actual malice is "knowledge of the statement's falsity or reckless disregard for its

truth." Lemelson, 903 F.3d at 23. "[T]o satisfy the actual malice requirement, a plaintiff

must point to 'sufficient evidence to permit the conclusion that the defendant in fact

entertained serious doubts as to the truth of his publication' or 'actually had a high degree

of awareness of . . . probable falsity.'" Id. (quoting St. Amant v. Thompson, 390 U.S.

727, 731 (1968), and Harte-Hanks Commc'n, Inc. v. Connaughton, 491 U.S. 657, 665

(1989)). "Actual malice then is measured neither by reasonably prudent conduct nor an

industry's professional standards, rather it is wholly subjective." Levesque v. Doocy, 560

F.3d 82, 90 (1st Cir. 2009); accord Lemelson, 903 F.3d at 24; see also St. Amant v.

Thompson, 390 U.S. 727, 731 (1968). Subjective actual malice depends on "the

defendants' state of mind at the time of publication." Sindi, 896 F.3d at 16 (internal

quotation marks omitted).

"Because 'direct evidence of actual malice is rare,' it may be shown through

inference and circumstantial evidence." Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 536

(1st Cir. 2023); see also Levesque v. Doocy, 560 F.3d 82, 90 (1st Cir. 2009).  This is no

less true because of the "convincing clarity" standard applicable here. [56]  Further, for

---

[56] Even in criminal cases, where the prosecution must prove its case under the "beyond a
reasonable doubt" standard, which is the highest standard of proof and more demanding
than the "convincing clarity" standard that applies here, the jury is instructed that it may
rely on circumstantial evidence to return a guilty verdict. See, e.g., Desert Palace, Inc. v.
Costa, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of
circumstantial evidence in support of a criminal conviction, even though proof beyond a

purposes of motion practice, "a court will typically infer actual malice from objective facts." Lemelson, 903 F.3d at 24. see also St. Amant v. Thompson, 390 U.S. 727, 731 (1968). Circumstantial evidence of "actual malice may be found where a publisher fabricates an account, makes inherently improbable allegations, *relies on a source where there is an obvious reason to doubt its veracity*, or *deliberately ignores evidence that calls into question his published statements.*" Sindi, 896 at 16 (emphasis added).

"[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." Harte-Hanks, 491 U.S. at 688. Recklessness may also be shown if the publisher refused "to take easily available steps that could confirm or refute a claim." Sindi, 896 F.3d at 16. A plaintiff can prove recklessness or  knowledge of falsity by "provid[ing] evidence that it was highly probable that the story was . . . based wholly on an unverified anonymous source that defendant had obvious reason to doubt." Freeman v. Giulani, 2022 WL 16551323, at *9 (D.D.C. Oct. 31, 2022) (internal quotation marks omitted); Biro v.Conde Nast, 963 F.Supp.2d

---

reasonable doubt is required."); Holland v. United States, 539 U.S. 90, 348 U.S. 121, 140 (1954) ("Circumstantial evidence [in criminal cases] is intrinsically no different from testimonial evidence."); United States v. Levin, 13 F.4th 96, 100 (1st Cir. 2021) (holding that jury could reasonably infer that defendant knowingly possessed child pornography based on reasonable inferences taken from circumstantial evidence); United States v. Padilla-Galarza, 886 F.3d 1, 6 (1st Cir. 2018) ("jury is 'entitled to rely on plausible inferences' from circumstantial evidence" (quoting United States v. Matthews, 498 F.3d 25, 31 (1st Cir. 2007)); see also United States v. Davis, 2023 WL 1970085, at *2 (D. Mass. Feb. 13, 2023). When, after a guilty verdict, a defendant moves for a judgment of acquittal, the court must consider "whether the evidence, both direct and circumstantial, and all plausible inferences drawn therefrom, would allow a rational jury to conclude that the Government had proven each element of the crime beyond a reasonable doubt." United States v. Burgos, 703 F.3d 1, 9 (1st Cir. 2012).

255, 277 (S.D.N.Y. 2013) ("Courts have noted various circumstances that may be probative of actual malice, including where a story is fabricated or is based wholly on an unverified, anonymous source.") (internal quotation marks omitted).

