# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| VERY REVEREND GEORGES F. de LAIRE, J.C.L.,<br><br>    Plaintiff,<br><br>v.<br><br>GARY MICHAEL VORIS, ANITA CAREY, ST. MICHAEL'S MEDIA a/k/a CHURCH MILITANT, and MARC BALESTRIERI<br><br>    Defendants. | CIVIL ACTION NO. 1:21-cv-00131-JL |

## THE VERY REVEREND GEORGES F. de LAIRE, J.C.L.'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A JUDGMENT OF LIABLITY

Respectfully submitted,

THE VERY REVEREND GEORGES F. DE LAIRE

By His Attorneys,

Joseph M. Cacace, N.H. Bar No. 266082
Howard M. Cooper, *pro hac vice*
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
jcacace@toddweld.com
hcooper@toddweld.com

- and -

Suzanne M. Elovecky, *pro hac vice*
PARTRIDGE SNOW & HAHN, LLP
30 Federal Street
Boston, MA 02110
(617) 292-7900
selovecky@psh.com

Plaintiff, the Very Reverend Georges F. de Laire, J.C.L. ("Father de Laire"), submits this memorandum in support of his motion seeking a judgment of liability on the sole count in the First Amended Complaint (defamation) against Defendants Gary Michael Voris, Anita Carey, and St. Michael's Media a/k/a Church Militant ("Church Militant") (collectively, "Defendants").

There are cases in which a party on one side of the "v." has inflicted such an extreme injustice on and interference with the opposing party's right to a fair discovery process and trial, that a court is compelled to enter a judgment of liability against the offending party. *See*, *e.g.*, *Ayash v. Dana Farber*, 443 Mass. 367, 402-404 (2005). This is such a case.

From the outset of this litigation, beginning with their Answer to the Complaint, Defendants have misled the Court and Plaintiff, obfuscated the truth, and repeatedly delayed producing discovery or withheld it entirely. In response, the Court has carefully considered the prejudice to Plaintiff and attempted to impose relief in order to remedy it; relief which Plaintiff has availed himself of at great expense, and for which Plaintiff will soon be filing a motion for his attorneys' fees per the Court's order.  Were the issues of Defendants' misrepresentations and delay which the Court previously addressed the only issues here, Plaintiff recognizes that the relief the Court already ordered must suffice. But what has happened since the discovery abuses previously addressed by the Court is of an entirely different character and requires a different result where Defendants have in bad faith deprived Plaintiff of critical and potentially dispositive testimony in this case.

Based upon the latest round of reopened discovery ordered by the Court the following is now clear:  Defendants, after first working arm in arm with the critical witness in this case, defaulted defendant Marc Balestrieri, and while advancing him substantial money, later became concerned that when it mattered most at his deposition, Balestrieri would not support their version

of the facts concerning who authored the articles at issue in this case.  As Defendant Voris conceded at his most recent deposition, he became greatly concerned that Balestrieri would deny writing the articles, so he decided to threaten him with retaliation (e.g., to "rain down on you publicly") if he provided that testimony. As the Court already knows, Defendants did so successfully. After receiving Defendants' threat, Balestrieri did not appear for his deposition.

Incredibly, Defendant Voris claimed that his motive in threatening Balestrieri was to prevent him from committing the "mortal sin" of lying. But Voris' alleged motivation is beside the point where he openly admits not just to sending Defendants' June 15, 2023 text but to doing so *for the express purpose* of making sure that either Balestrieri would testify to Defendants' version of the "truth" or that he would not testify at all.

The recently taken (but incomplete) discovery also disclosed, incredibly, that Defendants hid still more documents, intentionally spoliated communications with Balestrieri, and more, as discussed below. Plaintiff can only assume that is what led Defendants' prior counsel to withdraw (after which Defendants hired new counsel with a questionable ethical record, which led this Court to deny counsel's motion for admission *pro hac vice (see* ECF No. 183).   It is time for accountability.

Father de Laire submits that the injustice worked here has not only been substantial, but that it is now irremediable.[1] The Court need only look, for example, at the issue of falsity to see how badly he has been and will remain prejudiced by his inability to ask the alleged author of the defamatory statements whether he actually wrote the articles at issue and, if so, whether he had

---

[1] In addition to the prejudice inflicted on Father de Laire, Defendants' actions have caused a significant increase in attorneys' fees and costs to respond to these issues, including additional discovery, repeated depositions, additional depositions, preparation for unattended depositions, and motion practice.  As a result of this, Father de Laire intends to, at the conclusion of this matter, bring a motion for attorney's fees and costs, and he reserves the right to do so.

*any* sources, as represented in the articles in dispute, and/or, if so, who they were and what they said so that Plaintiff *could then depose them*. Alternatively, if Balestrieri were to testify that he did not write the articles thereby undermining Defendants' alleged defense that he was their trusted source who authored everything, then this case would have been over from a liability perspective. Indeed, the issue of who is telling the truth would be beside the point where, assuming he is lying, Balestrieri's testimony that he was not the author would fully undermine any reasonable juror ever believing him to be a reliable source for Church Militant.[2]  Plaintiff should not be forced to try this case having been deprived of a fair discovery process by Defendants. A judgment of liability should enter against Defendants and a trial should take place limited to the issue of damages.

## PROCEDURAL AND FACTUAL BACKGROUND

Father de Laire filed the Complaint in this action on February 5, 2021, and Defendants were served shortly thereafter.  *See* ECF No. 1.  Following their first of two (2) unsuccessful motions to dismiss the complaint, Defendants filed their Answer on April 15, 2021.  In that Answer, Defendants "admitted" allegations advanced by Father de Laire that Defendant Gary Michael Voris authored the central defamatory article in this case dated January 17, 2019, through which the defamatory campaign against Father de Laire commenced.  *See* ECF No. 14, ¶¶ 2, 43.

