UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| VERY REVEREND GEORGES F. de LAIRE, J.C.L.,<br><br>Plaintiff,<br><br>v.<br><br>GARY MICHAEL VORIS, ANITA CAREY, ST. MICHAEL'S MEDIA a/k/a CHURCH MILITANT, and MARC BALESTRIERI<br><br>Defendants. | Civil No. 1:21-cv-00131-JL |

**GARY MICHAEL VORIS, ANITA CAREY, AND ST. MICHAEL'S MEDIA'S MEMONRADUM IN SUPPORT OF OBJECTION TO PLAINTIFF'S MOTION FOR JUDGMENT OF LIABILITY**

Plaintiff asks this Court to impose the most powerful sanction in its arsenal in response to the non-defaulted defendants' failure to produce various requested documents in response to his discovery requests. Defendants do not deny that they have made missteps during this litigation. They have not addressed the demands of the litigation discovery with sufficient attention to detail or the searching self-interrogation necessary to identify and locate documents that opposing parties are entitled to obtain, and this has caused delay in bringing this matter to trial. But what they have not done is engage in intentional violation of their discovery obligations, nor have they intentionally destroyed evidence, sought to evade their responsibilities as parties, nor intended to cause witnesses to absent themselves from these proceedings in order to advance their defenses. While they have been insufficiently attentive at time, they were never maliciously vexatious or obstreperous. And importantly, they have not caused the plaintiff to

suffer concrete, demonstrable prejudice to his case.  Accordingly, the Court should decline to impose the drastic and extreme sanction that the plaintiff seeks.

**I.     Background**

The Court is well acquainted with much of the procedural history that brings the parties to this point, and the plaintiff has plead a great deal of the historical facts in previousl filings with this Court.  See, ECF Doc. 101 Plaintiff's Motion to Amend Complaint and objection thereto; ECF Doc. 157 Plaintiff's Emergency Motion and objection thereto; Hearing held June 6, 2022; Hearing held June 15, 2023; Conference held in Judge's Chambers held June 15, 2023; Hearing held July 14, 2023. And throughout this time, the Court exercised its discretion and authority to control the proceedings before it.  As plaintiff himself states, "the Court has carefully considered the prejudice to Plaintiff and attempted to impose relief in order to remedy it." *Memo* at 1, 10.  Plaintiff further states that he "will soon be filing a motion for his attorneys' fees per the Court's order." *Memo* at 1.  Issues raised in that motion will, of course, be addressed when they are raised.  Concenring the history of activity referenced above, Defendants will not rehash what has already been addressed by the Court.

Based upon recent events, plaintiff now asks this Court to impose the additional penalty of default judgment as a discovery sanction against the defendants. In essence, plaintiff asks the Court to rule that defendants' behavior is such that they have forfeited the right even to mount of defense to have the merits of their case decided by a jury.  As stated above, defendants admit that they have made errors during these proceedings.  But those errors are not of the kind that the Court should rule that they have forfeited their right to defend themselves.  The Court should deny plaintiff's motion.

II.     Governing Law

"[F]ederal law favors the disposition of cases on the merits, and, as a result, a default judgment is a drastic sanction that should be employed only in an extreme situation." *Stewart v. Astrue,* 552 F.3d 26, 28 (1st Cir. 2009).  "That sanction may be appropriate in cases where a party has lied to the court, repeatedly violated court orders, and committed willful discovery misconduct."  *Elmo v. Callahan,* 2012 WL 3669010 (citing *Global NAPs, Inc. v. Verizon New England, Inc.* 603 F.3d 71, 93-94 (1st Cir.2010)("*Verizon*")).  "[A] district court may use its inherent power to enter a default judgment [to punish litigation misconduct] only if it finds, first, by clear and convincing evidence–a preponderance is not sufficient–that the abusive behavior occurred; and second that a lesser sanction would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits."  *Shepherd v. American Broadcasting Companies, Inc.,* 62 F.3d 1469, 1472 (D.C.Cir. 1995).

