# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| VERY REVEREND GEORGES F. de LAIRE, J.C.L.,<br><br>     Plaintiff,<br><br>v.<br><br>GARY MICHAEL VORIS, ANITA CAREY, ST. MICHAEL'S MEDIA a/k/a CHURCH MILITANT, and MARC BALESTRIERI,<br><br>     Defendants. | CIVIL ACTION NO. 1:21-cv-00131-JL |

## PLAINTIFF THE VERY REVEREND GEORGES F. DE LAIRE'S APPLICATION FOR DAMAGES TO BE ASSESSED AGAINST DEFAULTED DEFENDANT MARC BALESTRIERI

Plaintiff, the Very Reverend Georges F. de Laire ("Father de Laire"), submits this Application for Damages, pursuant to the Court's January 21, 2025 Order (ECF No. 288) requiring same. Pursuant to said Order, the Court instructed Father de Laire to "file a memorandum specifically addressing the damages he is seeking and the injuries for which he seeks redress." Through this memorandum, Father de Laire seeks $100,000.00 in compensatory damages, including enhanced compensatory damages against Marc Balestrieri.

In support of this Application, Father de Laire provides an Affidavit and Exhibits reflecting the damages suffered. Father de Laire further sets forth the bases for seeking punitive damages against Balestrieri, in addition to compensatory damages.

I.     **Procedural and Factual Background**

Father de Laire Was Misled as to Author of the January 17, 2019 Article

As the record reflects, this litigation was commenced almost exactly four years ago, on February 5, 2021, when Father de Laire filed a complaint for purposes of redressing harm suffered by him as a result of various articles and other internet postings on the website known as churchmilitant.com, previously owned and operated by St. Michael's Media ("SMM").  See ECF No. 1.  At that time, Father de Laire believed, based on information gleaned from churchmilitant.com, that Defendant Gary Michael Voris ("Voris") had written an article entitled "NH Vicar Changes Dogma Into Heresy", which was published by churchmilitant.com on January 17, 2019.  See January 17, 2019 Article, with comments, a true and accurate copy of which is attached hereto as **Exhibit A** (hereinafter, the "Article").  That Article contained multiple untrue and defamatory statements about Father de Laire, his competency as a Vicar for the Diocese of New Hampshire, his personal character and his work ethic.  See **Exhibit A**; ECF No. 1 (Complaint), at ¶¶ 43-62; February 4, 2025 Affidavit of Georges F. de Laire, attached hereto as **Exhibit B** ("Father de Laire Aff.") at ¶¶ 14-16.  Father de Laire further alleged that the same untrue and defamatory statements were re-stated and/or re-purposed in subsequent posts and articles published by Church Militant.  See ECF No. 115, ¶¶ 64-67.

In response to those allegations, Voris and SMM admitted in their Answer that Voris did, in fact, author that article.  See ECF No. 14, at ¶ 43.  Litigation commenced, with written discovery, depositions and significant motion practice on various matters.  See, generally, Docket; ECF No. 184-1 (Memorandum in Support of Plaintiff's Request for Judgment as to Liability), p. 3-4.  It was not until December 23, 2021 – almost a year into this litigation – that SMM disclosed through court-ordered supplemental discovery responses that Voris was not the

author of the article.  See, e.g., ECF No. 184-1 (Memorandum in Support of Plaintiff's Request

for Judgment as to Liability), at p. 5.  In the days following that disclosure, SMM's counsel

disclosed, via email, that Marc Balestrieri authored the Article.  Id.

Balestrieri's Evasion of Service and Alternative Service

Once Father de Laire learned that Balestrieri was the author of that Article, he promptly

moved to amend his Complaint to add Balestrieri as a defendant, and the Court granted him

leave to do so.  See ECF No. 114 (Amended Complaint).  Father de Laire then attempted to serve

Balestrieri.  First, Father de Laire referred to the New Hampshire Rules of Civil Procedure,

which permit service on an out of state defendant via United States Registered Mail.  See ECF

No. 131 (Motion for Alternative Service), at ¶¶ 2-3.  That correspondence was sent to

Balestrieri's known business address, as gleaned from his business website.  See ECF No. 131-3,

September 9, 2022 Affidavit of Suzanne Elovecky ("Elovecky Aff.").  While tracking

information showed that the package was delivered, Plaintiff's counsel received subsequent

notice that the package was not deliverable.  Id. at ¶ 20.