A defendant's motive to harm the plaintiff, such as evil intent, ill will, or spite, standing alone, is not sufficient to prove actual malice. Harte-Hanks, 491 U.S. at 666-67. Instead, the plaintiff must provide evidence, direct and/or circumstantial, that proves directly or by reasonable inferences the defendant's knowledge of the statement's falsity or his reckless disregard for its truth. See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 509-11 (1991). "Although motive alone cannot suffice to prove actual malice, it is a highly relevant consideration." Sindi, 896 F.3d at 16.

Father de Laire contends that the defendants published Mr. Balestrieri's January 17 article and then repeated the allegedly defamatory statements in subsequent publications with actual malice.[57] He cites, inter alia, Mr. Balestrieri's bias in favor of the SBC and against Father de Laire and Mr. Voris's knowledge of the bias. He contends that Mr. Balestrieri's bias against Father de Laire gave him a motive to defame him and gave the defendants reason to doubt the truth of his statements. Father de Laire also contends that Mr. Balestrieri's attribution of information to anonymous sources (and quite possibly Mr. Balestrieri's reliance on no source other than himself) put Mr. Voris on notice to

---

[57] For purposes of proof of actual malice, the parties do not distinguish among Church Militant, Voris, and Carey, except that Father de Laire asserts in a footnote that actual malice by Voris and Carey is imputed to Church Militant. Doc. no. 140, at 25, n.8. The court, therefore, refers to those three defendants jointly without addressing any differences in status or quantum of evidence as to each defendant individually.

question the credibility of his statements. He further contends that, despite the known motive to defame him, as well as the anonymous sources, the defendants did no investigation or fact-checking to verify the statements about Father de Laire when they had time and opportunity to do so. Father de Laire argues that the defendants' affirmative in-court misrepresentations about the article's authorship, their efforts to hide Mr. Balestrieri's identity as the author of the article, and the circumstances that arose in relation to Mr. Balestrieri's scheduled deposition lend strength, substantiate, and support Mr. Voris's knowledge of the falsity of the statements or reckless disregard for their truth.

The defendants assert that Church Militant and Mr. Voris relied on Mr. Balestrieri's advice as a canonist for several years before the allegedly defamatory statements were published on January 17, 2019.  They also assert that they found Mr. Balestrieri's advice on canon law matters was reliable. The allegedly defamatory statements in the January 17 article, however, are aimed at Father de Laire personally, stating among other things that his *work colleagues say* he is emotionally unstable, that he "*is said to be* desperate to repair his image and save his chances at being promoted," that *complaints had been filed* against him alleging corruption, among other things, that *he is labeled* a troublemaker, that *sources say* he has botched cases, that he is outsourcing his work, that he *is said to be* vindictive and manipulative, and that questions about Father de Laire are raised by his residing in an expensive house, among other things.[58]

---

[58] Doc. no. 115-3.

The defendants provide no basis for them to rely on Mr. Balestrieri for that information about Father de Laire. Further, the personal nature of the statements about Father de Laire, and the fact that some of them addressed personal characteristics and issues unrelated to the public controversy (such as his assets, his purported ambitions, and his emotional stability), could support an inference that their tone and content should have disinclined Mr. Voris and Church Militant to accept and publish them without further checking.

In addition to their professional relationship, Mr. Voris and Mr. Balestrieri became friends. At the time Mr. Voris published the January 17 article, he knew that Mr. Balestrieri was advising the SBC on canonical matters in the dispute with Church governance about the SBC's continued adherence to the doctrine of *Extra Eccesiam Nulla Salus*. He also knew that Father de Laire and Mr. Balestrieri were adversaries in the doctrinal dispute between the SBC and Church governance and possibly in other matters. During oral argument, counsel for the defendants asserted that despite Mr. Voris's and Mr. Balistrieri's shared bias against Father de Laire, or even because of it, Mr. Voris believed Mr. Balestrieri was a reliable source. Counsel further argued that because actual malice is a subjective standard, Mr. Voris was entitled to believe Mr. Balestrieri was a reliable source absent a red flag that the information Mr. Balestrieri provided was false, unsourced, or that Mr. Balestrieri was the only source.