### A.    *Early Discovery Activities and Surprise Disclosure Concerning the Author of the January 17, 2019 Article*

On June 28, 2021, Plaintiff served interrogatories and requests for production of documents on Defendants, requesting, among other things, information regarding the source(s) of the January 17 Article and the statements contained therein.  In response to these inquiries, however, Defendants refused to provide substantive responses, objecting instead on the basis of the

---

[2] Father de Laire notes in this regard that he recently sent a demand to Defendants to take down the article given their own view reflected in Voris' threat that Balestrieri is a "liar" and a "perjurer." The offending articles remain online.

newsgathering privilege and the First Amendment.  *See, e.g.*, Church Militant's initial responses to Father de Laire's Requests for Production, attached hereto as **Exhibit 1**.  Meet-and-confer efforts failed to resolve the parties' discovery dispute, where Defendants continued to stand on their meritless objections, forcing Plaintiff to seek the Court's intervention.  *See* Doc. 60, Pl.'s Mtn to Compel.  Upon Plaintiff's Motion, the Court ordered Defendants to supplement their responses in light of the *qualified* newsgathering privilege as relevant in this case.  *See* Doc. 83, Order on Pl.'s Mtn to Compel.

When Defendants provided their amended discovery responses, on December 23, 2021, they disclosed for the first time that Voris did not write the January 17, 2019 article.  *See* Church Militant's Supplemental Responses to Requests for Production of Documents, attached hereto as **Exhibit 1A**.   In those responses, Church Militant did not provide the identity of the author; that was provided in the days to come, in discussions between counsel.  *See, e.g.*, email exchange dated February 10, 2022, attached hereto as **Exhibit 2**. Through those discussions, Defendants disclosed that Marc Balestrieri was the author of that article. *See, e.g.*, *id.*

### B.    Father de Laire's Motion to Amend to Add Marc Balestrieri as Defendant and Further Discovery Efforts

In light of the (late) disclosure of the author, Father de Laire proceeded to move to amend the Complaint in this matter to add the author of the January 17, 2019 article – Balestrieri – as a defendant.   *See* ECF No. 101.   Notwithstanding Defendants' knowledge (and statements concerning same) that Balestrieri was the author of the article, they opposed that motion.  *See* ECF No. 105. That motion was allowed and Father de Laire filed the First Amended Complaint.  *See* ECF No. 113.  Father de Laire made significant efforts to serve Balestrieri, without success.  *See, e.g.*, Father de Laire's Motion for Alternative Service, ECF No. 131.  After alternative service was effected, Balestrieri did not respond to the Complaint, and on October 25, 2022, a default was

entered against him.  *See* ECF No. 134.

Upon the entry of the default, a new scheduling order was entered, and Father de Laire served further discovery upon Defendants seeking, among other things, all communications between Defendants and Balestrieri concerning Father de Laire, the litigation, and the defamatory articles published by Church Militant.  *See, e.g.*, Church Militant's Responses to Father de Laire's Second Request for Production, attached hereto as **Exhibit 3**.  Defendants responded to those requests and provided a limited number of documents in connection therewith.  *Id.*

Remarkably, throughout the litigation, Defendants have claimed that they had no documents concerning the drafting of the article, disclaimed they possessed any drafts, and asserted that there were no communications with Balestrieri on that topic.  *See* Exs. 1, 3.

In March of 2023, Father de Laire took the deposition of the Saint Benedict Center (the "SBC"), the religious group against whom the Diocese of Manchester, New Hampshire and the Vatican have taken certain actions concerning their self-proclaimed identity as "Catholics".  *See, e.g.*, Fr. de Laire Aff., ¶¶ 17.  Andre Marie Villarrubia, who identifies as the Prior of the SBC, testified on behalf of the SBC.  *See, e.g.*, Deposition of Andre Marie Villarrubia ("SBC Dep."), attached hereto as **Exhibit 4**.  Mr. Villarrubia testified that (a) he had not been aware in January of 2019 that Balestrieri – who was then serving as the SBC's canon law advocate – had authored the January 17, 2019 article, (b) he did not become aware of Balestrieri's authorship until June of 2022, (c) upon learning that Balestrieri had written the article, he took immediate steps to terminate Balestrieri as the SBC's advocate, due to Mr. Villarrubia's belief that the authorship created a conflict, and (d) that during his discussions with Balestrieri, Balestrieri categorically and vehemently denied authorship of the January 17, 2019 article.  *See* Ex. 4 at pp. 71-73.  Mr. Villarrubia further testified that he had the "impression" that the article was a "collaborative

effort." *Id.*

###### C.     *Balestrieri's Appearance At The June 15, 2015 Hearing*

On April 5, 2023, Defendants filed a motion for summary judgment.  *See* ECF No. 138. Father de Laire opposed the motion, and a hearing was held on June 15, 2023.  On the morning of that hearing, the Court contacted counsel to inform them of an email received from Balestrieri. *See* June 15, 2023 Email from K. Otis to Counsel, attached hereto as **Exhibit 5**.  In that email, Balestrieri communicated to the Court his intention to appear at the June 15, 2023 hearing, and further stated that he wished to "'have my day in court' to defend myself against the false assertions of fact and claims that have been asserted by more than one party regarding me."  *See* Ex. 5. Balestrieri further claimed that he was "opposed to the granting of the Motion for Summary Judgment."  *Id.*[3]

Balestrieri did appear at the hearing.  While present in the courtroom, Father de Laire served two (2) subpoenas on Balestrieri:  one for a deposition to be held on that date (June 15, 2023), and one to appear at trial, which had been scheduled for September 6, 2023.  *See* **Exhibits 6** and **7** (subpoenas); **Exhibit 8** (June 15, 2023 Hearing Transcript) at p. 53-54 (stating Balestrieri had been served).  The Court discussed the deposition with the parties and encouraged the parties and Balestrieri to confer concerning a mutually agreeable deposition date.  *Id.* at p. 73.  The parties did in fact confer, resulting in an agreed-upon deposition date of July 12, 2023 to be held in Boston at Father de Laire's counsel's office.  *See, e.g.*, ECF No. 148.  Balestrieri voluntarily signed said stipulation.  *Id.*

###### D.     *Defendants' Threat Against Balestrieri*

---

[3] Notwithstanding Mr. Balestrieri's stated intent to hire counsel and move to vacate the default, and to seek dismissal of the claims brought against him in this action, he has taken no such action, and has not filed an appearance in this action.  *See* Ex. 5; docket, generally.