When determining whether "the ultimate sanction" is appropriate, "among [the substantive factors] commonly mentioned (this list is not complete) are the severity of the violation, the legitimacy of the party's excuse, repetition of violations, the deliberateness vel non of the misconduct, mitigating excuses, prejudice to the other side and to the operations of the court, and the adequacy of lesser sanctions." *Malloy v. WM Specialty Mortgage,* 512 F.3d 23, 26 (1st Cir. 2008) (parenthetical in original).  "A litigant's good faith attempt to comply with a discovery rule is generally a legitimate excuse for an inadvertent or unintentional violation." *Angiodynamics, Inc. v. Biolitec AG,* 991 F.Supp.2d 283, 291 (D. Mass. 2014).  Also relevant to a decision to impose the saction of default is the extent to which a party's conduct was directly contrary to, and in violation of, a specific court order.  Indeed, the Sixth Circuit appears to have adopted a requirement that a motion to compel

discovery, or other similar court order, be in place and be violated in order to support the default remedy. See, *Burley v. Gagacki,* 729 F.3d 610, 618 (6th Cir.1998) (holding that, by its terms, Rule 37(b) requires a party seeking a sanction of default against a party to secure a court order compelling disclosure or discovery). And it is important to emphasize that "[i]n the case of default, the range of discretion is more narrow than when a court imposes less severe sanctions." *Hathcock v. Navistar Intern. Transp. Corp.*, 53 F.3d 36, 40 (4th Cir.1995) (citing *Wilson v. Volkswagen of Am.,* 561 F.2d 494, 503 (4th Cir.1977)). Finally, courts in this circuit have held that the party to be sanctioned "must be made aware of a 'last chance' before [the court takes] this most drastic measure." *Velazquez-Perez v. Developers Diversified Realty Corp.,* 2011 WL 13351064 at *4.

    The case law cited by the plaintiff broadly bears these principles out. *Ayash v. Dana-Farber Cancer Institute,* 443 Mass. 367 (2005), involved defamation litigation against the *Boston Globe* and its reporters, and Dana-Farber. The *Globe* reporters refused to comply with court orders to disclose their sources. The court found that the defendants' "ongoing refusal to comply with [two different] discovery orders constituted a contempt, as well as a violation of the court's orders…." *Id.* at 401-02. Further, the trial court "reasoned that the earlier order of contempt and imposition of monetary sanctions had not succeeded in securing the newspaper defendants' compliance with the discovery orders, and, as a result, the alternate authorized sanction of default judgment was warranted." *Id.* at 402. Notably, the SJC found that the trial judge "clearly felt that he had no alternative method of enabling the plaintiff to obtain the information she needed, and he left open to the [newspaper] the option to remove the default by complying." *Id.* at 404-05. Stated otherwise, the default

sanction was one that was *chosen* by the litigant as punishment for its continued refusal to comply with a court order, rather than simply *imposed* by the trial court.

The facts supporting the default sanction in *Verizon* are likewise substantially different from the issues here. In *Verizon,* the conduct at issue was plainly intentional and directly contrary to specific orders issued by the court, as well as the discovery rules. The counter-claim defendants "lied to the court about the records [it] kept," claiming that they "did not keep a general ledger of any financial documents." *Id.* at 93. This was patently and demonstrably untrue. Second, the companies intentionally destroyed computer evidence by dropping computers down stairs and using a commercial software produce to permanently erase data, rather than produce it for the litigation. *Id.* at 94.