In light of the failure to serve by mail, and in order to effectuate service, Father de Laire

engaged two (2) private investigators in an attempt to locate a valid address for Balestrieri,

neither of which were successful.   Elovecky Aff., ¶¶ 14-16; 22-26.  Father de Laire then became

aware of a conference in Lacrosse, Wisconsin, which was addressing matters of Canonical Law.

Id. at ¶ 24.  Father de Laire engaged two (2) process servers to attempt service at the conference

and at planned events surrounding that conference.  Id. at ¶ 24-26.  While it was confirmed that

Balestrieri was present at the conference, and each of the two (2) process servers attempted

service, Balestrieri evaded service by both process servers, including by physically running into

the woods to avoid service.  See ECF No. 131-4; ECF No. 131-5.

Following these failed attempts at service, Father de Laire brought an unopposed motion seeking an order allowing alternative service, which was allowed on September 15, 2022. <u>See</u> ECF No. 131; 9/15/2022 endorsed order. Father de Laire, through counsel, served Balestrieri on September 16, 2022, via U.S. Mail and email. <u>See</u> ECF No. 133. Proof of Service was filed on October 6, 2022. <u>Id</u>. On October 25, 2022, the Clerk of Court entered default against Balestrieri. <u>See</u> ECF No. 134.

<u>Balestrieri's Clear Knowledge of the Action</u>

What Father de Laire did not know, while he was attempting to serve Balestrieri in the summer and fall of 2022, was that Balestrieri was having regular and substantive communications with Defendants Voris and SMM. Through documents produced as late as the summer of 2023 (on the eve of the then-scheduled trial), Voris and SMM disclosed that they had informed Balestrieri that he was being added as a defendant to the law suit. <u>See, e.g.</u>, May 5, 2022 text message between C. Niles and M. Balestrieri re: Motion to Amend, a true and accurate copy of which is attached hereto as **<u>Exhibit C</u>** ("Also, de Laire is seeking to add you as a defendant. We have opposed that. But Kate thought you should at least know they are trying to add you?? ….")[1]; Undated text message between M. Balestrieri and C. Niles concerning motion to amend, a true and accurate copy of which is attached hereto as **<u>Exhibit D</u>** ("The judge agreed to add you as a plaintiff [sic] – so yes, that means you will be named. We tried to fight it, but the

---

[1] At this point, and as reflected in Exhibit C, Balestrieri suggested that he and Niles move their communications to "Threema", which is a messaging app characterized as an "Ephemeral Messaging App", which means it provides, without limitation, "screen shot protection," and "automatic content deletion from all devices." *See, e.g.*, D. Hoover, "Ephemeral Messaging Apps Users: Use Caution During Anticipated or Ongoing Litigation," *ABA Journal* (Feb. 28, 2020), *available at* https://www.americanbar.org/groups/litigation/resources/newsletters/pretrial-practice-discovery/ephemeral-messaging-apps-users-use-caution-anticipated-ongoing-litigation/ (last visited February 4, 2025).

judge disagreed"); Jun 6 text between C. Niles and M. Balestrieri, a true and accurate copy of which is attached hereto as **Exhibit E** ("I have never received to date any summons or subpoena in the matter, nor should someone asserted by an adverse party as being a source acting within the \*ministerial privilege\* have to. I can't afford to hire a lawyer to defend me, all of my means are going to provide for the medical care of my ailing mother."); Sep. 9 text messages between C. Niles and M. Balestrieri concerning motion for alternative service, a true and accurate copy of which is attached hereto as **Exhibit F**.

Further communications showed that Balestrieri was in touch with Voris and SMM concerning the substance of the litigation ***prior to his name being disclosed***. See, e.g., August 25, 2021 text between C. Niles and M. Balestrieri, a true and accurate copy of which is attached hereto as **Exhibit G** ("Hi Marc. Hope you are well. We need to schedule a meeting. The court ruled against us, and we are required to prove sources in Rome called Father de Laire a troublemaker, etc. We need to meet to discuss options."); ("Please respond. Kate has also been trying to contact you. If we don't get some Rome sources, we have no choice but to reveal your name to de Laire's attorneys. It would be attorney's eyes only, so de Laire would not know, nor would the public. We can avoid that if we get name and affidavits from Rome sources. You're the only one with access to that…"). Those messages further showed that Balestrieri was meeting in person with Voris, Niles, and counsel for Voris and SMM. See August 31, 2021 text message between C. Niles and M. Balestrieri regarding in-person meeting at Voris's home, a true and accurate copy of which is attached hereto as **Exhibit H**.