The defendants appear to confuse permissible subjective belief in defamation law with potentially impermissible confirmation bias and "motivated reasoning," which does not necessarily negate actual malice in all facts and circumstances, particularly those

26

present here. Otherwise, ideological or religious fervor or shared bias or motive could justify an intentional lack of fact-checking or even critical reading and editing, completely insulating speakers and publishers from liability for the harm they cause in a way that defamation law does not countenance and has never countenanced. Mr. Voris's and Mr. Balestrieri's shared bias against Father de Laire and their shared sympathy and identification with the SBC's position on the doctrinal dispute allow a reasonable inference that Mr. Voris should have questioned the veracity of Mr. Balestrieri's several unattributed disparagements of Father de Laire.[59] Mr. Voris's failure to fact check, further question Mr. Balestrieri, or undertake any due diligence measures could support the additional inference that Mr. Voris had a reckless disregard for the statements' truth. His subjective agreement and ideological alignment with Mr. Balestrieri do not negate these inferences and in fact may strengthen them.

The record shows that in addition to information and articles about canon law, Mr. Balestrieri had previously provided other information and articles to Church Militant and used a pseudonym to do so. Mr. Voris testified during his deposition that Mr. Balestrieri generally did not use his real name on articles he wrote for Church Militant "[i]f [the article] drew some sort of conclusion or was talking about a case . . . [or] had some weird

---

[59] In fact, Brother Andre Marie testified in the SBC deposition that after he learned Mr. Voris attributed the January 17 article to Mr. Balestrieri, he told Mr. Balestrieri: "[T]his is a problem . . . you're our canon lawyer." Doc. no. 140-2 at 9. Brother Andre Marie saw the red flag presented by Mr. Balestrieri's dual roles as canon lawyer for the SBC and author of the disparaging article about Father de Laire. It may be inferred that Mr. Voris saw it too.

stuff around it."[60] Mr. Voris also testified that Mr. Balestrieri only put his name on "an analysis piece from a well-respected canonist and that was just it, and there was no conclusion other than this is his analysis as an expert." Id.  For other articles, he might be identified as "the priest investigator," a misleading characterization given that  Mr. Balestrieri was and is not a priest, or he might withhold all identification.[61] The defendants provide no evidence that (or why) Mr. Voris had found Mr. Balestrieri to be a reliable source for the other types of information and articles he provided under pseudonyms.

As such, Mr. Voris knew when he published the January 17 article that Mr. Balestrieri used anonymity to hide his identity and misrepresented his identity when he published articles that contained "weird stuff" or circumstances and when he otherwise did not want to be associated with a given article. Mr. Balestrieri's anonymity, and Mr. Voris's knowledge of the reasons for anonymity, put Mr. Voris on notice that the January 17 article did not solely address issues in Mr. Balestrieri's expertise as a canonist but instead involved "weird stuff" or circumstances or contained information with which Mr. Balestrieri did not want to be associated. As such, an inference might be drawn that Mr. Voris was on notice that further investigation was necessary.

Mr. Balestrieri did not identify his sources, if any, for the statements he made about Father de Laire, and every opinion and statement in the article (with several

---

[60] Doc no. 140-6, at 6.
[61] Id.

references to plural statements or sources) was unattributed.[62] Despite his knowledge of

Mr. Balestrieri's use of anonymity to avoid identification with certain articles and Mr.

Balestrieri's refusal to identify his sources for the January 17 article, Mr. Voris did no

investigation of the statements about Father de Laire. Mr. Voris testified in his deposition

that Church Militant had a correspondent, Jules Gomes, in Rome at that time, which

provided an opportunity for investigation of the statements about Father de Laire's

reputation in the Roman Curia.[63] Mr. Voris did not contact Father de Laire to verify the

statements before the January 17 article was published, even though Mr. Voris contacted

Father de Laire *after* the January 17 article was published, which shows that he had the

means to contact him before publication. Further, the summary judgment record contains

no evidence of time pressure to issue the article before a deadline or because the matters

discussed were breaking news. Time pressure was not a barrier to any customary

journalistic fact checking or other due diligence measures, whether or not based on

journalistic standards. Therefore, circumstantial evidence could support a reasonable

inference either that Mr. Voris knew the statements in the article about Father de Laire

were false and published them anyway, or that Mr. Voris was recklessly indifferent to

whether the statements were false.

    One might conclude that in the course of this case, Mr. Voris has gone to great

lengths to hide Mr. Balestrieri's identity as the author of the January 17 article. In the

---

[62]Mr. Balestrieri did not identify his sources before the article was published. Even after
this case began, in May and September of 2021, Mr. Balestrieri refused to identify his
sources when Mr. Voris asked him.  Doc. no. 140-6, at 7.
[63] Doc. no. 140-6, at 6.