On June 26, 2023, Father de Laire received a communication from Defendants, purporting to be a Fed. R. Civ. P. Rule 26(e) Supplemental Production.  In that email, counsel stated, "Attached are CM 1336-1462, documents we're producing under Rule 26(e). The emails are those in which Balestrieri used a pseudonym 'tommoore.'  The emails are response [*sic*] to your Document Request 30; they are all from 2018 and none relate to Fr. de Laire, the articles or this case."  *See* June 26, 2023 email (without attachments) attached hereto as **Exhibit 9** at page 2.  This description was vastly misleading, as it was intended to distract from the very last page of this nearly 130-page production, which was a communication from June 15, 2023, from Voris to Balestrieri, that indisputably related to Fr. de Laire, the articles, *and* this case.  *See* **Exhibit 10** (June 15, 2023 text message).  In that text message, Voris states as follows:

> **Marc – you are committing perjury. You know you write [*sic*] that article. What you don't know is this morning we found proof – your digital fingerprints – all totally documented on that article.   Remember the email address – TomMoore@Churchmilitant.com?  We have all the receipts.  *You go thru with this and we will rain down on you publicly.* You are a liar and a Welch.**

*Id.* (Ex. 10) (emphasis supplied).

As Father de Laire explained in his July 13, 2023 emergency motion (ECF No. 157), this text message raised red flags on two bases:  First, it represented intimidation of a witness through a clear threat – made by the principal of a media company with access to hundreds of thousands of readers and viewers – to publicly shame Balestrieri should he choose to testify in a manner that Voris did not approve.  *See* Ex. 10.  Second, it proved that – notwithstanding document requests served in 2021 and 2022, Defendants did not search for documents concerning the details of the January 17, 2019 article until June 15, 2023.  *See, e.g.*, Ex. 1A (Church Militant's supplemental responses to Father de Laire's Requests for Production), at Request Nos. 1, 7, 10, 20; Exhibit 3 (Church Militant's responses to Father de Laire's Second Request for Production), at Request Nos.

25, 26, 27, 28, 29, 30, 31, 32, 36, 37.  In response to the majority of these requests, Church Militant responded that it ***had no such documents***.  *Id.*  In its January 6, 2023 production, Church Militant produced documents wherein its employees communicated with Balestrieri concerning his prior use of the pseudonym (but not the email address) "Tom Moore" – which shows that Church Militant was well aware of Balestrieri's use of that name with Church Militant (*see, e.g.*, Deposition of Gary Michael Voris ("Voris Dep.")), attached hereto as **Exhibit 11**, at p. 458-468), and yet Church Militant failed to produce any documents where Balestrieri utilized an email address associated with that pseudonym until June 26, 2023.  Worse, the text message makes clear that Defendants did not even search for relevant documents until they were concerned that Balestrieri would testify against them.[4] *See* Ex. 10.

There is no question that Defendants are and were well aware of Balestrieri's particular and unique concerns about having his identity even as a Church Militant collaborator exposed, his personal information shared, and the general divulgence of his activities.  *See, e.g.*, Voris Dep. (Ex. 11); Deposition of C. Niles ("Niles Dep."), attached hereto as **Exhibit 12**, at pp. 90-91.  Given this knowledge, Voris's threat to "rain down on [Balestrieri] publicly" was certainly designed to strike terror in Balestrieri, and to convince him not to testify against Church Militant's interests.  *See* Ex. 10

---

[4] Mr. Voris was asked at his deposition on February 8, 2023 about Mr. Balestrieri's use of the name "Tom Moore," and he responded that "the Tom Moore name was a name he and I came up with very early on just to be able to refer to him, not in a publication fashion, but just to sorta keep his identity secret from, you know, people who would be interested in finding out where we were getting information from.  So there was a time – I don't remember when we stopped doing it, but there was a time, for a very long time, where he was actually in my phone as Tom Moore."  *See* Ex. 11, Voris Dep., at p. 459.  Given that Church Militant was well aware that Mr. Balestrieri used the name "Tom Moore", and that Mr. Voris actually identified Mr. Balestrieri in his own contacts as "Tom Moore," there is simply no basis for the emails with Mr. Balestrieri, wherein Balestrieri used the email address tommoore@churchmilitant.com, to have been withheld until June 26, 2023, more than 3 months after the close of discovery, after summary judgment briefing had been completed, and just over two months before trial.

Unsurprisingly, Balestrieri did not appear for the previously agreed-upon July 12, 2023 deposition. He did not cancel his appearance until the afternoon of July 11, 2023, after Father de Laire had incurred significant expense in the preparation of said deposition. *See, e.g.,* ECF No. 157 (Father de Laire's Emergency Motion), at pp. 3-4.

Following Balestrieri's failure to appear at the previously agreed-upon deposition, Father de Laire inquired of Defendants as to whether there had been any further communications between Church Militant and Balestrieri. *See* July 11, 2023 email exchange, attached hereto as **Exhibit 13**. In response, Defendants advised Father de Laire that on July 1, 2023, Balestrieri had informed a Church Militant employee that he would not be attending the deposition. *Id.* According to Defendants, that employee did not inform Voris or counsel about the conversation until July 11, 2023. *Id.*

Following Balestrieri's absence, Father de Laire filed an emergency motion, seeking to reopen the deposition of Voris and to depose the Church Militant employee who had communicated with Balestrieri. *See* ECF No. 157. That same day, mere hours after Father de Laire's filing, Defendants filed an "Unsworn Declaration" of Christine Niles. *See* ECF No. 158. Through that affidavit, Church Militant made several further disclosures:

- That notwithstanding prior representations, Niles was not in-house counsel or general counsel at Church Militant, but was in fact a senior producer. ECF No. 158, ¶ 2. As Niles stated in her affidavit, she attended law school, but is not a practicing attorney. At her subsequent deposition, Niles testified that she had very limited legal experience, had never had a client, and had never been licensed in Michigan, where Church Militant is located. *See* Ex. 12 (Niles Dep.), pp. 12-18. Notwithstanding these facts, Church Militant had previously made claims of privilege of communications between Voris and Niles, including at Voris's deposition. *See, e.g.*, Ex. 11 (Voris Dep.), pp. 547-548.