Other cases cited by the plaintiff similarly rely on a finding of a pattern of clear willfulness. See, *Southern New England Telephone Co. v. Global NAPs Inc.,* 623 F.3d 123, 147 (2nd Cir. 2010) (defendants acted willfully and in bad faith by intentionally deleting documents, lying about the existence and whereabouts of certain documents, and failing to provide a good-faith explanation and conduct was not isolated but rather formed a pattern of vexatious obstruction of discovery with respect to highly relevant records). See also, *Companion Health Services, Inc. v. Kurtz,* 675 F.3d 75, 85-87 (1st Cir. 2012) (suggesting importance of evidence that party "engaged in a deliberate pattern of stonewalling with the aim of frustrating effective discovery and the progress of the case"); *Southern New England Telephone Co. v. Global NAPs Inc.,* 624 F.3d 123, 148-48 (2nd Cir. 2010) (default sanction upheld where deletion of computer documents was intentional rather than merely negligent, conduct formed a pattern of prolonged and vexatious obstruction of discovery with respect to highly relevant records, court found lesser sanction would be ineffective due to party's

failure to comply with previously discovery orders, and court had previously warned party that failure to produce documents would likely result in imposition of default judgment).

### III. The Court Should Decline To Impose The Sanction Of Default

The facts of this case do not warrant the sanction of default. The plaintiff cannot meet its burden to establish by clear and convincing evidence that the discovery violations here we willful and made in bad faith, rather than merely the result of negligence coupled with poor observance of litigation practices. This is not a case where the court issued discovery orders which were violated, where a party was held in contempt, or where the Court was forced to issue a "last and final" warning to the defendants to comply with a court order to meet their discovery obligations. And plaintiff cannot prove that he suffered irremediable prejudice as a consequence of defendants' discovery violations.

### A. The Initial Failure To Repsonsive Documents Was Not Willful And Did Not Occur Because Defendants Acted In Bad Faith.

First, there is no evidence of willful conduct, intentional destruction of evidence, bad faith, or stonewalling of the kind that triggers imposition of the sanction of default. To be sure, the defendants' production of discovery in this case has been flawed, as the Court is well aware. ███████████████████████ ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████ ██████████████████

████████████████████████████████████████

████████████████████████████████████ ███

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████

Likewise, defendants' failure to locate and produce documents concerning the details of the January 17, 2019 article was the result of negligence, not intentional misconduct. The declaration of Christine Niles states that "[w]hen Church Militant received a discovery request asking for copies of the drafts of the January 17, 2019 article, [she] searched [her] email archives to find any drafts submitted by Mr. Balestrieri." Ex. 2, ¶8. Niles explained that "[n]ormally, freelance editors submit articles through email," Ex. 2, ¶7, and that "[t]here was nothing unique about the article that would have caused it to stand out in her memory. It was simply one among thousands of articles [she] was copy editing and publishing." Ex. 2, ¶6. When she looked for responsive documents, she looked in the most likely places that she would expect to find them–in her saved emails sent between Mr. Balestrieri and herself. Ex. 2, ¶8. And in those most likely places, she did not locate any drafts or emails with Mr. Balestrieri about the January 17, 2019 article. Ex. 2, ¶9. Thus, the person responsible for receiving, editing, and posting the relevant article, conducted a search of her email exchanges with Balestrieri, which is the most obvious place to look and the place most likely to hold responsive documents, and found nothing. Defendants' discovery responses reflected that no documents were found as a result of this search.

On June 15, 2023, defendants became aware for the first time that it might be necessary to prove authorship of the article when Marc Balestrieri made a surprise appearance in court and asserted in an email addressed to court staff that there were "false assertions of fact and claims that have been asserted by more than one party." Ex. 3. This

7

caused additional staff at Church Militant to become involved in thinking about the document trail more carefully. And, it was the involvement of the Chief-of-Staff in this process that ultimately resulted in the discovery of documents on Balestrieri's Google drive. Church Militant Chief-of-Staff Simon Rafe sent Niles an email noting that "the document appeared to be copy-and-pasted from a Google doc," and as a result of this communication, Niles located the a draft of the article. Ex. 2, ¶13. Notably, "Google Drive is not the normal means of submitting author articles" and "Mr. Balestrieri is the only freelance author to have share his articles from Google Drive." Ex. 2, ¶14. It was during this search, made at the suggestion of the Chief-of-Staff, that Niles "recalled that Mr. Balestrieri had asked that "Church Militant" create an alias email for him to communicate with: tommoore@churchmilitant.com." Ex. 2, ¶15.