Balestrieri's Attempts to Involve Himself in Litigation; Failure to Comply with Subpoena

On June 15, 2023, a hearing was scheduled on Defendants' Motion for Summary Judgment. See, e.g., ECF No. 155 (Transcript of June 15, 2023 Hearing). Prior to the hearing, in

the early morning, the Court informed all parties that it had received correspondence from Balestrieri.  See, e.g., June 15, 2023 email from clerk of court to parties, forwarding email from Balestrieri, a true and accurate copy of which is attached hereto as **Exhibit I**.  As Balestrieri stated in his email, he then appeared at the courthouse during the summary judgment hearing.  See ECF No. 155.  With Balestrieri present, the parties cooperated in serving Balestrieri with (a) a deposition subpoena, and (b) a trial subpoena.  See, e.g., ECF No. 155, p. 53-55.[2]  Balestrieri then proceeded to discuss the planned deposition with the Court, and the Court suggested the parties confer with Balestrieri to determine a mutually-agreeable future date for said deposition.  Id. at p. 73.[3]  The parties did so, and a written agreement concerning a July 2023 deposition was entered into the record and filed on the docket.  See ECF No. 148, including Exhibit A.

Notwithstanding (a) the subpoena that was duly served, (b) the conversation with the Court where it was clearly communicated that the subpoena constituted a Court Order, and (c) the written signed agreement to appear at the deposition, Balestrieri did not show up on the appointed date of July 12, 2023.  See, e.g., ECF No. 157, pp. 2-4 (including cited exhibits).

Despite his non-compliance with that subpoena, and his failure to – at any time – move to vacate the default entered against him, Balestrieri continued to insert himself in this litigation.  For example, on April 19, 2024, Balestrieri again communicated with the Court concerning his view of both the procedural history and factual background of the litigation.  See, e.g., ECF No.

---

[2] Balestrieri cannot claim ignorance concerning the force of that deposition subpoena.  At the hearing, Balestrieri stated "I have not had a chance to speak with any counsel regarding the opportunity of accepting this invitation to be deposed," and in response, the Court stated, "It's not an invitation.  It's a Court Order."  Id. at p. 55.

[3] As the transcript of the June 15, 2023 hearing reflects, the Court expressed on multiple occasions during its discussions with Balestrieri its concern that Balestrieri was, in fact, continuing in his attempts to evade service and to avoid adhering to the subpoena.  See ECF No. 155, pp. 55-75.

268 (filed under seal).  On June 14, 2024, Balestrieri filed a "Motion for Pro Se Appearance".

See ECF No. 281.  On November 14, 2024, Balestrieri filed a motion to participate in electronic

filing.  See ECF No. 284-1.  Finally, in November of 2024, Balestrieri filed a Motion to Dismiss

this action, notwithstanding the fact that he never moved to vacate the default entered against

him, which remains in place today.  See ECF No. 284.  That motion was denied.  See ECF No.

286.  Concurrently, Balestrieri failed to respond to Father de Laire's Motion for Default

Judgment, which was duly served on him.  See ECF No. 283, including certificate of service

indicating service by mail and email.

There is no question that Balestrieri has been aware of this lawsuit since at least the

summer of 2021, and that he has worked in concert with Defendants Voris and SMM to hide

evidence and information, despite discovery served, to manipulate the judicial process, to evade

service, and to thwart all attempts at obtaining relevant and necessary information for Father de

Laire to prove his case.

## II.    Father de Laire Suffered Significant Reputational Harm Resulting from Balestrieri's Actions

Where default has already been entered against a party, the defaulted party is taken to

have "conceded the truth of the factual allegations in the complaint as establishing the grounds

for liability."  NeighborCare of New Hampshire, LLC v. New Hope Healthcare Systems—

Bedford, LLC, No. 13-cv-14-SM, 2013 WL 5739084 (D.N.H. Oct. 21, 2013) (citing S.E.C. v.