Church Militant publication, Mr. Voris attributed the article to Church Militant rather than to Mr. Balestrieri. Mr. Voris misrepresented to the court and to Father de Laire in the defendants' answer to Father de Laire's complaint that he, Mr. Voris, wrote the article. Then, during discovery, Mr. Voris fought to preserve the confidentiality of Mr. Balestrieri's identity, referring to Mr. Balestrieri as a source rather than the author of the article. Even after the defendants were forced to disclose that Mr. Balestrieri was the author, the defendants opposed Father de Laire's motion to amend the complaint to add Mr. Balestrieri as a defendant.[64]

On June 15, 2023, the day that Mr. Balestrieri agreed to be deposed in this case, Mr. Voris sent him the threatening text message that is quoted in the background section.[65]  Mr. Voris's use of the term "Welch" in the text message implies that he and Mr. Balestrieri had an agreement related to the January 17 article.[66] Mr. Voris said that if Mr. Balestrieri went "through with this," which may have been a reference to the scheduled deposition,[67] there would be consequences. Although the nature of the

---

[64] Doc. no. 113; see also supra at Part II.

[65] As stated in the background section, Mr. Balestrieri was served with a subpoena during the hearing on the motion for summary judgment on June 15, 2023. He then agreed to appear for a deposition on July 12, 2023. Later the same day, however, Mr. Balestrieri received a text message from Mr. Voris that warned him he was committing perjury, called him "a liar and a Welch," and stated that if Mr. Balestrieri "went through with this," Mr. Voris and Church Militant would "rain down on [him] publicly." Doc. no. 157-10. Mr. Balestrieri then decided not to attend his deposition.

[66] In a subsequent filing, the defendants have provided an explanation for the "Welch" reference. Should the jury hear about or see the "Welch" text evidence, it will be free to accept or reject this explanation. The explanation certainly is not an undisputed fact lending itself to summary judgment.

[67] Again, a jury question should this evidence be presented at trial.

agreement was not revealed in the text message or elsewhere in the parties' filings, it might be inferred that Mr. Voris and Mr. Balestrieri colluded to publish the article to defame Father de Laire because of their shared bias against him and their motive to undermine the Decree of Precepts and the Church's position with respect to the disputed doctrine.[68]

## Conclusion

The evidence in the summary judgment record and reasonable inferences that may be drawn therefrom demonstrate that genuine factual disputes exist as to important material issues, including whether the defendants acted with actual malice in publishing the January 17 article, the April video, and the June article.

For the foregoing reasons, the defendants' motion for summary judgment (doc. no. 138) is granted in part and denied in part. A public controversy existed when the January 17 article was published, which is the dispute between the Saint Benedict Center and Roman Catholic Church governance (the Vatican and the Diocese of Manchester) about "Feeneyism" and the doctrine of *Extra Eccesiam Nulla Salus* or "Outside of the Church There is No Salvation." Father de Laire is a limited-purpose public figure for purposes of

---

[68] In a recent filing, the defendants state that Church Militant loaned money to Mr. Balestrieri to cover his mother's medical expenses. Doc. no. 165, at 2. Father de Laire moved for leave to file a reply that disputes the purpose of the loan. Doc. no. 166. This evidence of further entanglement between Church Militant/Mr. Voris and Mr. Balestrieri may also support inferences of actual malice.

this case with respect to the allegedly defamatory statements 3, 4, 5, 6, part of 8, and 10.[69]

The motion for summary judgment is otherwise denied.

      **SO ORDERED.**

                              _____
                              Joseph N. Laplante
                              United States District Judge

Dated:  August 9, 2023

cc:     Counsel of record

---

[69] (3) Father de Laire conducts his duties with incompetence in canonical matters that is also apparently well-known and corroborated in the Roman Curia.

  (4) Father de Laire is nicknamed in the Roman Curia as <u>an incasinaro,</u> "<u>a troublemaker,</u>" owing to his notorious botching of canonical cases involving clergy and other matters.

  (5)  Multiple independent sources in the Roman Curia say he has repeatedly botched diocesan cases and embarrassed his bishop before the Roman congregations of the Curia.

  (6)  Father de Laire is currently outsourcing work product that he as a canon lawyer is being paid well by the diocese to complete himself.

  (8)  At least three complaints against de Laire have been filed with the Holy See that together allege . . . incompetence as a canonist.

  (10) Father de Laire, individually, has been responsible for "attacks" against the Saint Benedict Center since shortly after his promotion to Judicial Vicar about two years ago.