- That Niles was well-aware of Balestrieri's use of multiple emails when communicating with her and others at Church Militant. ECF No. 158, ¶ 5.

- That neither she nor anyone else at Church Militant had searched their "Google Drive" documents prior to June 15, 2023 in order to locate responsive documents. ECF No. 158, ¶

13.   In her subsequent testimony, she stated that Voris regularly used Google Drive in the course of his work for Church Militant.  Ex. 12 (Niles Dep.) pp. 39-43.

- That she and counsel had inadequate discussions concerning documents, Church Militant's document storage process, and the manner in which Google Drive was used at Church Militant.  ECF No. 158, ¶ 16.

Attached to Niles' Unsworn Affidavit were two (2) drafts of the Church Militant January 17, 2019 article, which were not produced previously, although they were requested in June of 2021.  *See* ECF No. 158; Ex. 1 (Church Militant's Responses to Father de Laire's Requests for Production).  In fact, Church Militant stated affirmatively that no such documents existed.  *Id.*  This was false.  *See* ECF No. 158.

In response to Father de Laire's emergency motion, the Court gave Father de Laire leave to (a) reopen the deposition of Voris, (b) take the deposition of the Church Militant employee who communicated with Balestrieri, and (c) take the deposition of Niles.  *See* ECF No. 163.  The Court further ordered Defendants to bear the costs of these depositions, including attorney's fees for one (1) of Father de Laire's attorneys.  *Id.* Father de Laire will be filing a motion shortly seeking the payment of those fees by Defendants.

### E.    *Continued Late Productions by Defendants*

Shortly after the canceled deposition of Balestrieri, Father de Laire made a further demand on Defendants to produce all relevant, responsive documents, including communications with Balestrieri.  *See* July 26, 2023 email exchange, attached hereto as **Exhibit 14**.  In response, Defendants informed Father de Laire that they were preparing another supplemental production.  *Id.*  On July 27, 2023, Church Militant made yet another production, containing shocking and disturbing documents.  *See* July 27, 2023 email (attachments omitted), attached hereto as **Exhibit 15**.

Through that production, Father de Laire learned that during the time period when he moved to include Balestrieri as a defendant in this lawsuit, Defendants were not only in touch with

Balestrieri, but they were in the process of loaning him significant money. *See e.g.*, June 4, 2022 Loan Agreement between Marc Balestrieri and St. Michael's Media, attached hereto as **Exhibit 16**. The loan was interest-free. *Id.* There was no restriction on the use of the funds provided to Balestrieri. *Id.*

That production further included a text exchange between Voris and Balestrieri, wherein Balestrieri shared a "tweet" (from the website twitter.com) that stated, "Marc Balestrieri, Canon Lawyer for Church Militant, has apparently admitted to writing articles for CM…" *See* Nov. 26, 2022 text message, attached hereto as **Exhibit 17**. Voris responded to Balestrieri two days later and stated, "Also you should know, that what I presume is going to be a failure to repay as agreed, we are likely going to have to lay off at least one person. You agreed to pay the $70k and so far haven't." *Id.*

Through both the November 2022 and the June 15, 2023 text messages, Voris himself connected Church Militant's loan to Balestrieri to Balestrieri's participation in this litigation and, more specifically, to Balestrieri's testimony about whether he authored the January 17, 2019 article. *See* Exs. 10 and 17. On November 22, 2022, Voris's only response to Balestrieri's concern over public statements about his authorship was to chastise Balestrieri about expected nonpayment of the loan. *Id.* On June 15, 2023, Voris called Balestrieri a "Welch" (for failure to repay the loan) in connection with Voris's threats against Balestrieri should he testify against Church Militant's interests. *See* Ex. 10. In sum, the evidence suggests that Church Militant paid Balestrieri for his testimony in this case and then threatened him when that testimony was expected to hurt Church Militant's defense.

**F.      *The Deposition of Christine Niles and Further Discovery Abuses***

On August 9, 2023, Father de Laire took the deposition of Christine Niles, a Senior

Producer at Church Militant.  Ex. 12 (Niles Dep.), p. 21.  At that deposition, Father de Laire inquired as to whether Niles had communicated with Balestrieri in 2022 concerning Father de Laire's attempts to amend the complaint.  *Id.* at p. 93-95. Niles stated that, "I think I might him s – might have sent him something in September of 2022 letting him know that you were going to publish his name." *Id.* When asked how Niles communicated with Balestrieri, she responded that it was via text. *Id.*  Niles then testified that she did not provide the text message between herself and Balestrieri to counsel because she "was never asked."  *Id.*; *but see* Ex. 3, at Request Nos. 25, 26, 27, 28, 29, 30, 31, 32, 36, 37.   Niles further responded that she "didn't believe" that Balestrieri responded to her (single) text message.  Ex. 12 (Niles Dep.), p. 93-95.

Shortly after that exchange, counsel for Defendants sought a break during the deposition. *See* Ex. 12 (Niles Dep.), p. 97.  After the break, Defendants produced several PDFs of multiple text messages, spanning several months, between Niles and Balestrieri. Those text messages are attached hereto as **Exhibit 18**. These text messages, in addition to testimony of Niles and Voris, show that Defendants have been working and coordinating with Balestrieri concerning information to be disclosed (or, more accurately, withheld) from Father de Laire throughout the duration of this entire litigation.  *Id.*

Due to this late production, made in the midst of a deposition, Father de Laire adjourned and suspended the deposition. Niles Dep. (Ex. 12) at p. 98-100. Prior to closing the deposition, Father de Laire made demands for all relevant, responsive documents (such as those produced during a 10-minute break).  *Id.* As stated on the record, a production that was made in 10 minutes' time, using cell phone screen shots, was not adequate, and did not reflect a diligent search.  *Id.* at p. 98-100.