These facts undermine any claim advanced by plaintiff that the failure to produce documents was the result of willful misconduct or discovery violations, as opposed to merely negligence, carelessness, or an insufficiently robust search for documents responsive to the plaintiff's discovery request. While this explanation may reflect an inadequate initial search in response to a discovery request, it also indicates that failure to locate relevant documents on the first attempt did not occur because of intentional misconduct, the intentional distruction of evidence, or bad faith.

> **B.     Defendants Have Not Violated A Court Discovery Order And Have Thus Far Never Received 'Fair Warning' Of The Risk Of A Default Sanction.**

Plaintiff has neither alleged nor proven that the Court has issued a specific court order addressing a discovery dispute and there is no allegation that defendants violated any such order. Likewise there has been no finding of contempt and no warning from the court or

notice that defenadants were exposed to the potential issuance of a default sanction. Unlike the cited cases, in which the imposition of the default sanction was upheld, this case plainly lacks the procedural history of discovery violations that required this Court to issue orders requiring the defendants to produce documents, followed by a refusal to do so. And in the absence of discovery litigation of that nature, there has simply been no occasion for the Court to issue any such order, find a party in contempt, or issue a warning to the defendants that violation of a court order could trigger the sanction of a default. Likewise, there is no allegation that the defendants were on notice of the possible consequences of inadequate discovery searches or other alleged litigation failings.

      **C.**     **Plaintiffs Make No Showing That Lesser Sanctions Would Be Ineffective.**

A lesser sanction than entry of a default judgment is adequate to address any discovery violations that plaintiff has alleged. In the first instance, defendants have observed the consequences of inadequate discovery procedures first-hand, to include the loss of representation by counsel of their counsel of choice. Absent issues surrounding discovery in this matter, they would likely still be represented by Attorney Klaus. Second, plaintiff has indicated his intent to file a motion for attorney's fees, which the Court has invited in its orders. They are acutely aware that they will face that sanction. Third, in addition to attorney's fees, defendants face the potential for some additional sanction. Taken together, these sanctions, some judicially imposed and others that are simply consequences of the discovery error, have fully focused defendant's attention on ensuring they are not subjected to additional sanction.

Finally, the Court previous identified the fact that out-of-state counsel would likely not appear in the District of New Hampshire again, and expressed its concern about that fact. The Court stated:

> I don't know you. I don't know Mr. Nicholson too well. I hope to get to know him better. See, here's what I worry about. You're probably never going to see me again so you might not care what you say to me, but he does.

Ex. 4. As the Court is aware, the undersigned appears regularly in the District of New Hampshire. Indeed, this is the third matter before this Court in the past six months. Undersigned counsel has every incentive as a regular participant in federal court litigation in this district to avoid discovery, or other, failures. Undersigned counsel initially appeared in this matter with the intention of serving as local counsel for a new out-of-state *pro hac vice* attorney. As the Court is fully aware, that plan did not work out, and now the undersigned is in the case as primary counsel. And while this case has grown into a substantial and weighty matter over time, the undersigned has every incentive to endeavor to catch up with the case and see it through to conclusion without further incident.

### D. Plaintiff Has Not Established That Voris's June 14 Text Message Was Intended To Intimidate Balestrieri To Avoid Testifying Or That It Caused Plaintiff Prejudice.