New Futures Trading Int'l Corp., No. 11-cv-532-JL, 2012 WL 1378558, at *1 (D.N.H. Apr. 20,

2012).  But, the entry of default alone does not compel the granting of a default judgment; the

claimant must also state a legally valid claim for relief.  See id. (citing United States v.

Simoneau, No. 12-cv-348-JL, 2012 WL 6917071, at *1 (D.N.H. Dec. 20, 2012).

Each of the above-referenced statements written by Balestrieri regarding Father de Laire further constitutes defamation *per se* under New Hampshire law.  A statement accusing a person of committing a crime, or engaging in activities that would tend to injure him in his trade or business, is defamatory *per se*. See Martin v. Mooney, 448 F. Supp. 3d 72, 84 (D.N.H. Mar. 3, 2020) (citing cases).  A statement that is defamatory *per se* is defamatory on is face; therefore, a plaintiff can recover as general damages all damages which would normally result from such a defamation, such as harm to his reputation, without needing to prove these damages specifically. Id.

"It is well established in New Hampshire that no proof of specific damages is required '[w]hen ... the jury could find that the defamatory publication charged the plaintiff with a crime or with activities which would tend to injure him in his trade or business, commonly called libel per se.'"  Chagnon v. Union Leader Co., 103 N.H. 426, 441, 174 A.2d 825 (1961); see Restatement (Second) of Torts § 570 (1977) (stating that "[o]ne who publishes matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other ... a criminal offense ..., or ... matter incompatible with his business, trade, profession, or office"); see also Lassonde v. Stanton, 157 N.H. 582, 592-93, 956 A.2d 332 (2008). Instead, the plaintiff "can recover as general damages all damages which would normally result from such a defamation, such as harm to his reputation." Chagnon, 103 N.H. at 441, 174 A.2d 825.

Here, it is clear that Balestrieri's statements related to Father de Laire's trade or business (*i.e.*, references to his reputation as "emotionally unstable" in his role as chief canonical judge and counselor to his bishop (Father de Laire Aff., ¶ 14(a)); references to repair image for purposes of promotion (Id. at ¶ 13(b)); reference to his "incompetence" in canonical matters,

related to his position as Vicar of Canonical Affairs (Id. at ¶ 13(c)); references to his work on canonical matters (Id. at ¶ 13(d)), and that Father de Laire is therefore entitled to recover general damages. See, e.g., MacDonald v. Jacobs, 171 N.H. 668, 674, 201 A.3d 1253, 1259 (2019).

As the false and defamatory statements plainly concern Father de Laire in his professional capacity as Judicial Vicar and Vicar of Canonical Affairs, each false statement would "tend to injure [Father de Laire] in his trade or business," as Father de Laire's colleagues in the Catholic church, church officials and leaders, clergy and parishioners alike would likely think and act differently towards Father de Laire as a result of reading the article and believing that he was "emotionally unstable" or "incompetent" or "vindictive and manipulative" or "botched cases." They are, accordingly, defamatory *per se*, and Father de Laire is entitled to recover the attendant damages.

While Father de Laire would not be required to prove harm to his reputation in light of the fact that the defamatory statements constituted *per se* defamation, he nevertheless is prepared to do so, as follows:

Father de Laire was ordained as a cleric of the Catholic Church (the "Church") in 1996 and has served the Church uninterrupted since that time. See Father de Laire Aff., Exhibit B at ¶ 7. He obtained his Masters in Divinity, and a Masters in Biblical Theology, in 1997 from Saint John's Seminary in Brighton, Massachusetts. Id. at ¶ 5. In 2012, he earned his *Juris Canonici Licentia* from the Pontifical Gregorian University in Rome, Italy, earning magna cum honors in that program. Id. at ¶ 6. In 2013, while continuing to lead a parish, Father de Laire was promoted to the roles of Judicial Vicar and the Vicar for Canonical Affairs, reporting to Bishop Libasci, who presides over the Diocese of Manchester. Id. at ¶ 8.

Since being ordained, Father de Laire has taken great pride in his work, and worked throughout his career and service to ensure that he was known as an honest, hard-working, empathetic and fair jurist and pastor.  Father de Laire Aff., ¶ 11.  He is an esteemed member of the Canon Law Society of America, where he has been invited to speak at its national convention.  Id. at ¶¶ 12-13.