The following day, August 10, 2023, counsel for Defendants moved to withdraw from this

litigation.  *See* ECF No. 171.  To date, the August 9, 2023 production has not been supplemented, nor have Defendants provided any representation that their productions are complete, despite the appearance of attorney Richard J. Lehmann on September 15, 2023. ECF No. 176.  Instead, Defendants wasted the Court's and Plaintiff's counsel's time unsuccessfully seeking the *pro hac vice* admission of an out-of-state lawyer with a checkered ethical history that includes a pending ethics investigation in another state.

### G.  Evidence That Defendants Coordinated with Balestrieri Throughout This Litigation and Voris's Threats and Interference

The defamatory articles at issue in this case commenced with the January 17, 2019 article titled "NH Vicar Turns Dogma Into Heresy".  *See* Amended Complaint ("Am. Cmplt.") at Ex. C. Following that article's publication, Church Militant repeated the defamatory statements in various postings, videos, and articles throughout 2019.  *See* Am. Cmplt., ¶¶ 68-70.  On December 26, 2019, Father de Laire – through counsel – sent a demand to Church Militant to cease making said defamatory statements, to remove the articles from the website, to issue an apology to Father de Laire, and to retract the statements.  *See* Dec. 26, 2019 Correspondence, attached hereto as **Exhibit 19**.  In that letter, Father de Laire asserted his understanding that Voris was the author of the January 17, 2019 article.  *Id.* On January 16, 2019, St. Michael's Media responded to the demand letter, through correspondence signed by Voris.  *See* Jan. 16, 2019 Correspondence, attached hereto as **Exhibit 20**.  Through discovery, Father de Laire learned that it was Balestrieri, not Voris, who drafted that response.  *See* ███████████████████████████████ ████████████████████████████████ as **Exhibit 21**.  A comparison of the draft provided to Church Militant by Balestrieri, and the final version sent to Father de Laire, shows very few changes to Balestrieri's writing, including the continuation of typographical

errors.[5]  *See* Exs. 20 and 21.  The letter did not disclose the author of the January 17, 2019 article.  *Id.*





*See* ███████, attached hereto as **Exhibit 22**.  In a ████████ ███████ ███████████████████████  *Id.* at p. 2. ███ ██████████████████████████████████████  *Id.* ████████████████████████████  ███████████  *Id.*

Voris testified at his August 8, 2023 deposition that he "presume[s]" that Balestrieri was part of the conversations with counsel in preparing Defendants' answer to the complaint in this matter.  *See* Voris Dep. (Ex. 11) at p. 641-42.  This refers to the answer to the original complaint, which contained the admission that Voris authored the January 17, 2019 article (which Defendants later changed to claim that Balestrieri was the author).  *Id.*

In August of 2021, Voris continued to work with Balestrieri to mount a defense in this litigation.  On August 26, 2021, ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████  *See* █████████████ attached hereto as **Exhibit 23** (emphasis added).   At his deposition, Voris conceded that Balestrieri had been "part

---

[5] It is clear that paragraphs were inserted in the letter after Mr. Balestrieri provided a draft, such as those citing civil law cases, but the text provided by Mr. Balestrieri went largely unedited. *See* Exs. 20 and 21.

of the team," working with Church Militant to "cooperate in defending the lawsuit" "on an ongoing basis." *See* Voris Dep. (Ex. 11), p. 654-655.   Notwithstanding this "cooperation," Voris testified that Balestrieri never provided him with a list of the names of his sources in Rome. *Id.*, p. 657.

Voris testified that he had two in-person meetings with Balestrieri, which were also attended by Attorney Klaus (Defendants' prior counsel) and Christine Niles.  Voris Dep. (Ex. 11), p. 659-669.  At the first meeting, Balestrieri did not provide the names of sources that he had for the January 17, 2019 article, stating that he had to "ask the people" because the "subject matter was delicate" if they were "marriage and annulment cases".  *Id.*  The second meeting took place at Voris's house. *Id.*  Voris further stated that "Marc was bothered, I guess, that he might be identified as the author of the article." *Id.*  Voris testified that he had told Balestrieri: "well, you know, Marc, these are your sources and if they won't step up, well, then you have to." *Id.*  Voris testified that he was forceful with Balestrieri, and that he (Voris) raised his voice during this conversation. *Id.*

When asked about the timing of the loan that St. Michael's Media made to Balestrieri, Voris claimed that, although the loan was made while the parties were "arguing about the disclosure of Mr. Balestrieri as the author of the article and whether he could be added as a defendant," it was simply a "coincidence of time."  *See* Voris Dep. (Ex. 11), p. 715-716.

Voris testified that on June 15, 2023, he learned from Attorney Klaus that Balestrieri had communicated to the Court his intent to appear at the hearing scheduled on Defendants' motion for summary judgment.  Voris Dep. (Ex. 11), p. 748-749.  Voris then composed a text to Balestrieri, and asked a Church Militant employee to send it to Balestrieri.   *Id.*  Voris claimed that, notwithstanding all of his prior communications with Balestrieri, "I didn't have any of Marc's contact information, phone numbers, texts or nothing." *Id.*  Voris testified that he did not send the

June 15, 2023 text to the number he previously used to contact Balestrieri because "he hadn't responded to that," and many other communications had gone unanswered. *Id.* at p. 750-753.