Plaintiff alleges that on June 15, 2023, Voris sent Balestrieri a text message "for the express purpose of making sure that either Balestrieri would testify to the defendant's version of the truth or that he would not testify at all." *Pltf's Memo* at 2. This is incorrect. While Voris clearly did not want Balestrieri to testify *falsely* by denying authorship of the article, there can be little doubt that if he did so, his testimony would be easily countered. Plaintiff asserts that early in the case, defendants were working "arm and arm" with defendant Balestrieri. *Ptf's Memo* at 3. Without bickering about the characterization, ▇▇▇▇

10

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████  Plaintiff certainly does not allege that he did.  Given the presence of the three witnesses to this meeting, Voris simply had no reason to be concerned about the truth–that Balestrieri authored the article–ultimately being proven.  Plus, as he indicated in the June 15 text message, Church Militant had the "digital fingerprints" to prove that Balestrieri authored the article.  Ex 5.

████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ █████

███████████████████████████████████████████

Given these facts, there was simply no realistic possibility that Balestrieri was going to be able to successfully deny that he wrote the article, and accordingly, absent any such fear, the claim that Voris sought to intimidate him into silence does not hold up.

11

Further, the plaintiff simply cannot meet his burden to show the kind of prejudice that supports default as a discovery sanction. Cases in which the sanction is ordered involve real, substantive prejudice. For instance, in *Ayash* he court found that "as a result of the *Globe* defendants' refusals to comply with the discovery orders, the plaintiff lost her opportunity to proceed against the defendants on a theory of joint and several liability. Knowledge of who (if anyone) at Dana–Farber had spoken to [the reporters], and exactly what had been said, could have allowed the plaintiff to bolster her asserted claims or to add new ones." 442 Mass. at 403. Similarly, in *Verizon* and in *Southern New Hampshire Telephone,* the intentional destruction of evidence rendered highly relevant evidence unaccessible by any means. These are direct and real harms.

Here, plaintiff's claim that he is prejudiced is based entirely on speculation. He asserts that Voris's text establishes that "it is likely that Balestrieri would have testified that he did not write the articles," and that this testimony would have "destroyed" defendants' defense in this case. *Plft's Memo* at 20. But it is unclear how this would have operated. Plaintiff fails to establish how Voris learning that Balestrieri lied years after Voris relied upon his credibility as an author, refers back to Voris's subjective belief at the time of publication in 2019. Not only that, but plaintiff further fails to exaplin how Voris's text, made with full knowledge of the evidence of meetings and participation in the defense set out above, makes it any more or less likely that Balestrieri would have testified that he did not write the articles.

Plaintiff also speculates about what would have occurred had Balestrieri admitted to authorship of the article. If Balestrieri refused to name his sources, he argues, then the jury would have hear this evidence. But Balestrieri was not an active defendant in the case–he

12

had already been defaulted. And evidence that Balestrieri refused to identify his sources may have prejudiced Balestrieri, but it would not have harmed the non-defaulted Church Militant defendants at all. Plaintiff also states that if Balestrieri did name his sources, that those sources could have been deposed. But he expressly concedes that "we will never know" what they would have had to say. *Pltf's Memo* at 20. Ultimately, plaintiff's argument serves to highlight the degree to which he asks this Court to impose the sanction of default based entirely on speculation and unproven prejudice.

In addition to the effect of Balestrieri's testimony in the case, plaintiff also speculates about how his testimony could have affected the defense. He argues that "by virtue of Voris feeling the need to threaten him, it is likely that Balestrieri would have testified that he did not write the articles. This would have destroyed Defendants defense in the case." *Pltf's Memo* at 20. But that is simply incorrect. Whatever Balestrieri might have said under oath, defendants were easily going to be able to establish Balestrieri's authorship of the article. Further, the fact that Balestrieri was becoming publicly involved in a controversy involving matters on which he was both a canon lawyer *and* the author of published material, had the potential to seriously harm his career. Balestrieri has every reason to deny writing articles about the SBC dispute with the church to Brother Andre. He would have every reason to deny being the author of the article, and those lies could be easily shown as such. And to the extent that showing the Balestrieri was lying in this case undermined Voris's reliance on Balestrieri's credibility as a reliable reporter in the past, that evidence is not especially compelling. Nobody can predict the future, and at the time of publication, the plaintiff has identified no evidence that should have tipped off Voris that Balestrieri was not credible.