On January 17, 2019, however, Father de Laire had reason to fear that all of his years of dedicated service and efforts were destroyed, when he was alerted by a coworker to the Article published on churchmilitant.com.  Father de Laire Aff., ¶ 14.  When he reviewed the Article, Father de Laire quickly identified several untrue, defamatory statements, many of which called into question his integrity, professionalism, and his trade.  Id. at ¶¶ 14-15.  Father de Laire instantly felt attacked, and that he would be seen as someone who could no longer function as a priest, or be taken seriously as a moral person.  Id. at ¶ 16.  Father de Laire was deeply concerned, knowing that the article would be seen by the thousands of readers of Church Militant.  Id.

Following the publication of the Article, Father de Laire reviewed the comments section, appended to the Article on ChurchMilitant.com.  See, e.g., a true and accurate copy of the Article, including comments, attached hereto as **Exhibit A**.  The comments left on the article showed that Father de Laire's worst fears about his reputation had in fact come true – there were several comments that evidenced that the Article, including the defamatory statements, had been accepted as true by several readers.  See Father de Laire Aff., ¶¶ 21-24; see also, e.g., **Exhibit A** ("Botched? … or deliberately mangled. Circumstantially, it would appear that Father Georges de Laire, the 'canon' lawyer is really just a 'fixer.'  Likely for the Lavender Mafia.  Just sayin' … that's what it looks like."; "[a]rrogance, insolence and intentional ignorance are some of the

hallmarks of an unduly ambitious person. He seems to qualify for the grade.  In the priesthood, this can mean putting aside dogma for the sake of heresy in order to grab a seat at the head of the table.")[4]

In addition to the public comment, Father de Laire received emails, both through the Diocese website and addressed to his work email, adopting the untrue defamatory statements as true, and reflecting that his reputation had been marred.  See Father de Laire Aff., ¶ 25; Collected emails reacting to the Article, a true and accurate copy of same attached hereto as **Exhibit J** ("Shameful! Reprehensible!"; "It is a dreadful disgrace!"; "You are nothing but a butt kissing disgusting heretic"; "Church Militant has exposed the errors of Georges de Laire!"; "Your [sic] a heretic and should be relieved of your office as canon lawyer"; "de Laire has complaints of corruption, abuse of office, grave violations of law and incompetence as a canonist filed against him"; "[i]n addition, he resides most often at a 1.5 million dollar estate he purchased"; "The news is out about Fr. Georges de Laire, we demand his immediate firing … The news media will not let you get away with this, no money to the Diocese until you fire Laire [sic] and publicly apologize").

As those emails reflect, they range from simple adoption of the statements as true, to demands for Father de Laire's resignation and/or termination.  But those overt statements were not the only evidence that Father de Laire had that his reputation had been damaged.  He had also learned that inquiries were made about him amongst fellow clergy, as people were concerned that the defamatory statements may have been true (which they were not).  He also

---

[4] These statements are not offered for the truth of the content of the comments, but rather to show what statements were being made about Father de Laire in the days and weeks following the publication of the Article; therefore, hearsay does not bar admissibility of the comments made on the Article.

saw people looking at him, with expressions of uncertainty, or even anger.  See Father de Laire

Aff., ¶ 27.  He noted that when in groups, people would turn their eyes away from him, and

avoided speaking with him.  Id.  He further felt embarrassed and belittled when his colleagues

and others in his supportive network felt that they needed to comfort him.  Id.

### III.    Father de Laire Suffered Significant Emotional Distress Resulting from Balestrieri's Actions

As a result of the Article, Father de Laire suffered emotional distress, which manifested

as anxiety, depression, sleeplessness, and loss of appetite.  Id.  Father de Laire Aff., Exhibit B, ¶

33.  This distress was caused not only by the Article itself, but also the reactions that others had

to the Article, including the several emails and voice mails he received, and in-person

confrontations.  Id. at ¶ 29.  Father de Laire received threatening voice mails.  Id.  Shortly after

the articles were written, a news reporter approached Father de Laire's home, trespassing, via

kayak, to take photographs of Father de Laire and his property.  Id.  Finally, in one instance,

during a service at his parish, a person unknown to Father de Laire attended service and was

threatening toward Father de Laire during communion, invading his personal space, and

attempting to intimidate Father de Laire as he provided the sacrament.  All of these instances –

direct results of the Article and the untrue, defamatory statements contained therein – caused

Father de Laire further emotional distress and anxiety.