Voris testified that when he sent the text, he knew that Balestrieri was going to be deposed. *Id.* Voris further testified that "[t]op of my mind was that he was going to say that he hadn't – or I had – top of mind was my fear that he was going to say he hadn't written the article … it was at this point that it came back to me that Brother Andre had said that Marc denied writing the article." *Id.* at p. 756-57. Due to that fear, Voris conceded that he had "asked someone to go find proof that [Balestrieri] had written the article." *Id.* When asked what was meant by his statement that "we will rain down on you publicly" in that text (*see* Ex. 10), Voris responded "[t]hat Marc's great overarching concern was always being worried that his providing information – sometimes extraordinarily sensitive information – on all kinds of cases that – that he was always very squirrelly about any of that being found out … He was always – for obvious reasons, because of retaliation and, you know, not viewed as trustworthy by, you know, individuals in the church who would care about that sort of thing." *Id.* at p. 759.

Voris also testified that June 15, 2023 – the day of the hearing on the motion for summary judgment in this case, which took place more than three months after discovery closed in this matter – was the first time he ever directed anyone at Church Militant to find proof that Balestrieri wrote the January 17, 2019 article. *Id.* at 763. That is notwithstanding the multiple document requests that Plaintiff made throughout this litigation seeking information about Balestrieri's authorship of that article. *See*, *supra*, at p. 4-5. Voris testified that was the first time he directed anyone to look for documents relevant to Balestrieri's authorship of the article because "it had not come up before" and because "it had never been a – at question." Voris Dep. (Ex. 11), p. 763-765. After confirming that no one at St. Michael's Media had previously conducted such a search, Voris

stated, "I don't know why they would have done that. Again that was never -- … at question." *Id.* at 765. When pressed as to whether his attorneys had ever led such a search, Voris stated once again: "never at question." *Id.* at 765-66.

When asked about his motivation for sending the June 15, 2023 text to Balestrieri, Voris stated that he was "troubled that he was going to perjure himself. First of all, that's a sin to take an oath before God and then lie. It's a mortal sin, which is in the category of pretty darn bad in Catholicism." Voris Dep. (Ex. 11), p. 788-789. In other words, Voris admitted that he was trying to change Balestrieri's testimony to match Voris's version of the "truth."

### H.    Defendants Spoliated Relevant Documents in this Case

While the entirety of the August 9, 2023 production reflects abuses of the discovery process and significant prejudice to Father de Laire, what was most concerning was the reference, by Balestrieri, to the parties using the application called "Threema." *See* Ex. No. 18, at p. 13. Niles testified that she did not recall using that application, but that she had communicated with Balestrieri using an application called "Signal." Ex. 12 (Niles Dep.) p. 100-102. She further admitted that the communications on Signal had **not** been searched for production in this litigation. *Id.* However, Father de Laire's research has revealed that both Threema and Signal are applications known as "Ephemeral Messaging Apps," which means that they provide, without limitation, "screen shot protection," and "automatic content deletion from all devices."[6] Balestrieri suggested the use of these applications ***during this litigation***, and according to Niles, Defendants agreed to use Signal, at a minimum, despite their ongoing obligation to retain documents, and to

---

[6] *See, e.g.*, D. Hoover, "Ephemeral Messaging Apps Users: Use Caution During Anticipated or Ongoing Litigation," *ABA Journal* (Feb. 28, 2020), *available at* https://www.americanbar.org/groups/litigation/committees/pretrial-practice-discovery/practice/2020/ephemeral-messaging-apps-users-use-caution-during-anticipated-or-ongoing-litigation/ (last visited August 24, 2023).

supplement their productions.  *See, e.g.*, Rule 26 of the Federal Rules of Civil Procedure.

For Defendants to move their conversations from traditional communication platforms to a platform that is known to automatically delete content, paired with their abject failure to conduct reasonable and timely searches of their documents in response to discovery requests, shows that Defendants made deliberate efforts to delete and make inaccessible relevant documents to Father de Laire.  There is rarely more clear and irrefutable evidence of spoliation, and – when coupled with the plethora of abuses set forth above, coupled with the proximity to trial – this justifies the unusual remedy of a default judgment.

## I.   ARGUMENT

Entry of default as a sanction is a strong medicine and is reserved for egregious cases like this one. *Hooper-Haas v. Ziegler Holdings, LLC*, 690 F.3d 34, 37-38 (1st Cir. 2012). In appropriate cases, the availability of default as a sanction may well "play [] a constructive role in maintaining the orderly and efficient administration of justice." *Hooper-Haas*, 690 F.3d at 38 (quoting *Remexcel Managerial Consultants, Inc. v. Arlequin*, 583 F.3d 45, 51 (1st Cir. 2009)).

The appropriateness of a default sanction must be evaluated on a case-by-case basis under the totality of the circumstances. *Id.* at 38. Relevant factors include, but are not limited to, the nature of the misconduct, its repetition (or lack thereof), its degree of deliberateness, the extent to which the offender had fair warning of the possible consequences of misconduct, the availability *vel non* of an opportunity to offer an explanation or to plead for leniency, the legitimacy of any proffered excuse, any other aggravating or mitigating circumstances, the presence or absence of prejudice to the other party, the degree of interference with the functioning of the court, and the adequacy of a lesser sanction. *Id.* at 38. These factors require the court to balance the desirability of resolving cases on the merits against the importance of "the orderly and efficient administration

of justice." *Id.* at 38 (quoting *Remexcel Man. Cons., Inc.*, 583 F.3d at 51).

> **A.** **Defendants have impeded Father de Laire's ability to prosecute first by withholding the identity of, and then later by intimidating the seminal witness in this matter, Marc Balestrieri, which has prevented him from testifying.**

In *Ayash v. Dana Farber*, 443 Mass. 367 (2005), the Massachusetts Supreme Judicial Court (the "SJC") held that the trial judge did not abuse his discretion by imposing an entry of default sanction against a newspaper and a newspaper reporter for their ongoing refusal to comply with a discovery order directing them to disclose confidential sources to the plaintiff, which "inflicted an injustice" on the plaintiff's right to discovery and resulted in the plaintiff's inability to proceed against other defendants on certain claims, and where the judge provided Defendants the option to remove the default by complying with the discovery order. *Ayash*, 443 Mass. 402-404.