13

Arguing in the alternative, the plaintiff asserts that "assuming that Balestrieri admitted to his authorship of the defamatory article, Fr. de Laire would have been able to examine him about his alleged sources. If he refused to name them, then the jury would have heard this evidence. If he named them, then Fr. de Laire would have reached out to them to interview them and/or taken their depositions even if he needed the Hague Convention to do so." *Pltf's Memo* at 20. But neither Balestrieri's refusal to identify sources nor information gleaned from sources in Rome would be useful against Voris, Carey, or Church Militant. To be sure, this information might cast Balestrieri in a negative light and would likely advance a case against him. But it's relevance to the non-defaulted defendants is speculative at best.

Finally, plaintiff's claim of prejudice relies on his assertion that it is the non-defaulted defendants that are wholly responsible for Balestrieri's unavailability. But, as set forth above, Balestrieri himself has plenty of reason avoid participation in this matter. Balestrieri has long acted in various capacities as a practicing canon lawyer, as a source of information for Church Militant, and as the author of various articles published on the Church Militant website. Ex. 2, ¶4. And he went to substantial lengths to protect this fact from disclosure, including publishing under pseudonyms, using a variety of email addresses at which he asked to be contacted, Ex. 2, ¶5, and denying authorship of certain articles when asked. Ex. 7 at 72. Indeed, plaintiff himself recognizes this fact in his motion, stating that Balestrieri had "particular and unique concerns about having his identity…as a Church Militant collaborator exposed, his personal information shared, and the general divulgence of his activities." *Pltf's Memo* at 8.

In an effort to meet the high standard necessary for imposition of the "ultimate sanction," plaintiff turns to supposition and thin inferences, unsupported by facts. For

14

example, plaintiff argues it is "reasonable to infer" that a loan from Church Militant to Balestrieri was in fact a payoff to secure Balestrieri's "participation (or lack thereof) in this litigation." *Pltf's Memo* at 23.  Plaintiff highlights the suggestion that the loan was a never intended to be paid back by placing the word "loan" in quotations.  *Id.*  Indeed, elsewhere plaintiff alleges that "there was no restriction on the use of the funds provided to Balestrieri." *Pltf's Memo* at 11.  But documents relied upon by plaintiff elsewhere, undercut this suggestion the the loan was actually a gift (or a bribe), ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ And as plaintiff himself references in his motion, Voris made repeated statements "about his expectation that Balestrieri would not repay the loan" *Pltf's Memo* at 23, which fly in the face of the suggestion that those funds were to compensate Balestrieri for his conduct related to the litigation. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ caring for Balestrieri's mother.  Ex. 9. In light of these facts, the inference that the loan was some sort of litigation-related payoff does not stand up.

Likewise, the claim that the non-defaulted defendants are primarily responsible for the decision to communicate on the Threema application is unsupported, or at the very least mitigated, by the facts.  The suggestion the defendants communicate using the application was made by Balestrieri, not by any of the non-defaulted defendants.  Ex 11.  And plaintiff provides no indication or suggestion of what prejudicial material he believes was discussed on that platform.

15

## IV.   Conclusion

For the foregoing reasons, this Court should deny plaintiff's motion seeking imposition of the sanction of default.

Respectfully Submitted
Gary Michael Voris, Anita Carey, and
  St. Michael's Media
By thier attorneys,
Lehmann Major List, PLLC

November 8, 2023

*/s/Richard J. Lehmann*
_____
Richard J. Lehmann (Bar No. 9339)
6 Garvins Falls Road
Concord, N.H. 03301
(603) 731-5435
rick@nhlawyer.com

## **CERTIFICATION**

I hereby certify that a copy of this pleading was this day forwarded to opposing counsel of record via the court's electronic service system.

November 8, 2023

*/s/Richard J. Lehmann*
_____
Richard J. Lehmann