As a result of what Father de Laire suffered in the wake of the Article, he spoke with his

psychiatrist, Dr. Amy Lister at the Hallowell Center in Sudbury, Massachusetts.  See Father de

Laire Aff., ¶¶ 30-31; Deposition of Dr. Amy Lister, attached hereto as **Exhibit K**, at p. 25;

Excerpts of Medical Records Produced by Amy Lister ("Lister Records"), a true and accurate

copy attached hereto as **Exhibit L**, at pp. 1-2 (dated September 20, 2021"lawsuit exposed his

family" "Article Jan 17 2019 winter spring 2019" "Diocese recommended after article that he get

protection"); 8 (dated June 12, 2019 "I'm a mess"); 9 (dated March 13, 2019, references "return of slander on internet"; "life threatened multiple times in Jan(related to legal work he does)".[5]

## IV.    Father de Laire Seeks General Damages in the Amount of $100,000

New Hampshire law is clear that Father de Laire is entitled to general damages, i.e., "all damages which would normally result from such a defamation, such as harm to his reputation" and that he "need not prove these damages specifically".  See, e.g., Lassonde v. Stanton, 157 N.H. 582, 592-93 (2008), citing Chagnon v. Union Leader, 103 N.H. at 441; Restatement (Second) of Torts, § 573 (1977).  Based on the foregoing and the evidence provided herewith, Father de Laire has established that he suffered both reputational harm and emotional distress and is entitled to general damages.

In order to establish an amount of general damages, Father de Laire provides the following examples of damages awarded in defamation cases in similar cases:

**Neelon v. Krueger, et al**, No. 12-CV-11198-IT, 2015 WL 7627378 (verdict slip) (D. Mass. Sept. 22, 2015).  Plaintiff brought claims for defamation (amongst others) alleging that defendants made certain false statements in Canada suggesting that Plaintiff was facing criminal charges in Mongolia, and that these statements were published in the United States, harming plaintiff's reputation and business prospects.  See, e.g., Neelon v. Krueger, No. 12-CV-11198-IT, 2015 WL 1037992 at * 1 (D. Mass. March 10, 2015).  Ultimately, following jury trial, Plaintiff was awarded $100,000 in compensatory damages, and $250,000 in special damages.  See, e.g.,

---

[5] Unfortunately, since her deposition was taken, Dr. Lister died on January 14, 2024.  See, e.g., https://www.legacy.com/us/obituaries/bostonglobe/name/amy-lister-obituary?id=54204411 (last visited February 3, 2025).  Where Dr. Lister is now clearly unavailable, Father de Laire would seek to enter her deposition testimony, coupled with her notes concerning her meetings with Father de Laire, as evidence of the treatment sought.

Neelon v. Krueger, et al, No. 12-CV-11198-IT, 2015 WL 7627378 (verdict slip) (D. Mass. Sept. 22, 2015).

According to the verdict slip, $100,000 in compensatory damages was awarded after the jury found by a preponderance of the evidence that "Mr. Neelon has suffered impairment to his reputation and standing in the community, emotional distress, personal humiliation, shame and disgrace, or mental suffering as a result of Defendants' defamatory statements (or statement)." Id. at Question 7.

**Sindi v. El-Moslimany, No. 1:13-CV-10798-IT, 2016 WL 6394089 (verdict slip) (D. Mass. July 20, 2016)**.  Plaintiff brought defamation claims, amongst others, alleging that over a period of five years, defendants "published a series of web posts pertaining to [plaintiff] in a variety of forums, including Amazon.com, Facebook, the Washington Post website, and various blogs" accusing the plaintiff of "fraudulently obtaining her doctorate by paying a colleague to ghostwrite her dissertation, repeatedly lying about her age in order to obtain awards meant for younger scientists, and inflating her resume".  See Sindi v. El-Moslimany, 896 F.3d 1, at 1 (1st Cir. 2018).