Instructive here is the case of *Massachusetts Institute of Technology v. Imclone Systems, Inc.*, 490 F. Supp. 2d 119 (D. Mass. 2007), where the plaintiff, MIT, moved for sanctions because Defendant attempted to intimidate a witness during a deposition, as well as other interference with witnesses. As a result of this intimidation, the witness refused to testify for MIT. In its motion, MIT requested that the court impose sanctions on the defendant, which the court allowed in full. *Imclone Systems, Inc.*, 490 F.Supp. 2d at 127. ("A court has discretion to 'fashion an appropriate sanction for conduct which abuses judicial process.'" *Id.* at 125 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991))). Both *Ayash* and *ImClone Systems, Inc.* are persuasive here — as both matters deal with obstructionist adversaries—and "the entry of default provides a useful remedy when a litigant is confronted by an obstructionist adversary." *Remexcel Managerial Consultants, Inc. v. Arlequin*, 583 F.3d 45, 51 (1st Cir. 2009).

Here, analogous to the underlying principle in both *Ayash* and *ImClone Systems, Inc.*, Defendants' actions—first withholding and then later intimidating Balestrieri, which prevented

him from testifying—have irrefutably "inflicted an injustice" on the plaintiff's right to discovery. Consequentially, here, as in *ImClone Systems, Inc.*, Defendants' actions have significantly prejudiced Father de Laire's ability to prosecute this litigation. Again, it is important to focus on what has Fr. de Laire has been deprived of from an evidentiary and process perspective. First, by virtue of Voris feeling the need to threaten him, it is likely that Balestrieri would have testified that he did not write the articles. This would have destroyed Defendants defense in this case. Second, assuming that Balestrieri admitted to his authorship of the defamatory article, Fr. de Laire would have been able to examine him about his alleged sources. If he refused to name them, then the jury would have heard this evidence. If he named them, Fr. de Laire would have reached out to them to interview them and/or taken their depositions even if he needed to use the Hague Convention to do so. As a result of Defendants' actions thwarting the civil judicial process, we will never know. Even worse than *ImClone Systems, Inc.*, Defendants' actions have resulted in Father de Laire being unable even to depose Balestrieri. Therefore, here, where the Court possesses inherent powers "to fashion an appropriate sanction for conduct which abuses the judicial process," *Chambers*, 501 U.S. at 44-45, a harsher punishment is warranted than in *ImClone Systems, Inc*. Thus, entry of default as a sanction against Defendants is warranted in this matter where Defendants' very deliberate, egregious misconduct—throughout the entirety of this litigation—has caused a prolonged, disorderly, and inefficient administration of justice and irreparably prejudiced Father de Laire's ability to try this case.

**B.**   **Defendants have spoliated evidence and are willfully responsible for a pattern of prolonged and vexatious obstruction of discovery with respect to highly relevant records.**

In *Global NAPs, Inc. v. Verizon New England Inc.*, 603 F.3d 71 (1st Cir. 2010) ("*Verizon*"), the First Circuit affirmed a default sanction where "the [district] court made a number of factual

findings that [we]re well supported in the record" showing that the counterclaim-defendants had "violated [the district court's] orders and committed willful discovery misconduct," including lying to the court and the destruction of evidence. *Verizon*, 603 F.3d 71 at 93-94. Specifically, in *Verizon*, the First Circuit found that counterclaim-defendants specifically lied to the district court by testifying they did not keep a general ledger or any financial records when they did, in fact, keep a general ledger and financial documents. *Id.* at 93. The First Circuit also found that counterclaim-defendants lied to the district court by testifying they had "lost" their financial records, when their accountant later testified to preparing the company's taxes during the relevant time. *Id.* at 94. Lastly, the First Circuit supportably found that the counterclaim-defendants had withheld and destroyed financial records by "dropping a computer down a flight of stairs" and "deleting files using a program called Windows Washer." *Id.* at 93.

In *Companion Health Services, Inc. v. Kurtz*, 675 F.3d 75, 85-87 (1st Cir. 2012), while the First Circuit vacated the district court's default sanction where it was based on a single instance with significant mitigating factors, the First Circuit stated.:

> This would be a different case if, after allowing Kurtz and Reid to respond to a much broader charge of misconduct, the district court had supportably found that they had themselves engaged in a deliberate pattern of stonewalling with the aim of frustrating effective discovery and the progress of the case.

*Id.* at 85. The First Circuit reasoned, relying on *Southern New England Telephone Co. v. Global NAPs Inc.*, 623 F.3d 123 (2nd Cir. 2010) ("*SNET"*), the case would be different under these materially different circumstances because the court might have been able to find them as individuals willfully responsible for "a pattern of prolonged and vexatious obstruction of discovery with respect to highly relevant records." *Id.* at 85 (quoting *Southern New England Telephone Co. v. Global NAPs Inc.*, 623 F.3d 123, 148 (2nd Cir. 2010)).

In *SNET*, the Second Circuit affirmed the district court's decision to impose a default

sanction. *Southern New England Telephone Co. v. Global NAPs Inc.*, 623 F.3d 123, 147 (2nd Cir. 2010). The Second Circuit reasoned, *inter alia*: (1) the record fully supported the district court's determination that Defendants acted willfully and in bad faith by (a) intentionally deleting documents, (b) lying about the existence and whereabouts of certain documents, and (c) failing to provide a good-faith explanation for their negligence in producing financial documents that were clearly the subject of the court's discovery orders; and (2) defendants' conduct was not isolated but rather formed a pattern of "prolonged and vexatious obstruction of discovery with respect to highly relevant records." *Southern New England Telephone Co.*, 623 F.3d 123, 147-148 (2nd Cir. 2010).