According to the verdict slip, the jury awarded the plaintiff in that case $400,000 in compensatory damages for defamation against one plaintiff, and $100,000 against another.  See Sindi v. El-Moslimany, 2016 WL 6394089 at Q1c, Q5c.  These awards were appealed, and the First Circuit held:

> The issue of damages remains. Samia and Ann characterize the damages awarded by the jury on the defamation claims ($400,000 against Samia and $100,000 against Ann) as excessive and entreat us to either grant a new trial on damages or to reduce the awards. Their main argument is that the damages are too high because Dr. Sindi offered insufficient evidence of economic loss resulting from their libels.

The court below was tasked with assaying the damages awarded by the jury, and its decision to deny the appellants' motion for a new trial on damages or for a remittitur is reviewed for abuse of discretion. See Trainor, 699 F.3d at 29. We discern none here.

To recover damages, Massachusetts does not require a plaintiff to prove that economic harm resulted from defamatory statements alleging "that the plaintiff lacks a necessary characteristic of [her] profession." Ravnikar, 782 N.E.2d at 511. In such circumstances, the plaintiff may recover for wholly noneconomic losses, including "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." Draghetti v. Chmielewski, 416 Mass. 808, 626 N.E.2d 862, 868 (1994).

Sindi v. El-Moslimany, 896 F.3d 1, 20 (1st Cir. 2018). New Hampshire law does not significantly differ from Massachusetts on this point (See, e.g., Lassonde v. Stanton, 157 N.H. 582, 592-93 (2008), citing Chagnon v. Union Leader, 103 N.H. at 441; Restatement (Second) of Torts, § 573 (1977)), and no differing outcome is required pursuant to New Hampshire law.[6]

In light of the foregoing, Father de Laire's request for $100,000 in compensatory damages is fair and reasonable, and is in line with (a) the type of defamation suffered, and (b) the harm to Father de Laire as a result of said defamatory statements.

**C.    Conclusion**

In view of the foregoing, Plaintiff Father de Laire respectfully requests the Court assess damages against defaulted defendant Marc Balestrieri in the amount of $100,000.

---

[6] Similar awards are not inconsistent with awards based on emotional distress alone, without regard to the reputational harm aspect of what Father de Laire has suffered. See, e.g., Powell v. Jones-Soderman, 433 F. Supp. 3d 353, 379 (D. Conn. 2020), aff'd, 849 F. App'x 274 (2d Cir. 2021) (awarding $40,000 for emotional distress damages related to defamation, and collecting cases concerning "garden variety" emotional distress damages, evidencing appropriate ranges of $30,000 to $125,000) (citing Vera v. Alstom Power, Inc., 189 F. Supp. 3d 376, 378-79 (D. Conn. 2016) (collecting cases awarding "garden variety" emotional distress damages ranging from $40,000-$125,000)); see also Olsen v. Cty of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y.) (collecting cases awarding "garden variety" emotional distress damages ranging from $30,000 to $125,000).

Dated: February 4, 2025                     Respectfully submitted,

                                            THE VERY REVEREND GEORGES F. DE LAIRE

                                            By His Attorneys,

                                            /s/ *Joseph M. Cacace*
                                            Joseph M. Cacace, N.H. Bar No. 266082
                                            Howard M. Cooper, *pro hac vice*
                                            TODD & WELD LLP
                                            One Federal Street, 27th Floor
                                            Boston, MA 02110
                                            (617) 720-2626
                                            jcacace@toddweld.com
                                            hcooper@toddweld.com

                                            - and –

                                            /s/ *Suzanne M. Elovecky*
                                            Suzanne M. Elovecky, *pro hac vice*
                                            PARTRIDGE SNOW & HAHN, LLP
                                            30 Federal Street
                                            Boston, MA 02110
                                            (617) 292-7900
                                            selovecky@psh.com

**CERTIFICATE OF SERVICE**

        I hereby certify that on the 4th day of February 2025, a copy of the foregoing document was served and transmitted to all counsel of record via the court's electronic filing system. The following pro se party was served conventionally via U.S. Mail and email at the addresses below:

        Marc Balestrieri
        514 Americas Way
        PMG 20863
        Box Elder, South Dakota 57719
        Balestrieri.marc@gmail.com

                                            /s/ *Suzanne M. Elovecky*
                                            Suzanne M. Elovecky