Here, as in *Verizon* and *SNET*, Defendants have committed willful discovery and litigation misconduct by lying to Father de Laire and the court and through the destruction of evidence. As set forth above, Defendants' conduct was first highlighted when they disclosed Balestrieri as the author of the first defamatory article, dated January 17, 2019, after having pled that Voris was the author, and allowed Father de Laire to hold that belief for a full year of active litigation before finally disclosing the truth. *See, e.g.*, ECF No. 101 (Father de Laire's motion to amend). It is now apparent, based on late-produced documents, that Defendants and Balestrieri were conspiring in the background to continue to withhold this information from Father de Laire. *See, e.g.*, Ex. No. 18 (August 9, 2023 production), *supra* at p. 13-15. It also has been disclosed, in August of 2023, that Defendants and Balestrieri intentionally spoliated relevant documents in this case, by choosing to communicate through third-party applications that employ automatic deletion processes. *See, supra*, at p. 17-18. Defendants (at least Voris) have also interfered with a key witness in this case, Balestrieri, by threatening him with public exposure and/or humiliation if he were to testify in this matter, resulting in Balestrieri failing to show up for his deposition. *Id.* at p. 15-16. Father de

Laire was and is highly prejudiced by the absence of Balestrieri's testimony, as it appears that only Balestrieri has information concerning his so-called "sources" (or lack thereof) for the defamatory statements at issue in this litigation. *See* Ex. 18 (August 9, 2023 production). It is also reasonable to infer that when Church Militant "loaned" Balestrieri up to $65,000, during the time period in which Father de Laire was attempting to join Balestrieri as a defendant in this matter, that it was part of an agreement concerning Balestrieri's participation (or lack thereof) in this litigation. That inference is supported not only by the timing, but by the multiple communications between Voris and Balestrieri that connect this litigation and Balestrieri's authorship of the articles at issue with those funds provided and Voris's repeated statements about his expectation that Balestrieri would not repay the loan, including by calling Balestrieri a "Welch" in the June 15, 2023 text message. *See, e.g.*, Exs. 8, 10 and 17.

Finally, there are multiple instances of documents being withheld from production, and late admissions that documents, which were clearly requested in discovery, were never even collected, much less reviewed or produced. As Niles testified, despite the fact that she is a party to nearly every email produced in this matter concerning Balestrieri, the January 17, 2019 article, and this litigation, she never searched her own documents to find communications with Balestrieri until she was sitting in a deposition on August 9, 2023 – less than a month before the trial of this matter was scheduled to begin and 5 months after discovery had closed. *See, supra*, at p. 11-12. Similarly, in his August 8, 2023 deposition, Voris admitted that no one at Church Militant had ever searched for documents related to Balestrieri's authorship of the January 17, 2023 article until June 15, 2023, when Voris became fearful that Balestrieri would testify that he did not write the article. *Supra*, at p. 17-18. As set forth above, many other documents were withheld and information was obscured until after the close of discovery. *See, supra*, at pp. 3-17.

As evidenced by the multitude of examples of discovery and litigation misconduct, Defendants unambiguously spoliated evidence and are willfully responsible for a pattern of prolonged and vexatious obstruction of discovery with respect to highly relevant records and information. Such conduct demonstrates that Defendants have unequivocally engaged in a deliberate pattern of stonewalling with the aim of frustrating effective discovery of basic facts and ultimately undermining the truth-finding function of the trial in this case. Thus, entry of default as a sanction against Defendants is a warranted in this matter where Defendants' very deliberate, egregious misconduct—throughout the entirety of this litigation—has caused a greatly prolonged, disorderly, and inefficient administration of justice that has irreparably prejudiced Father de Laire's ability to try this case by depriving him of testimony from a critical witness: Marc Balestrieri.[7]

### C.   An order for entry of default as a sanction is warranted to deter similar misconduct in future litigation.

In *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976)—in reversing a Court of Appeals decision—the Supreme Court held that the district judge did not abuse his discretion by imposing an entry of default as a sanction in response to discovery abuses by the National Hockey League. *National Hockey League*, 427 U.S. at 643. The Supreme Court further held that the district court judge did not abuse his discretion in concluding that the extreme sanction of dismissal was appropriate because of respondents' "flagrant bad faith" and their counsel's "callous disregard" of their responsibilities. *Id.* 643. The Supreme Court reasoned "as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose

---

[7] If the Court does not grant this motion, Father de Laire will file a motion *in limine* seeking a jury instruction about Defendants' conduct with respect to Balestrieri and requiring the jury to take an adverse inference based on Defendants' causing his failure to testify.

conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id.* at 643. The Supreme Court further reasoned, if the Court of Appeals decision had remained undisturbed, "other parties in other lawsuits would feel freer than [the Supreme Court thought Fed. R. Civ. P.] 37 contemplates they should feel to flout other discovery orders of other district courts." *Id.* at 643.

Here, Defendants' deliberate, egregious misconduct—throughout the entirety of this litigation—axiomatically meets such a standard and, as a result, significantly reduces the desirability of resolving the current matter through a trial on the merits when conducting a balancing test against the importance of "the orderly and efficient administration of justice." Thus, following the reasoning of the Supreme Court in *National Hockey League*, an entry of default as a sanction against Defendants is warranted to deter similar misconduct in future litigation.

## II.    CONCLUSION

Plaintiff, the Very Reverend Georges F. de Laire, J.C.L., respectfully requests that this Court enter an order of judgment of liability as a sanction against Defendants, Gary Michael Voris, Anita Carey, and St. Michael's Media a/k/a Church Militant.

*Signatures on Following Page*

Dated: October 18, 2023

Respectfully submitted,

THE VERY REVEREND GEORGES F. DE LAIRE

By His Attorneys,

*/s/ Joseph M. Cacace*
Joseph M. Cacace, N.H. Bar No. 266082
Howard M. Cooper, *pro hac vice*
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
jcacace@toddweld.com
hcooper@toddweld.com

**and**

*/s/ Suzanne M. Elovecky*
Suzanne M. Elovecky, *pro hac vice*
PARTRIDGE SNOW & HAHN, LLP
30 Federal Street
Boston, MA 02110
(617) 292-7900
selovecky@psh.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of October, 2023 a copy of the foregoing document was filed via ECF and transmitted to all counsel of record through that system.

*/s/Suzanne M. Elovecky*
Suzanne M. Elovecky