**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 8-11-2025**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
REVEREND GEORGES F. de LAIRE,       *
J.C.L.                              *   21-cv-131-JL
                                    *   April 25, 2025
            v.                      *   2:15 p.m.
                                    *
GARY MICHAEL VORIS, ANITA CAREY,    *
ST. MICHAEL'S MEDIA a/k/a CHURCH    *
MILITANT, and MARC BALESTRIERI      *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF DAMAGES HEARING - DAY ONE
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:

For the Plaintiff:         Suzanne Elovecky, Esq.
                           Partridge, Snow & Hahn

For the Defendant:         Marc Balestrieri
                           Pro Se

Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

I N D E X

WITNESS:                    Direct        Cross

GEORGES F. de LAIR

By Ms. Elovecky            30

By Mr. Balestrieri                        92


EXHIBITS:                                FOR ID      IN EVD

Plaintiff's Exhibit A.                                45

Plaintiff's Exhibit B.                                73

```
1                     P R O C E E D I N G S
2               THE CLERK:  The Court is now in session and has
3     before it for consideration a damages hearing in 21-cv-131-JL,
4     Reverend de Laire versus Voris, et al., Marc Balestrieri.
5               THE COURT:  All right.  We're here for a default
6     damages hearing.
7               Father de Laire is here represented by counsel.
8               Mr. Balestrieri is here unrepresented, but he's --
9     at this point of the proceeding he has a right to be here and
10    participate because it's a default damages hearing.  So his
11    default does not preclude him from participating.
12              Let me just ask you, Mr. Balestrieri.  Do you
13    understand what's happening here today?
14              MR. BALESTRIERI:  As much as I can in my capacity
15    as a regular citizen, not a licensed civil attorney.
16              THE COURT:  Yeah, it's -- understood, but it's not
17    a complicated situation here today at all.
18              There's two parts to any civil litigation,
19    liability and damages.
20              Liability is deciding whether -- is when a Court
21    decides whether you can be held legally at fault for
22    something.
23              MR. BALESTRIERI:  Uh-huh.
24              THE COURT:  Damages is the part where if you are
25    legally at fault, what the Court orders you to compensate the
```

1    plaintiff with.  How much and in what capacity.  All right?

2            The liability part of the litigation has already

3    ended, and you've been deemed to be liable by default, not by

4    any sort of process so much as really more of a ruling based

5    on your failure to participate, but that's over.  You're being

6    held liable for defamation.

7            And what happens today is Father de Laire is going

8    to present evidence of his damages, and you're going to be

9    able to cross-examine him, ask any questions you want to ask

10   him, and then when he's done, you'll be able to present any

11   evidence you want to present, and I'll consider it all in

12   deciding whether to award damages and if so, how much.

13           Do you understand?

14           MR. BALESTRIERI:  Yes, sir.

15           THE COURT:  All right.  Let me ask this.  Before we

16   do this, you know, you're sitting here together in a courtroom

17   in a federal courthouse.  He's made a request here for

18   $100,000 in damages.  Do you want any sort of opportunity to

19   sit with his lawyer and discuss a settlement with him rather

20   than proceeding in this fashion?  It might be that you could

21   work something out, and if you could -- you can't negotiate

22   through me, but if that's something you're interested in

23   doing, I would give you a short opportunity to at least talk

24   to each other since you're both here.  Is that something you

25   are interested in?

1          By the way, even if you are, that doesn't mean they

2    are.  So I'm going to ask them the same question, but I need

3    to at least give you the opportunity.

4          MR. BALESTRIERI:  Can I -- and, forgive me, I don't

5    want to ask any questions that would be improper of the judge.

6          THE COURT:  That's okay.  Ask me anything you want.

7    I can't give you legal advice, but I can answer questions

8    about the process here.

9          MR. BALESTRIERI:  I have a preliminary request

10   that's prior to the question of damages being addressed

11   procedurally from what I've been told.  If I might raise that

12   briefly now?

13         THE COURT:  It's very unlikely you're going to be

14   able to do that, but tell me what you have in mind.

15         MR. BALESTRIERI:  Yes, your Honor.

16         So it has been exceedingly difficult for me to

17   obtain legal counsel as I've mentioned I think the last time I

18   was here, as well as also because New Hampshire is a very

19   tightly knit community.  It's a small state.  Everyone knows

20   each other.  Those are common general reasons.

21         But just for an example, I secured local counsel

22   just recently.  That counsel backed out due to being

23   conflicted.

24         THE COURT:  Who was that?

25         MR. BALESTRIERI:  I would rather not say, but it's

```
 1    someone who's here in Concord if I'm not mistaken.

 2                THE COURT:  You would rather not say?

 3                MR. BALESTRIERI:  Is it required for me to say,

 4    your Honor?

 5                THE COURT:  No, no, it's not required, but why

 6    would you rather not say?

 7                MR. BALESTRIERI:  I don't want to put anyone on the

 8    spot, but it's true.

 9                THE COURT:  You're telling me that you hired a

10    lawyer?

11                MR. BALESTRIERI:  So I have found a federal

12    attorney, and I have a letter whereby he communicates to this

13    Court, if I can present it to the court clerk to bring to your

14    Honor.

15                THE COURT:  Just tell me what you're looking for

16    here.

17                MR. BALESTRIERI:  Yes, your Honor.

18                And do I need to stand when I address you?

19    Understood.

20                So I would like to make an oral motion for a

21    continuance based upon the fact that I've found a licensed

22    federal attorney, Christopher Kolomjec, who's admitted at

23    state, federal, and military practice.  Well-known.  He is

24    willing to -- he has -- he says -- if I can read you the

25    letter that he's written, your Honor?
```

1          THE COURT:  I think I get it.  Is he a member of

2    the bar in this court?

3          MR. BALESTRIERI:  He's a member of the federal bar,

4    but he needs a local attorney in order to appear pro hac vice,

5    and that is the stumbling block that we've faced in my being

6    able to secure representation.

7          I have a skilled litigator.  I don't have a local

8    attorney by reason of them all being conflicted or my not

9    wanting to pay an exorbitant amount of money, and I mean

10    exorbitant in order to secure representation, and so --

11          THE COURT:  I'm sure there's plenty -- I mean, a

12    myriad of attorneys who are not conflicted in this case.  I'm

13    sure.

14          MR. BALESTRIERI:  Sir, it's been exceedingly -- I

15    must contradict that.  At least fifteen to twenty attorneys.

16          THE COURT:  Well, you've represented to this Court

17    repeatedly that you're destitute, okay, and I don't know if

18    you still are.

19          MR. BALESTRIERI:  Your Honor, I wouldn't use the

20    term destitute, but I have extremely heavy financial

21    obligations and --

22          THE COURT:  You have limitations on your ability to

23    pay counsel.

24          MR. BALESTRIERI:  Yes, sir.

25          THE COURT:  That sometimes can be a barrier to

1  getting counsel.  Counsel want to be paid.

2           MR. BALESTRIERI:  So I now have been able to raise

3  the funds needed to secure counsel.  It's taken some time.

4           THE COURT:  I mean -- here's the thing though,

5  okay?  So you need local counsel to move his admission pro hac

6  vice so he can represent you in this default.

7           MR. BALESTRIERI:  Yes, your Honor.

8           THE COURT:  By the way, I would not be interested

9  in appointing a lawyer to help you file a motion to remove the

10  default.  That's a long time ago.

11           MR. BALESTRIERI:  I think you've addressed that in

12  your most recent court orders.

13           THE COURT:  Yeah.  The problem though is -- I mean,

14  you know, respectfully, this is a lot of drama.

15           Where did you come from today?  Where did you

16  travel from?

17           MS. ELOVECKY:  I traveled from Massachusetts.

18           THE COURT:  Where?

19           MS. ELOVECKY:  Danvers, Massachusetts.  It was an

20  hour and fifteen minute drive.

21           THE COURT:  Right.  I mean, your lawyer even though

22  he's not a member of our bar could easily have contacted the

23  court -- if he's any kind of lawyer, could have contacted the

24  court and said, look, Mr. Balestrieri wants to retain me, I

25  need to line up local counsel, can I have some more time.  And

1    counsel would have even agreed to that I'm sure.

2            MR. BALESTRIERI:  Your Honor, this letter is --

3    this commitment was offered yesterday, April 24th, in writing

4    from this federal court attorney.

5            THE COURT:  Yeah, it's just too much drama.

6            MR. BALESTRIERI:  It's also my first motion for a

7    continuance.  I've never to date requested a motion for a

8    continuance.

9            THE COURT:  You haven't been before the Court until

10   today.  You're not before the Court.

11           MR. BALESTRIERI:  I also traveled from far away.  I

12   traveled further.

13           THE COURT:  It would have been easier and more

14   reasonable to just have this lawyer, even if it was

15   yesterday -- and the idea that he doesn't know that raises

16   questions.  That it would have been a better idea for him to

17   contact us, explain it, and be in touch with counsel lawyer to

18   lawyer.

19           Because do you think she wants to come up here

20   today and walk into a courtroom and have someone say I would

21   like to postpone this?  It's not reasonable.

22           MR. BALESTRIERI:  Sir, for a case that's lasted --

23   when was this case initiated, back in 2019 or in 2020?  I

24   don't recall exactly.  It's been at least five years.

25           MS. ELOVECKY:  February 2021.

1          MR. BALESTRIERI:  February 2021.  Thank you.

2          THE COURT:  What's your point?

3          MR. BALESTRIERI:  My point is that to request a

4    continuance, per what he requests, for four to six weeks to

5    allow adequate time to retain appropriate local counsel and

6    prepare for the forthcoming hearing on damages.

7      (Court reporter asks Mr. Balestrieri to speak slower)

8          Pardon me.  I'll repeat.

9          THE COURT:  You don't need to repeat.  You don't

10   get it, okay?  It's not that the request is unreasonable.  The

11   request is not unreasonable.  Walking into court and making

12   the request is unreasonable when it could have been prevented.

13         Lawyers cost money.  She's here representing Father

14   Balestrieri, right?  Nobody wants to --

15         MR. BALESTRIERI:  Father de Laire.

16         THE COURT:  Sorry.  Father de Laire.  My mistake.

17   Sorry about that.

18         But, you know, people have -- there's a court

19   reporter here and a deputy clerk in the room.  I'm here, I've

20   prepared, but you walk in the day of.

21         MR. BALESTRIERI:  I apologize to the Court and to

22   the plaintiff and his counsel.

23         This just materialized yesterday afternoon/evening.

24   It was not easy to obtain a commitment from this attorney.

25         He also needed to know more, but he decided to

1    proceed and expresses clearly in black and white:

2            "I am in the process of securing local counsel and

3    will be submitting a formal appearance on Mr. Balestrieri's

4    behalf."

5            THE COURT:  Slow down.  Slow down.  The court

6    reporter has to keep up with you.

7            MR. BALESTRIERI:  I apologize.

8            THE COURT:  You don't need to read the letter.

9    Just hand the deputy clerk your letter, and I'll read it.

10           MR. BALESTRIERI:  Yes.  Do I pass one to --

11           THE COURT:  You can do whatever you want.

12       (Mr. Balestrieri gives a copy to the Court and counsel)

13           (Pause)

14           I want to know who the lawyer is that you said had

15   a conflict and couldn't participate.  Hey, this is not a deep,

16   dark secret.

17           MR. BALESTRIERI:  Sir, it's a question of names.

18   I'm trying to recall the name.  I apologize.

19           THE COURT:  You don't remember the name?

20           MR. BALESTRIERI:  Not off the top of my head.  I'm

21   trying to think.

22           THE COURT:  Okay.  All right.  Look, this is a very

23   reasonable request, just not in the way it's being done.  It's

24   being done in a way that was inefficient, wasteful, and

25   disrespectful to your opponent and counsel.

1          Now, look, you've apologized for it, apology

2     accepted, but I'm not going to grant this relief unless

3     adverse counsel would prefer to deal with counsel instead of

4     dealing with you.  If adverse counsel doesn't want to go along

5     with this, we're going to have a hearing today.

6          I understand your request, but the way you've done

7     it is sort of more of the same of your conduct in this

8     situation.

9          MR. BALESTRIERI:  Your Honor, if I can respectfully

10    submit --

11         THE COURT:  Here's what's not respectful.  You

12    interrupting me.

13         What is it you respectfully want to do now?

14         MR. BALESTRIERI:  Your Honor, I respectfully submit

15    that the way I've handled this in the Court's eyes

16    inappropriately only underlines my need for counsel.  I did

17    not know that this was improper.

18         I, secondly, factually only obtained this attorney

19    yesterday, but I've been working --

20         THE COURT:  I know, but for him not to know that

21    the right move is to contact the Court speaks volumes about

22    this lawyer, okay?  For him to tell you to walk in here with a

23    letter, that's --

24         MR. BALESTRIERI:  He didn't tell me that.  If I may

25    speak?

1          THE COURT:  There's a letter here.

2          MR. BALESTRIERI:  I requested it.

3          THE COURT:  Okay.  You requested it.

4          He didn't send it to us.  He didn't call us.  He

5   didn't do any of those things, and yet there's people here who

6   have spent time, money, and resources preparing to litigate

7   today.  So to walk in the day of is unreasonable.

8          And aren't you a canon lawyer?

9          MR. BALESTRIERI:  A very different forum, your

10  Honor.

11         THE COURT:  I doubt you're allowed to walk into

12  canon court the day of proceedings and ask for delays in ways

13  that were very preventable if people had notice ahead of time.

14  I doubt it.  I know it's very different, I'm not an expert in

15  canon law, but I doubt that that kind of practice is

16  countenance.

17         MR. BALESTRIERI:  It's subject to conditions and

18  facts, your Honor.  If I may, again, it's only preventable

19  inasmuch as one could ask ahead of time.

20         This was just secured yesterday.  This commitment

21  was not easy to obtain at all.  And so when you say

22  preventable, I've had tremendous difficulty finding local

23  counsel by reason of conflicts which I mentioned, and someone

24  who's skilled as a federal court litigator was even more

25  difficult.

1          THE COURT:  Okay.

2          What's your position?

3          MS. ELOVECKY:  Your Honor, Father de Laire objects

4   to this request.

5          As you know, Mr. Balestrieri was here almost two

6   years ago and at that time was saying he had difficulty hiring

7   counsel.

8          Even if we were to agree to this today, there is

9   nothing that prevents a further request.  This case has been

10  pending for quite some time.

11         As you've properly surmised, we have spent

12  significant time preparing for today, including preparing for

13  testimony which of course needs to happen close in time to

14  said testimony.  We would have to redo some of that

15  preparation.

16         I think that it is highly prejudicial to the

17  plaintiff given the amount of time that this hearing has been

18  set and that Mr. Balestrieri has been aware of this action and

19  his need for counsel.  As I said, we know that on June 15th of

20  2023, he was here in this courtroom saying the same things.

21  There is nothing that prevents him from saying it again in

22  four to six weeks, and any continuance from today is highly

23  prejudicial to Father de Laire.

24         THE COURT:  I actually agree.

25         MS. ELOVECKY:  Thank you, your Honor.

1              THE COURT:  The letter dated April 24th from

2      Attorney Kolomjec says that he respectfully requests an

3      adjournment of four to six weeks to allow adequate time to

4      retain appropriate local counsel and prepare for the

5      forthcoming hearing on damages.

6              He can't make a request respectfully or not.  He's

7      not before the Court.  He's not a member of the bar.  He

8      hasn't filed an appearance in this case.  So it's not that

9      this request is -- this request by Attorney Kolomjec,

10     completely inappropriate, completely -- well, inappropriate is

11     the right word, but I guess what I'm saying is it's improper.

12             For you to make the request, though, is not

13     improper.  For you to ask for it is not improper.

14             So I'm going to set aside that this request was

15     ever made because it's improper, but I'm considering your

16     request to give yourself time to hire a lawyer.

17             If adverse counsel had gone along with it, I would

18     allow it.  I'm prepared to go, I've spent time preparing, but

19     I would disregard that if adverse counsel and Father de Laire

20     agreed to it, but they don't agree to it.  So we're going to

21     proceed today.

22             You've had plenty of time.  There's nothing that

23     made it impossible to hire a lawyer until yesterday.  There

24     isn't.

25             MR. BALESTRIERI:  May I respond, your Honor,

1    briefly?

2            THE COURT:  It isn't about brief or -- it isn't

3    about briefly or taking a long time.  You're going to be able

4    to say everything you want here today.  It's almost as if you

5    think I'm impatient with you.  We've bent over backwards for

6    you.  You don't seem to understand that.  The whole process

7    has been bending over backwards for you.

8            It makes no sense that you don't think you could

9    have spoken to a lawyer from Novi, Michigan, until yesterday.

10           You're about to tell me why it was impossible until

11   yesterday, and I guess if you want me to listen to that, I

12   will, but I'm very unlikely to be persuaded by what you're

13   about to say.  So go ahead if you want.

14           MR. BALESTRIERI:  Your Honor, very respectfully,

15   back here two years ago when I appeared in court in June of

16   2023, I had a situation which the plaintiff and his counsel

17   know fully well about, and that is a situation with my mother,

18   86 years old now, who suffered a cataclysmic situation, a

19   sequence of events back in December 2021.  She remains

20   bedbound with aphasia.  She is incapable of taking care of

21   herself.

22           I'm providing caregivers practically around the

23   clock when I'm not there, and I cannot begin to tell you the

24   difficulty being an only child having to provide her care.

25   Not simply putting her in a nursing home and forgetting about

1   her, but providing the care that a dutiful son is obliged to

2   provide, which I aim to do and am doing.  That costs a

3   tremendous amount of money.

4           Secondly, my father caught cancer -- acquired

5   cancer, three kinds of cancer that metastasized.  He was sick

6   for the entirety of 2023 and died at the end on November 19,

7   2023.

8           THE COURT:  I'm sorry about that.

9           MR. BALESTRIERI:  Which I think I mentioned he was

10  already gone when I came to this court, and it should be on

11  the record if I recall correctly.

12          But we all have parents who age, get sick, and die.

13          THE COURT:  Every day people litigate in this court

14  with the same problems you have.

15          MR. BALESTRIERI:  Yes, sir.

16          THE COURT:  I sympathize, but I don't understand

17  where you're going with this.

18          MR. BALESTRIERI:  So most of the law firms that I

19  contacted here in New Hampshire wanted a deposit of $25,000

20  simply to secure representation.  Off the bat, 25,000.  A

21  local attorney wanted -- 10,000 I think was the common amount

22  that they needed.

23          But when I am burdened with having to find funds

24  week to week to provide for medical care of my mother and come

25  up with $25,000, $10,000 --

1          I also traveled much further away than Attorney

2     Elovecky.  I regret that she has been inconvenienced despite

3     the fact that she is being compensated for that.

4          I did not relish the burden of coming here, but I

5     was called, notified duly by Ms. Otis of this hearing.

6          All I can say is that it seems as if this system,

7     this particular case it seems, I'm not saying it is, is

8     leveraged by a matter of fact, not by design, on the abilities

9     of a wealthy individual to be able to file suit.  It's just

10    the way our system is perhaps, but there is no doubt that

11    there is a power differential and a disparity of means to

12    provide for counsel, and I've been adversely affected by that.

13         And now that I've finally found federal counsel to

14    assist and am requesting a delay, a postponement of four to

15    six weeks for a case that's lasted five years, I discussed it

16    with Attorney Kolomjec, he did not seem to think that it would

17    be improper to ask for a small delay for me to be able to

18    continue looking for local counsel now that I've also found

19    the funds beyond that which is needed to take care of my

20    mother.  My mother's health and caregiving has always been my

21    main priority.  I think I submitted that in writing in my

22    response.

23         THE COURT:  I take you at your word for that.

24         MR. BALESTRIERI:  So I respectfully submit and

25    request that the Court please take that under advisement.

1          MS. ELOVECKY:  Your Honor, I would like to respond.

2          THE COURT:  If you think you need to.

3          MS. ELOVECKY:  For the record.

4          Your Honor, I hear what Mr. Balestrieri is saying.

5  I would like to point out that, first of all, Father de Laire

6  lost his own mother in November of 2024 after an illness that

7  required him to be out of the country for months.  That is, as

8  you mentioned, not something that is unusual.

9          Father de Laire is not here because he wants to be.

10 He is here because he's been defamed and because he is looking

11 to have equity and justice as a result of that.

12         Father de Laire in no small part because of Mr.

13 Balestrieri's own actions has had a significant increase in

14 the attorney's fees that he has been required to pay in this

15 matter by the tune of hundreds of thousands of dollars, and we

16 absolutely do not feel that the reasons listed by Mr.

17 Balestrieri in any way justify the highly prejudicial request

18 that's being made today.

19         THE COURT:  Yeah.  Understood.

20         Look, I definitely sympathize, but I can't

21 countenance walking into a courtroom the day of the proceeding

22 and asking for a delay that could have been asked for -- that

23 you could have made yesterday, but your counsel should have

24 known better, the one you claim to have hired in Michigan.

25 It's just -- it's completely inappropriate and strange

 1    credulity that this man, Attorney Kolomjec, would think this

 2    is the approach that you should take.  It's not.

 3             What we're going to have to do today is proceed

 4    with our hearing.  I'm not going to grant your request for a

 5    continuance.  It's unreasonable under the circumstances given

 6    where we've been in this litigation to ask of anyone, but the

 7    method of doing it in the courtroom on the day of the

 8    proceeding as opposed to in advance makes it even more

 9    inappropriate and unmeritorious.

10             Let's proceed.

11             This is an evidentiary hearing.  You may proceed.

12             MS. ELOVECKY:  Thank you, your Honor.

13             May I make one sort of request of information and

14    one kind of opening argument or question before I ask Father

15    de Laire to take the stand?

16             THE COURT:  Sure.

17             Mr. Balestrieri, you'll be able to make an opening

18    yourself.  Listen to what she says.  If you want to respond to

19    it, you'll be able to do that.

20             MR. BALESTRIERI:  Thank you.

21             MS. ELOVECKY:  As your Honor knows, we are here

22    today seeking damages against the defaulted defendant Marc

23    Balestrieri.

24             Mr. Balestrieri not only failed to respond to the

25    complaint in this matter, but he also evaded service on

1    multiple occasions when we were attempting to serve him with

2    both a subpoena and a summons.

3                And he also, as we discovered through the discovery

4    process, that he had actually colluded with the other

5    defendants in this case to improperly conceal material

6    evidence and information from Father de Laire throughout the

7    length of this litigation.

8                We now know that Mr. Balestrieri is the author of

9    the January 17, 2019, article that was published by

10   churchmilitant.com, and it is those actions and the drafting

11   of that article and the defamatory statements made therein for

12   which we are seeking damages today.

13               The damages take the form of reputational harm and

14   emotional distress damages.  And as you know, Father de Laire

15   is here and is prepared to testify as to the damages he

16   experienced which he also gave a summary description of in an

17   affidavit that was submitted to you.

18               The Court has permitted Mr. Balestrieri the

19   opportunity to refute Father de Laire's request for damages.

20   In response, Mr. Balestrieri filed an affidavit which by my

21   read is seeking to reopen the question of liability rather

22   than damages.

23               And it would be my request, your Honor, that that

24   affidavit and those topics be conclusively stricken and that

25   your Honor give direction to this proceeding that we are not

1    addressing matters of liability.

2            If your Honor is inclined to entertain the issues

3    raised in Mr. Balestrieri's affidavit, Father de Laire is

4    prepared to testify to same, but it will be more efficient if

5    we are not dealing with those liability matters.

6            Also in Mr. Balestrieri's affidavit he engages in

7    impermissible and improper hearsay where he conveys the

8    out-of-court statements which are offered for the truth of the

9    matter therein.  That takes place at paragraphs 11, 12, 14 and

10   16 of his affidavit which we would ask again that the Court

11   not consider and that be stricken based on that impermissible

12   hearsay.

13           And of course if Mr. Balestrieri provides any

14   testimony today, I will make the appropriate objections at

15   that time.

16           At this time we are happy to have Father de Laire

17   be able to take the stand and are happy to proceed before your

18   Honor in determining the damages in this matter.

19           THE COURT:  All right.  You may call your witness.

20           Actually, you've opened, so we're going to give him

21   a chance to respond.

22           MS. ELOVECKY:  Thank you.

23           THE COURT:  If you want to respond to what she said

24   in her opening, I'll listen.

25           MR. BALESTRIERI:  Thank you, your Honor.

1          This is the first time I'm doing this in federal

2     court, so forgive me for lack of form or other potential

3     improper means of proceeding.

4          I would like to first respond by saying that

5     everything that I've provided information for is a source,

6     bearing in mind that I was not the only source but one of

7     multiple sources, is not defamatory because it's true.

8          Now, that has been litigated and the period for

9     argument has closed, but that is my response to an affirmation

10    on the part of counsel for plaintiff de Laire --

11          THE COURT:  Right.

12          MR. BALESTRIERI:  -- first and foremost.

13          Secondly, Attorney Elovecky makes the assertion

14    that I have, quote, evaded service, that multiple times I

15    failed to participate.

16          First and foremost, the first communication I

17    received from this Court was a notice of default dated October

18    25, 2022, if I'm not mistaken.

19          In the canonical system court decisions are

20    communicated from the judge, from the tribunal court clerk,

21    called a notary, to the parties concerned.

22          I had received the text message from Christine

23    Niles of St. Michael's Media, Church Militant, advising that

24    someone was looking to add me on but never anything definite

25    indicating that I had in fact been added as a defendant, and I

1  was waiting, as I thought I indicated in my text messages, to

2  be notified by the court per the canonical system.

3        You asked me you would imagine that in canon law

4  something happens a certain way.  That goes both ways, your

5  Honor.  I was waiting for the court to notify me based upon my

6  experience in canon law, and I received nothing from the court

7  until that notice of default being entered.

8        Secondly, plaintiff de Laire also states that he

9  has suffered reputational harm and emotional distress, but

10  since we're -- since your Honor has mentioned canon law as

11  being some basis for how this Court might proceed --

12        THE COURT:  I didn't do that.

13        MR. BALESTRIERI:  I mentioned that canon law --

14        THE COURT:  I didn't mention canon law as a basis

15  of how to proceed.  I mentioned canon law as an example of how

16  I think it would be very unlikely that people would walk into

17  court the day of a proceeding asking to delay a proceeding

18  when it would have been very easy to ask in advance.  That's

19  all I did.  Canon law has got nothing to do with how to

20  proceed here.

21        MR. BALESTRIERI:  I stand corrected, your Honor.

22  However, canon 1420 -- this is relevant to the issue raised by

23  Attorney Elovecky and plaintiff.  Canon 1420, paragraph one of

24  the Code of Canon Law states, quote, the judicial vicar and

25  the associate judicial vicars must be priests of good repute

1    with a doctorate or at least a licentiate in canon law and not

2    less than thirty years of age, end quote.

3          To my knowledge, Father de Laire has been since

4    prior to my first contact with him as an advocate judicial

5    vicar, and he remains to this day without interruption

6    Judicial Vicar of the Diocese of Manchester.  Hence, he has

7    continuously enjoyed the good repute and trust of the Bishop

8    of Manchester.  If he had suffered reputational harm, he would

9    no longer be judicial vicar.  He would no longer be a judge.

10   He wouldn't be working in that tribunal.

11         THE COURT:  Or at least -- it's a good point, or at

12   least we would have evidence that his reputation with the

13   Bishop and those close to him have somehow been diminished.

14   You're right.

15         MR. BALESTRIERI:  And, to the contrary, he's been

16   reaffirmed to those positions -- reconfirmed.

17         Secondly, the faithful continue to present cases to

18   him without objection to his standing in the community point

19   of view reputation.  They still -- there's no objection to my

20   knowledge to Father de Laire processing cases as judicial

21   vicar by reason of any publication of this article or any

22   comments that appeared in the press.  So he stands indemn

23   without having suffered reputational harm in that regard.

24         Third, Attorney Elovecky and plaintiff de Laire

25   presented printouts of comments next to the Church Militant

1  article that appeared in 2019.  Those comments are a mix of

2  negative and positive comments.  They're not purely negative.

3          But I really would like to underline the fact that

4  Canon 1420 is applicable to this case by analogy, by way of

5  example, because, again, if he had lost reputation, you

6  wouldn't want him to be in this position.

7          THE COURT:  That's a fair point.  That's definitely

8  a fair point.

9          MR. BALESTRIERI:  Now, regarding emotional

10 distress --

11         THE COURT:  I don't know if I accept that he

12 wouldn't still have the position, but I do agree with your

13 point that the fact that he still has the position is some

14 evidence against a diminution of his reputation for sure.

15         MR. BALESTRIERI:  He enjoys a good standing in the

16 community to this day.  He has not suffered by reason of this

17 article.

18         THE COURT:  I get your point.

19         MR. BALESTRIERI:  Thank you, your Honor.

20         MS. ELOVECKY:  Your Honor, I'm sorry, I understand

21 we have a pro se litigant, but it does sound like some attempt

22 of evidence being offered during an opening, and I just want

23 to put an objection on the record.

24         THE COURT:  Overruled.

25         By the way, if you disagree with that fact that

```
 1   he's still in good standing -- I assume he is.  Do you dispute

 2   that?  Counsel, do you dispute that?

 3               MS. ELOVECKY:  That he's still in good standing and

 4   that he's been reappointed?

 5               THE COURT:  Yeah.

 6               MS. ELOVECKY:  No.

 7               THE COURT:  All right.

 8               MS. ELOVECKY:  I'm sorry.  I believe more had been

 9   said.  That wasn't --

10               THE COURT:  Well, he did.  He said if he -- he said

11   if his reputation had been damaged, he wouldn't have the job

12   anymore.  I don't accept that.

13               Look, he's just making his opening.

14               MS. ELOVECKY:  Okay.  Thank you, your Honor.

15               THE COURT:  Go ahead.

16               MR. BALESTRIERI:  Your Honor --

17               THE COURT:  I ruled in your favor.  Keep going.

18               MR. BALESTRIERI:  Thank you, your Honor.

19               I believe he's also a pastor or exercising public

20   ministry.  In any diocese in the United States one cannot do

21   that if one has a bad reputation.  Especially in Boston.

22               To the contrary, I know of cases where Father de

23   Laire has set aside, revoked permission for priests in the

24   Diocese of Manchester to exercise public ministry because

25   their reputation has come into bad repute.
```

1          THE COURT:  Slow down.  Slow down for the reporter.

2          MR. BALESTRIERI:  Pardon me.

3          THE COURT:  Okay.  I'm following.

4          MR. BALESTRIERI:  When it comes to the question of

5     the allegation of emotional distress being suffered by

6     plaintiff de Laire, I would like to point out that in his

7     affidavit --

8          THE COURT:  Wait a minute.  Don't present your

9     whole case.  This is an opening.  You're going to get to

10    cross-examine him and you're going to get to present evidence.

11         MR. BALESTRIERI:  Of course.

12         THE COURT:  Just tell me generally -- I mean,

13    you've only got about one minute left here.  It's just an

14    opening.

15         MR. BALESTRIERI:  Yes, your Honor.

16         When it comes to emotional distress, I would like

17    to affirm that plaintiff de Laire has contributed to the

18    emotional injury that he allegedly suffered.

19         He states here on point No. 32 of his affidavit

20    filed on February 4, 2025:  I was taking less than the

21    prescribed dosage of my medications.  After the article was

22    published and I suffered heightened anxiety, I increased my

23    dosages.

24         So prior to the article being published, he was

25    taking less than what his doctor prescribed him to take.

1          There's an axiom in Latin, no one can invoke one's

2     own turpitude, nemo potest invocare turpitudinem suam.  One

3     cannot claim --

4          THE COURT:  She's not going to know how to

5     transcribe Latin.

6          MR. BALESTRIERI:  One cannot invoke one's own

7     failings, by way of dynamic translation, in support of a

8     remedy for tort.

9          THE COURT:  We call that in this court a duty to

10    mitigate damages, and if there's other sources of the damage

11    that's being complained of, you are free to point that out.

12          MR. BALESTRIERI:  Yes, your Honor.

13          THE COURT:  And you have, yeah.

14          MR. BALESTRIERI:  Thank you.

15          When it comes, lastly, to the question of my

16    testimony and my response being stricken from the record, then

17    I would seriously call into doubt the question of due process

18    being offered by this Court.

19          Everyone has a right of response.  According to the

20    natural law, which Father de Laire recognizes the natural law,

21    canon law, this is a court of common law, civil law, and I

22    would pray that this Court not strike from the record the very

23    few written contributions that I have made for the Court's

24    consideration.

25          THE COURT:  Understood.

```
1              MR. BALESTRIERI:  Thank you.

2              THE COURT:  You may proceed.

3              MS. ELOVECKY:  Thank you, your Honor.

4              I call Father de Laire to the stand.

5                       GEORGES F. de LAIRE

6          having been duly sworn, testified as follows:

7              THE CLERK:  For the record, please state your name

8     and spell your last name.

9              THE WITNESS:  Georges de Laire.  D, as in David, e,

10    space, L-a-i-r-e.

11                       DIRECT EXAMINATION

12    BY MS. ELOVECKY:

13       Q.    Thank you very much.

14             You are a priest within the Catholic church,

15    correct?

16       A.    Yes, I am.

17       Q.    And how do you prefer to be addressed?

18       A.    Father de Laire, please.

19       Q.    Thank you.

20             So, Father de Laire, where were you born?

21       A.    I was born in Paris, France.

22       Q.    And what year?

23       A.    1966.

24       Q.    Did you grow up in France?

25       A.    I did for the first -- for ten years, and then
```

1  moved to the United States for two years, and back to France

2  until I was 17 years of age when I moved to the United States.

3       Q.   Did you graduate high school?

4       A.   Yes, I did.

5       Q.   And what year?

6       A.   I graduated high school in 1985.

7       Q.   And what high school did you graduate from?

8       A.   I graduated from the Lycée Français -- I'll have to

9  spell that.  I'm sorry.

10       L-y-c-e-e, space, F-r-a-n-c-a-i-s, space --

11       THE COURT:  The French school?

12       THE WITNESS:  The French school, Lycée Français.

13       THE COURT:  Where?

14       THE WITNESS:  In New York City.

15       THE COURT:  Thanks.

16       Q.   And, Father de Laire, did you attend college

17  immediately after high school?

18       A.   Yes, I did.

19       Q.   And what college did you attend?

20       A.   I attended St. Lawrence University in upstate New

21  York.

22       Q.   And did you graduate from that school?

23       A.   I graduated from St. Lawrence University in 1989

24  with a degree -- a BA in European history.

25       Q.   And after college did you engage in employment?

1      A.    Upon graduation from college, yes, I did.

2      Q.    And can you walk the Court through your early

3  employment, just a brief summary?

4      A.    So I was raised in a family that has a family

5  business, and so it was anticipated that I would work for the

6  family business upon graduation from college.

7            Instead, I thought of gaining experience in Europe

8  so as to bring something to the company later on, but that

9  didn't work out, and so I came back to New York and worked for

10 the family business in Manhattan.  It's a fragrance business.

11     Q.    Prior to working for the family business after

12 college, had you had any work experience with the family

13 business prior to that?

14     A.    So as it is a family -- as it was a family

15 business, being the sole male in my family, it was understood

16 not long after I was, oh, 7 years of age, 8 years of age, I

17 was taken to the family business factory and so on regularly

18 by my grandfather or my uncles, but I really started to have

19 an involvement with the company while working there during the

20 summers of high school and college.

21     Q.    And how long did you work for the family business

22 after college?

23     A.    After college?

24     Q.    Yes.

25     A.    I worked for one year.

1      Q.    And what did you do after that?

2      A.    While working for the family business I realized

3   that there were going to be some conflicts that I would have

4   to deal -- that I was not at ease with, mostly about business

5   ethics, and so I decided to go back to -- to go to graduate

6   school.  I'm sorry.

7      Q.    When you say conflicts, the conflicts were between

8   who?

9      A.    So the conflicts were with my conscience in the

10   sense that it would have been common in order to secure

11   contracts from purchasers to provide what would be called, I

12   don't know, night entertainment to potential buyers, and I did

13   not agree with that.

14      Q.    Okay.  So instead you decided to attend graduate

15   school?

16      A.    That is correct.

17      Q.    And what graduate school did you attend?

18      A.    I went back to St. Lawrence University to acquire a

19   degree in -- a master's in education in counseling and human

20   development.

21      Q.    And during graduate school did you work at all?

22      A.    To pay for graduate school.  Because my family was

23   not particularly happy with my departure from the family

24   business, I had to secure payment, income to pay for graduate

25   school.  So I worked for the university as a residence

1  director.

2      Q.    And did you graduate with a degree from St.

3  Lawrence College for graduate school?

4      A.    Yes, I did.

5      Q.    And when was that?

6      A.    I graduated with my master's in education in

7  counseling and human development in 1992.

8      Q.    At some point did you decide to become a priest?

9      A.    I don't know that I would say that I decided to

10  become a priest, but I decided that I could no longer ignore

11  the stirrings that I felt within, and I needed to go check it

12  out.

13      Q.    And when was it that you decided that?

14      A.    My second year of graduate school.  So '91, '92.

15      Q.    And so what did you do to pursue this calling?

16      A.    The first step I took was to actually go back to

17  France and meet with some clergy and friends to see what the

18  environment was in France, and then decided that France would

19  not be the place for it and came back to the U.S. and met with

20  a variety of priests and what are known as vocations directors

21  in religious orders or dioceses, and that led me to apply to

22  the Diocese of Manchester which -- part of that process is a

23  variety of testing and reports, academic documents, and so on.

24      Q.    What type of testing was required with that

25  application?

1       A.    At the time we were required to provide a medical

2   record and a battery of psychological tests.

3       Q.    And did the Diocese of Manchester approve your

4   application?

5       A.    I was accepted by the Diocese of Manchester, yes.

6       Q.    And so then what was the next step after you were

7   accepted by the diocese?

8       A.    The diocese decided where I was going to go for

9   formation and was -- not being from New Hampshire, not having

10  much experience with the state, I was sent to the closest

11  seminary in Brighton, Massachusetts.  Saint John's Seminary.

12      Q.    Did you graduate from that seminary program?

13      A.    I did graduate from Saint John's Seminary in

14  Brighton, yes.

15      Q.    And when did you graduate?

16      A.    I graduated in May of 1997.

17      Q.    And what degree or degrees were conferred upon you

18  at that time?

19      A.    I actually obtained two different degrees.  I

20  obtained a vocational degree of a master's in divinity and I

21  obtained a master's in biblical theology.

22      Q.    And were you eventually ordained?

23      A.    And I was ordained to the priesthood in Manchester,

24  New Hampshire, on June 7, 1997.

25      Q.    When you were ordained, did you take a vow?

1    A.    As a diocesan priest, I do not take a vow.

2    Q.    Do you make any promises?

3    A.    At ordination a diocesan priest would make three

4    promises to the bishop.

5    Q.    And what are those promises?

6    A.    The promise of obedience, promise of celibacy, and

7    the promise to pray the prayer of the church.

8    Q.    Did you make any promise related to poverty?

9    A.    I did not.

10    Q.    Were you expected to?

11    A.    No, I was not.

12    Q.    Were you ever asked to?

13    A.    No, I was not.

14    Q.    And in your experience are any priests required to

15    make any vow of poverty?

16    A.    Priests who make vows or take vows of poverty are

17    priests that belong to religious orders or what are called

18    institutes of apostolic life.

19    Q.    And you did not elect to join such a religious

20    order, correct?

21    A.    That is correct.  I did not.

22    Q.    Okay.  Can you describe for the Court your early

23    years as a priest with the Diocese of Manchester?

24    A.    Upon ordination in a very unusual, actually the

25    first time for the Diocese of Manchester, as a newly ordained

priest I was assigned as the administrator of St. Francis

Xavier parish in Nashua.  At the time it was a trilingual

parish, and I was the only trilingual cleric available and so

I was asked to administer the parish while the diocese sent a

priest to learn Spanish.

           Then I was assigned to various other parishes as

assistant priests until I was named a pastor in June of 2000.

    Q.    And being named a pastor, can you just describe for

the Court what that means?

    A.    I guess in the simplest of ways it's -- a pastor

would be the person who's responsible for a parish, which is a

community of people associated with a church territorially or

otherwise and who gains a certain amount of rights by virtue

of the office of pastor.  Such as stability, for instance.

    Q.    And by stability, do you mean that this would have

been a long-term appointment?

    A.    I'm sorry.  Yes.  Stability means that ultimately

staying put in that parish is preferred over moving me or

moving to another parish.  So yeah.

    Q.    And how long were you the pastor of St. Francis

Xavier?

    A.    I was not pastor of St. Francis Xavier.

    Q.    Oh.  I'm sorry.

    A.    I was the administrator of St. Francis Xavier.

           I was appointed pastor of Our Lady of Lords

1    Pittsfield, St. Joseph's Northwood, and I was there for four

2    years.

3         Q.   Okay.  And after those four years did you remain a

4    pastor of a different church?

5         A.   I was then appointed as pastor of Our Lady of Mercy

6    in Merrimack, New Hampshire.

7              THE COURT:  I'm getting the picture.  Why don't we

8    move up to when he assumed his role as a, you know, canonist

9    and the like.

10             MS. ELOVECKY:  All right.

11        Q.   Father de Laire, at some point you did obtain a

12   further degree, correct?

13        A.   In 2009 I was asked by the Bishop of Manchester to

14   start studies for a licentiate in canon law.

15        Q.   Okay.  And so did you start those studies?

16        A.   And I started those studies in the summer of 2009,

17   yes.

18        Q.   And you state that the Bishop had requested that

19   you attend that program, correct?

20        A.   In the Catholic church that is how it works in the

21   sense that the bishop is the one who makes the decision as to

22   where a priest will be assigned or what sort of ministry he

23   will have, and for me it meant studying canon law.  I mean,

24   the Bishop had granted me permission to go and study

25   psychology for a doctorate, but then there was a need for

1    canon law.  So I guess beggars can't be choosers.

2        Q.    So you changed your plans based on the Bishop's

3    request?

4        A.    So I changed my plans, and I started studies in

5    canon law.

6        Q.    And you ultimately obtained a licentiate in canon

7    law, correct?

8        A.    Yes, I did.

9        Q.    And when did you receive that degree?

10        A.    I received that degree in July of 2012.

11        Q.    And where did you receive that degree from?

12        A.    I received the degree from the Pontifical Gregorian

13    University in Rome.

14        Q.    Did you graduate with any honors?

15        A.    I graduated with -- I graduated magna cum laude.

16        Q.    And other than the licentiate degree, were you in

17    any other programs while in Rome?

18        A.    I guess I was greedy.  So I took whatever courses I

19    could take offered by the Vatican itself.  The various

20    congregations offer -- some offer courses for certification,

21    and I obtained those certifications while I was there, such

22    as --

23        Q.    I'm sorry.  Go ahead.

24        A.    Such as congregation for the clergy, now known as

25    the Dicastery for the Clergy, the Apostolic Penitentiary, and

1    the Dicastery for Divine Worship and Discipline of the

2    Sacraments.

3        Q.    And while you were studying in Rome did you have

4    any interactions with clergy at the Vatican?

5        A.    Yes, I did.  By taking the courses there and being

6    most often the only American that took those courses when I

7    was there, I got to meet many of the officials, yes.

8        Q.    And did you maintain relationships with the clergy

9    at the Vatican after you left Rome?

10       A.    Yes, I did.  Although at this point most of them

11   have moved on to other positions in the church.

12       Q.    And are you aware of any criticisms that were made

13   of you by anyone at the Vatican during that time that you were

14   in Rome?

15       A.    I am not aware of such.

16       Q.    How about at any time?

17       A.    I'm not aware of such.

18       Q.    Once you obtained your degree at the request of the

19   Bishop, did your position in the diocese change?

20       A.    Well, upon my return from studies I was appointed

21   judge on the tribunal.  I had asked for one year before

22   assuming the office of judicial vicar.  I felt it was

23   necessary for me to have some experience with the tribunal

24   first.  So for one year I worked full-time as a judge at the

25   tribunal, and at the same time, the term we use is covered, I

1    provided for the celebration of masses in various churches or

2    parishes where priests were ill or taking vacation.

3        Q.    So when you first went to Rome in 2009, you no

4    longer maintained your position at that parish that you were

5    with prior to that?

6        A.    No.  I had to resign that position in order to

7    begin studies.

8        Q.    And after you returned were you assigned to another

9    parish?

10       A.    A year after my return I was appointed pastor as

11   well as at the time Judicial Vicar and Vicar for Canonical

12   Affairs, yes.

13       Q.    That was going to be my next question.

14             At some point you were appointed as a vicar,

15   correct?

16       A.    Yes.

17       Q.    And you just stated that you were appointed both as

18   Judicial Vicar and Vicar of Canonical Affairs, correct?

19       A.    That is correct.

20       Q.    And that was in 2013?

21       A.    That was in September of 2013, yes.

22             THE COURT:  That was in this diocese?

23             THE WITNESS:  In the Diocese of Manchester, yes.

24             THE COURT:  Back up for a minute.  The tribunal

25   that you were a judge in, what's the name of that tribunal?

1              THE WITNESS:  It's the Ecclesiastical Tribunal of

2     the Diocese of Manchester.

3              THE COURT:  Okay.  So here?

4              THE WITNESS:  Yes.  Correct.

5              THE COURT:  And you were adjudicating matters

6     before the court?

7              THE WITNESS:  At that time I was adjudicating in

8     second instance appeals from -- cases from the Pacific Islands

9     because of the need of the language of French and English, but

10    I had never adjudicated in the Tribunal of the Diocese of

11    Manchester as such.

12             THE COURT:  Is that because there just were no

13    cases or is that because someone else was doing it?

14             THE WITNESS:  No.  At the time there were other

15    judges, but it was also a time when the Bishop was seeking to

16    clean files that had not been addressed for 50 years of

17    priests who had abandoned ministry or who had got involved in

18    other problematic matters.  So I was tasked to clean -- to

19    process all these cases of lay cessations.

20             THE COURT:  Thank you.  You may proceed.

21        Q.   Can you just briefly describe for the Court what

22    the position of Vicar of Canonical Affairs entails?

23        A.   For here in the -- ultimately, the definition of a

24    vicar is going to be provided by the bishop whose vicar you

25    are, but here in the Diocese of Manchester that meant that I

1    addressed all matters of administrative law whether it was

2    real estate law -- canon law.  I'm sorry.  All of it are

3    canonical matters.  I'm sorry.  So canonical real estate

4    matters, employment, contracts, temple goods, alienations,

5    purchases, schools, and as well as disciplinary.

6         Q.    And you were also appointed as judicial vicar,

7    correct?

8         A.    That is correct.

9         Q.    And can you just briefly summarize for the Court

10   what that position entails?

11        A.    In the simplest way, I guess the judicial vicar is

12   the priest in charge of the administration of the tribunal of

13   a given diocese or jurisdiction along with the bishop.

14        Q.    All right.  Father de Laire, I'm going to show you

15   a document that's been marked -- well, that I'm marking now as

16   Exhibit A for identification.

17             THE WITNESS:  I'm sorry.  Can I have my glass of

18   water, please?

19             THE COURT:  Sure.

20             MS. ELOVECKY:  Yes.

21             THE WITNESS:  Thank you.

22             THE COURT:  You can go get it if you want.  Either

23   way.

24             MS. ELOVECKY:  I have a glass here that I'll give

25   to him in a moment, if that works for you.

1          Your Honor, may I please approach to provide a copy

2    of what I've marked as Exhibit A for identification?

3          THE COURT:  You may.

4    Q.    And here's also a glass of water.

5    A.    Thank you.

6    Q.    Father de Laire, if you could take a moment to

7    review what has been marked for identification as Exhibit A

8    and just let me know once you've had a chance to look at it?

9    A.    All right.

10         THE COURT:  Do we have anymore copies of this?

11         MS. ELOVECKY:  I have one more copy, yes.

12         THE COURT:  Can you give it to the law clerk over

13   there?  Thank you.

14   Q.    Father de Laire, can you tell the Court what this

15   document is?

16   A.    This is a print copy of an article that was

17   published on the churchmilitant.com website, and it seems to

18   be followed by comments that were made in response to the

19   article posted.

20   Q.    Thank you.

21         Have you seen this document before today?

22   A.    Yes, I have.

23   Q.    When did you first see this or a version of this

24   document?

25   A.    I saw the article itself on January 17th of 2019,

1    and due to the content I kind of kept track of the comments

2    that were being added for months afterwards.

3          Q.    You know in the bottom right-hand corner it states

4    CM0042?

5          A.    Yes.

6          Q.    And would you agree with me that that indicates

7    that this document was produced by Church Militant, which is a

8    defendant in this matter?

9          A.    If I recall from earlier on, yes, I do remember

10   that those were call letters.

11         MS. ELOVECKY:  Your Honor, at this time I would

12   move what's been marked as Exhibit A into evidence.

13         THE COURT:  This is obviously admissible, but do

14   you have any objection to it?

15         MR. BALESTRIERI:  No, your Honor.

16         THE COURT:  It's admitted.

17         (Plaintiff's Exhibit A Admitted)

18         Q.    All right.  Father de Laire, can you just -- I

19   believe that you already stated this, but I'm going to ask you

20   again.  When did you first see this article?

21         A.    I saw the -- the article was -- the link to the

22   article was sent to me by the Director of Communications of

23   the Diocese of Manchester on January 17th of 2019.

24         Q.    And would it be fair to say that the link that was

25   sent to you was to churchmilitant.com?

1          A.    Yes.  That is correct.

2          Q.    Prior to receiving that link had you been familiar

3     with the website previously known as churchmilitant.com?

4          A.    I don't know how familiarity gets to be defined,

5     but I was aware of the website, I was aware of some of its

6     practices as it had covered a story about a classmate of mine

7     from Rome, and one of the judges at the time reviewed the

8     website daily and would comment about it at lunch, but that

9     was the extent to which I knew about the churchmilitant.com

10    site.

11         Q.    And was this a website that you would check on your

12    own at any time prior to January 17th of 2019?

13         A.    No, it was not.

14         Q.    And you testified that one of your colleagues had

15    sent you a link on January 17, 2019, to this article, right?

16         A.    Yes.  That is correct.

17         Q.    And at that time did you read this article?

18         A.    I read the article and was quiet dismayed and

19    alarmed by it, yes.

20         Q.    Why were you alarmed?

21         A.    Because the article attacks me in so many different

22    ways.  I mean, the article attacks so many of the values that

23    I hold very dear to my heart.  To call me corrupt, to call me

24    a troublemaker, to call me mentally unstable, psychologically

25    unstable, to call me incompetent, many attacks of my character

1    that were quite problematic I guess to my ego, and at the same

2    time it also implied some potentially other important issues.

3            My mother had moved in with me at that time.  She

4    suffered from Alzheimer's and lived at the house that I built

5    in Amherst, and the fact that that house was now a known

6    public entity and my mother suffering from Alzheimer's could

7    be -- I don't know.  Potentially aggression could be expressed

8    towards her.  So I was quite perturbed.

9        Q.    So if you just turn to the page that's marked

10   CM0046.

11       A.    Yes.

12       Q.    The final paragraph that's right above the red bar,

13   do you see that?

14       A.    Yes.

15       Q.    It states that additional -- I'm going to read from

16   that:  Additional questions are raised, however, not just by

17   the recent decisions of the vicar affecting --

18            THE COURT:  Please read more slowly.

19            MS. ELOVECKY:  Thank you, your Honor.

20       Q.    Not just by the recent decisions of the vicar

21   affecting Catholic faithful under his power but also by his

22   acquisitions.  While Pope Francis has checked into a hotel

23   instead of the Apostolic Palace for lodging, Church Militant

24   has learned that de Laire now frequently resides at an estate

25   located near Manchester that he recently purchased, currently

1    valued at $1.5 million, an exclusive 4,000 square-foot,

2    four-bedroom residence with 600 feet of waterfront, waterfalls

3    and a koi pond.

4            Did I read that correctly?

5    A.    Yes.

6    Q.    And is that the house that you're referencing that

7    your mother had lived in at the time?

8    A.    That is correct.

9    Q.    After you read this article, what did you do next?

10   A.    I printed a copy of it and went to the Bishop's

11   office to present him the article and express my concerns to

12   him.

13           I then took it to the Chancellor of the diocese,

14   who happened to be at the time house counsel, and showed her

15   the article.

16   Q.    And did you do anything else at that time?

17   A.    On the day of -- on January 17th of 2019?  Well, I

18   mean, I acted in a variety of ways.  Because after returning

19   to my office having left the Bishop's office presenting him

20   the article, there was a voice message on my voicemail box

21   that threatened me and my welfare that somebody was coming

22   after me to get me, and so I gathered the staff of the

23   tribunal to inform them that they might be getting phone calls

24   and to develop a protocol with them as to what to do should

25   calls come in, and I did the same by calling my parish and

1  addressed it with the parish staff so that they, too, would

2  know how to address the matter.

3      Q.    So you mentioned a voicemail that you received?

4      A.    Yes.

5      Q.    And is that something that you listened to

6  yourself?

7      A.    Yes, I did.  I did listen to it to make sure that

8  -- I'm not great with technology, and so to make sure that it

9  was not going to get erased or otherwise damaged, corrupted, I

10  gave that message to an employee of the tribunal to transcribe

11  the message.

12      Q.    And when you listened to the message, was it a

13  voice that you recognized?

14      A.    No, I did not know the voice.

15      Q.    Was there a phone number connected with the

16  voicemail that you were able to see?

17      A.    Yes, there was a phone number associated.

18      Q.    And was that a number that you were familiar with?

19      A.    No, it was not a number that I was familiar with.

20      Q.    And do you recall what was said on the voicemail?

21      A.    There was something to -- this is now five years

22  ago -- four years ago, five years ago.

23           It was something to the extent I've just learned --

24  something to -- I've just learned from Church Militant on and

25  on, and then accusations of corruption and that the faithful

1  were not going to be taking this anymore and they're coming

2  after me.

3       Q.   And was that a man or a woman's voice, if you know?

4       A.   It was a woman's voice.

5       Q.   All right.  I would like you to go back to what's

6  now Exhibit 1 and turn to page CM0050.

7       A.   Yes.

8       Q.   Give me one moment.

9            (Pause)

10           So at the very top of the page there is a comment

11  that is left under the name photius.  Do you see that?

12      A.   Yes, I do.

13      Q.   And it states here:  Tracey, the truth shall set

14  you free.  He is a hateful man who does not know his theology.

15  Why defend a hateful man?  Like, what's your involvement with

16  him?

17           Did I read that correctly?

18      A.   Yes, you did.

19      Q.   Prior to -- and did you see that comment prior to

20  today?

21      A.   Yes, I did.

22      Q.   When did you see that comment?

23      A.   Depending on when it was posted, I probably saw it

24  within several hours of it being posted.  I think I was

25  hooked.  I guess I was -- my attention was really geared to

1    the article and the comments because the comments were quite

2    nasty, and so I did keep track of the comments.  I guess maybe

3    -- yeah, I did.  So I probably checked it several -- every

4    other hour or so.  So whenever it was posted is probably when

5    I saw it.

6        Q.    Prior to January 17th of 2019 had anyone suggested

7    that you don't know your theology that you're aware of?

8        A.    Nobody had stated such, no.

9        Q.    Okay.  I would like to turn to page 55.

10            If you look, it's about a third up from the bottom

11   of the page, a comment that was added by someone who

12   identified as Jim Dorchak.  Do you see that?

13       A.    Yes, I do.

14       Q.    And that comment states:  What is this heretics

15   contact data?  The gates of Heaven and the Internet need to

16   flood this idiots inbox and his Bishops!

17            Did I read that correctly?

18       A.    Yes, you did.

19       Q.    So prior to January 17th of 2019 had anyone in your

20   professional capacity ever called you an idiot before?

21       A.    To my face, no.

22       Q.    Are you aware of anyone calling you an idiot in

23   your professional capacity at all prior to January 17th of

24   2019?

25       A.    No, I was not aware of such.  No.

1      Q.    And then in this comment right below it another

2    commenter that identified as Colors of the Wind shares some

3    contact information, correct?

4      A.    Yes.

5      Q.    And did that concern you?

6      A.    I mean, it is public information.  I'm sorry.  Did

7    that concern me?  It did concern me because, again, any -- the

8    comments being posted on the website were, again, very

9    aggressive and nasty and implied potentially some sort of a

10   personal retaliation, and that somebody went to the effort of

11   actually publishing my address as a comment following the

12   article is -- yes, was of great concern.  Although in

13   fairness, it's public information.

14     Q.    Meaning that the diocese's website has some contact

15   information for you, correct?

16     A.    Yeah, and the parish has a website.

17           MR. BALESTRIERI:  Objection, if I may.

18           That seems to be a leading question.  Meaning?  Is

19   it for an attorney to provide a meaning or is it for a

20   deponent to provide a meaning?

21           He said nothing about the diocese lists

22   information.  That was offered spontaneously by the attorney.

23           THE COURT:  It doesn't hurt you though at all.

24           MR. BALESTRIERI:  It just seems leading, your

25   Honor.

```
 1                    THE COURT:  That's true.

 2                    Ask it open-ended.

 3           Q.    You mentioned that the information was available

 4    publicly, correct?

 5           A.    Yes, I did.

 6           Q.    Where would that information have been available?

 7           A.    Probably anybody using a search engine on the

 8    Internet could enter my name and I'm sure that there would be

 9    listings, and some of which would include my address, yes.

10           Q.    At any time were you contacted by the public about

11    the article?

12           A.    I mean, for weeks I received e-mails.  For weeks

13    there were phone calls both at the tribunal offices and at the

14    parish of the public having read the -- at least seemingly

15    having read the article posted by Church Militant.

16           Q.    All right.  I would like to look at page 58 of

17    Exhibit 1.  Again, about a third from the bottom of the page

18    there's a comment by someone who identified as Dan Knight.

19                    Do you see that?

20           A.    Yes, I do.

21           Q.    And that comment states in quotes, "botched?", and

22    then "or deliberately mangled."

23                    Did I read that correctly?

24           A.    That is what it says.

25           Q.    Prior to January 17th of 2019, and to your
```

```
 1   knowledge, had anyone ever suggested that you botched a canon

 2   law case?

 3        A.    Not to my knowledge, and I think at the time I

 4   enjoyed a great reputation in the sense that I had processed

 5   numerous cases of disciplinary cases leading to lay

 6   cessations, and all of them being granted without any

 7   difficulties let's say.  So no.

 8        Q.    Just for the record, can you just say what you mean

 9   by lay cessations?

10        A.    Lay cessation is the term for the process that is

11   used by the Catholic church, I don't know about other

12   denominations, whereby a man in the clerical state, ordained a

13   deacon, ordained a priest, or ordained a bishop, is returned

14   by the church to the lay state losing the rights and

15   obligations of the clerical state.

16        Q.    And as of January of 2019, how many of such cases

17   had you processed?

18        A.    By January of 2019 I had processed 52 cases.

19        Q.    Did any issues ever get raised by anyone about your

20   processing of those 52 cases?

21        A.    Never.

22        Q.    Were any complaints made about your processing of

23   those 52 cases?

24        A.    Never.

25        Q.    In your experience was 52 cases as of January of
```

1    2019 the norm?

2        A.    I can say that at the Canon Law Society of America,

3    this professional association of canon lawyers in the United

4    States, I was known at the time as the priest who had

5    processed the most cases.  So, yeah, it was a known fact.

6        Q.    Was there anything else that made you believe that

7    this comment was actually contrary to your reputation?

8        A.    Well, I don't know if it's contrary.  It's

9    fabricated because there's absolutely no -- to my knowledge

10   there was absolutely no evidence of any such thing.

11       Q.    Mr. Dan Knight, or who identified as such, in that

12   comment also said that you had potentially -- well, it says

13   botched, and then it goes on and says or deliberately mangled;

14   is that correct?

15       A.    That is what is attributed to a Mr. Knight, yes.

16       Q.    And prior to January 17th of 2019 had anyone ever

17   suggested that you deliberately mangled a case?

18       A.    I mean, that's quite -- I'm sorry.  That is quite

19   insulting because, I mean, it attacks my integrity.  It

20   attacks the purpose for which I'm processing these cases.  I'm

21   not processing any of these cases for George de Laire.  I'm

22   processing these cases for the church.

23           So the questions of integrity are loaded.  They're

24   heavy.  And so deliberately mangled, no.

25       Q.    No one had ever said that to you before?

1       A.    No.  Never.

2       Q.    As of -- well, prior to January 17th of 2019 did

3  you have any understanding other than the cases that you

4  already mentioned as to how people viewed your canon law work?

5       A.    I can say that, unbeknownst to me, colleagues in

6  the Canon Law Society of America it appears recommended me to

7  represent priests who may have some issues of their rights

8  being abused or violated by the church or their religious

9  community.  So I was asked to consider representing them as an

10  advocate.

11       So obviously some folks out there, I do not know

12  whom, respected me and my work sufficiently so as to recommend

13  me to advocate for somebody in need.

14       Q.    So you mentioned that you had been recommended as

15  an advocate, correct?

16       A.    Yes, that is correct.

17       Q.    In addition to your work as a pastor of a parish

18  and as Vicar of Canonical Affairs and as Judicial Vicar, were

19  you also serving as an advocate?

20       A.    That doesn't go to my psychological welfare, does

21  it?  No, I -- so I believe that I have a certain amount of

22  gifts.  And since I did not pay for my formation in canon law,

23  it was for me to offer those services to those who might be in

24  need of it.

25       Q.    And did you represent -- well, who would you

1    represent as an advocate?

2        A.    I represented -- in every instance it was a priest,

3    and in three of those I represented -- I advocated for four

4    priests, three of whom were members of religious orders and

5    one was a diocesan priest.  They're all still priests in

6    ministry.

7        Q.    And did you represent those clergy within the

8    Diocese of Manchester?

9        A.    No.  I'm sorry.  Yes.  I did not -- I couldn't

10   ethically represent within my own jurisdiction.  That would be

11   a conflict of interest should appeals or questions be raised.

12   So, no, I -- every priest that I represented were from

13   different jurisdictions.

14       Q.    And were you paid for that work?

15       A.    Like I said, I did not pay for my formation, and so

16   I didn't think it was proper for me to get paid for the

17   representation.  So, no.  I provided my advocacy pro bono.

18       Q.    You also referenced in your prior testimony the

19   Canon Law Society of America, correct?

20       A.    Yes, I did.

21       Q.    Can you just briefly describe for the Court what is

22   that?

23       A.    So it's an association of -- a professional

24   association of canon lawyers in the United States where

25   ultimately membership is available whether one is in the

1    United States or not.  So there are members from other

2    countries.  It's an association that provides forums for

3    continued formation, forums for a national convention with

4    workshops and opportunities to meet and discuss current

5    issues, current matters in canon law.  It's also an

6    association that publishes a journal and various other books

7    on canon law.

8         Q.    And are you a member of that society?

9         A.    Yes.  I am a member of the Canon Law Society of

10   America, and I was also a member of one of its subcommittees

11   on matters of the clergy.

12        Q.    In addition to that membership both of the society

13   and that committee, did you have any other involvement or

14   participation with the society?

15        A.    In 2017.  In 2017 I was asked by the board of

16   governors to present at the following convention on the topic

17   of clergy lay cessations, and so I was asked to be one of the

18   guest speakers, yes.

19        Q.    Was that session well attended?

20        A.    It actually caused issues because the demand

21   required the Canon Law Society to schedule a second

22   opportunity, a second forum for it.  So I gave the

23   presentation twice because of the numbers.

24             THE COURT:  Does the Canon Law Society have an

25   office somewhere located in the United States?

1              THE WITNESS:  Yes.  They're located whether on the

2    campus or just off the campus of Catholic University of

3    America in Washington, D.C.

4              THE COURT:  That's what I thought.  Thank you.

5         Q.    Okay.  I would like you to turn to page 60 of

6    Exhibit 1, and I would like you to look at the second comment

7    where there's a comment that was made by someone identifying

8    as JCS.

9              Do you see that?

10        A.    Yes, I do.

11        Q.    It states:  It sounds like this fraud is living

12   quite well off the laity's donations.  He is a jerk.  They

13   should just laugh in his face.

14             Did I read that correctly?

15        A.    Yes, you did.

16        Q.    Did you purchase the home that you previously

17   testified to using laity donations?

18        A.    No, I did not.

19        Q.    Are you paid as a priest?

20        A.    I do receive a salary, yes.

21        Q.    And how much is your salary?

22        A.    I do not recall what my salary was in 2019.  I can

23   say that for the month of March I received $2,885.

24        Q.    And is that for the entire month?

25        A.    That is for the entire month.

1    Q.    And is that your typical monthly payment at this

2    time?

3    A.    That is -- we get a pay raise every 1st of July of

4    $50 added.  So, yes, for a full year that is the paycheck I

5    receive.

6    Q.    How were you able to purchase property in Amherst,

7    New Hampshire?

8    A.    So I was very lucky to be born in the family or

9    families that had wealth, and due to inheritance and the sale

10    of the family business I had funds to purchase the property.

11    Q.    As we saw in the article, it had been suggested

12    that additional questions are raised by your ownership of that

13    property, correct?

14    A.    Yes.  That is the last paragraph of the article.

15    Q.    And the comment that we just looked at where it

16    says, it sounds like this fraud is living quite well off the

17    laity's donations, that appears to interpret the statement to

18    mean you improperly used funds to purchase the home, correct?

19    A.    That certainly implies it and implies that -- yeah,

20    it implies corruption.  It implies misappropriation of funds.

21    It implies, I don't know, robbing the church, as well, of

22    monies that should duly go to it.  Yes.

23    Q.    After this article was published, other

24    publications also published articles concerning your home;

25    isn't that right?

1         A.    So at the time that all this was happening, yes, I

2    was keeping a close eye I guess on the Internet only in the

3    capacity that I'm -- you know, again, I'm not particularly

4    technology savvy, but just basic searches on a search engine

5    on the Internet led to a whole variety of other websites that

6    posted links to the article of Church Militant and some that

7    were then prompted to write articles or blog entries

8    ultimately leading the local newspaper, the only state

9    newspaper we have here in New Hampshire, the Union Leader, to

10   come and question and even one day come to my property via

11   kayak to, yeah, take pictures and so on.

12        Q.    Can you just say a little bit more about that?  You

13   testified that someone went to your property via kayak?

14        A.    The entrance of my property is at the end of a

15   lengthy, long driveway shared with other residences on the

16   lake.  So my house could not be seen from the road.  The

17   journalist decided to come around via kayak or canoe, I

18   forget, all the way to the house to take pictures, and I

19   happened to be there because I was on vacation.  I guess I

20   haven't said that.  I do not reside there.  As a pastor, I

21   have an obligation to reside at my own parish.  So I'm there

22   on my days off and whenever there was a crisis with my mother,

23   but I happened to be there on vacation sitting on the deck

24   when the journalist and a photographer came.

25        Q.    And did you have any conversation with the people

1    in the kayak?

2        A.    Conversation, no, but they certainly hollered and

3    asked questions from where they were, and I did not respond,

4    no.

5        Q.    Were there any other instances where someone, a

6    member of the public, had gone to your home after January 17th

7    of 2019?

8        A.    Excuse me.  Within a week of the article being

9    published, so this is in the winter, winter months, I was with

10   my mother in my car on the back roads going back to my house

11   after grocery shopping, and somebody stopped the car, waved at

12   the car as they were -- whereupon inquiry they said, do you

13   know where Father de Laire's house is, which was a significant

14   red flag because I do not use that residence as Father de

15   Laire.  I'm just George de Laire.  I'm known as George de

16   Laire by all the other residents around me.  And so for

17   somebody to ask where Father de Laire's house was for a

18   claimed delivery in an unmarked van, not an Amazon van, not a

19   UPS, FedEx, or any such, was very disconcerting.  Especially

20   at night and having my mother there.

21       Q.    Do you know what time it was at night?

22       A.    Do I know?  No.  But it was probably around 5:00,

23   5:30.

24       Q.    And did they give you a delivery?

25       A.    No, they did not.  Well, I did not identify as

1    Father de Laire because I was concerned again, but they asked

2    where Father de Laire's house is and I said I did not know and

3    just drove home.

4         Q.    Did you do anything in response to that event?

5         A.    I contacted the police officers that I knew from

6    the parish.  I spoke with the deputy chief of police of the

7    Manchester Police Department and I spoke with a former

8    parishioner in Merrimack, the police chief in Merrimack, who

9    both recommended that I contact the Amherst Police Department.

10   And after speaking with the chief on the phone, I went in for

11   a meeting with the chief of police of the police department of

12   Amherst.

13        Q.    Did you file a police report?

14        A.    I did not.  No, I did not file a police report.  My

15   concern was truly what could be done, what could I do to

16   improve the security of my mother given the fact that it's

17   winter, the lake is frozen, anybody can have access via the

18   water to my property, and so I was very concerned.

19             The chief of police recommended that I post the

20   property every I forget how many feet apart with no trespass

21   signs.

22        Q.    And did you do that?

23        A.    And I did that that same day.

24        Q.    Did the incident with the van make you afraid?

25        A.    It certainly made me afraid for my mother, and

1    quite frankly for myself as well, but certainly, yeah, it

2    heightened anxiety in one way or another.  It meant --

3    ultimately, it meant for me that somebody had taken the words

4    of that article to heart and that they were indeed going to

5    seek me out.  I don't know for what, I have no idea, but given

6    the nature of the comments that were published, none of them

7    were warm fuzzies.

8         Q.   Can we, speaking of that, look at page CM0064.

9              MS. ELOVECKY:  I believe this is the last comment

10   we're looking at, your Honor.

11        Q.   So about a third down the page there's a comment by

12   HRpuffinstuff.  Do you see that?

13        A.   Yes, I do.

14        Q.   Did you see that comment before today?

15        A.   I'm sure I have, yes.

16        Q.   And when did you see it?

17        A.   Probably when it was posted.

18        Q.   And that comment says:  Do you happen to have an

19   address for his --

20             THE COURT:  Please slow down.

21             MS. ELOVECKY:  Thank you, your Honor.

22        Q.   Do you happen to have an address for his palatial

23   home?  I live in NH and might want to pay him a visit.

24             Did I read that correctly?

25        A.   Yes, you did.

1      Q.    And how did that comment make you feel when you

2   read it in 2019?

3      A.    Even to this day, I'm sorry, it's threatening.   I

4   mean, somebody -- I guess that's my bias, but somebody who fed

5   on the terms and the content of that article chose to take the

6   matter -- was considering taking the matter into their own

7   hands which, yeah, is quite threatening and problematic and

8   worrisome and paralyzing even at times.

9      Q.    Do you remain worried as of today?

10     A.    I just said I was, yes.  Yes, indeed.

11     Q.    So you talked about the kayak and the van, correct?

12     A.    Correct.

13     Q.    Did you have any other in-person interactions that

14   you believed at the time to be related to the article?

15          MR. BALESTRIERI:  Your Honor, point of order, if

16   that's what it's called.  I'm not quite sure I heard the

17   question.  Can you please repeat the question?

18          THE COURT:  Repeat the question.

19     Q.    Other than the incidents that you discussed already

20   concerning the kayak approaching your house and the van, did

21   you have any other in-person exchanges with anyone that you

22   believed to be related to the January 17, 2019, article?

23     A.    Yes.  There was one other instance during daily

24   mass -- and I'm going to say it was also within the first week

25   after the publication of the article.  During the celebration

1    of -- mass is celebrated daily in my parish, and somebody that

2    was not one of the quote-unquote regulars, somebody that I had

3    never noticed before and who behaved in ways that were -- that

4    certainly drew attention to him during the celebration of mass

5    presented himself at the time to receive communion.  So I'm in

6    the center aisle of church, and the person came and stood

7    within six, ten inches of me and just sought to intimidate,

8    stared at me, and didn't move.

9         Q.    Is six to ten inches the typical distance that a

10    parishioner has between you and them for receiving communion?

11         A.    I mean, that's going to vary depending on whether

12    the parishioner is receiving communion on the tongue or

13    whether they're receiving it in their hand, but ultimately the

14    gesture is to reach out to them.  So they're usually at arm's

15    length.

16              THE COURT:  They're always within arm's length.  I

17    get it.

18         Q.    So this was closer than that, correct?

19         A.    Without a doubt, yes.

20         Q.    Did you have any conversation with this person?

21         A.    No.  I stood there to give him communion, which did

22    happen, and somehow I made my way back to my chair, finished

23    mass, but then I collapsed.  My legs were shaking

24    uncontrollably and then I -- yeah, so I had to sit down

25    because I was in bad shape I guess.

1          Q.    And did anyone notice that that you're aware of?

2          A.    Some of the parishioners that were there for daily

3    mass that day noticed the man's behavior and came right away

4    to the sacristy after mass and saw the state that I was in,

5    yes.  I mean, so much so that parishioners then became

6    concerned, and so whenever there was somebody who was not the

7    common -- or a regular common face -- I laugh.  Today I laugh.

8    Back then I was quite grateful.  But some would get up and go

9    and sit right behind the person just in case they would be

10   doing something unexpected, let's say.  So parishioners took

11   an active role.

12         Q.    And how long after the article was published did

13   this take place?

14         A.    The interaction with that man?  I'm going to say

15   within the first two weeks of the article being published.

16   The thing was that for years, a lot less now I have to say,

17   but for years without a doubt anytime somebody walked into

18   mass late, and because of the way the church where I am is set

19   up, people would walk in in my peripheral vision, and I always

20   end up looking worried and concerned, is this going to be a

21   problem or not, which is quite distracting but also a very

22   uneasy feeling for me to feel that I'm not even safe in

23   church.

24         Q.    And this event did not take place on a Sunday,

25   correct?

1       A.    The event with the man standing in front of me?

2       Q.    Yes.

3       A.    No.  That was during the week.  During daily mass

4    during the week, yes.

5       Q.    And typically for daily mass that is not a Sunday

6    mass, how many people usually attend?

7       A.    It varies.  I'm going to say 25 to 35.  20 to 30,

8    yeah.

9       Q.    Okay.  Other than your immediate reaction to that

10   event, how did -- well, did it impact you at all?

11           Just to clarify, you had mentioned your legs were

12   shaking and that you were upset in the moment.  Was there any

13   impact after that day?

14      A.    So many elements of my character I guess are

15   attacked by that article or in that article that I never knew

16   who would have read the article, who didn't read the article.

17   It's not like because there are just so many comments on it

18   that it meant that more people didn't read it without

19   commenting.  The spread on the Internet at the time with how

20   many other sites decided to publish the article increased its

21   visibility.

22           Yeah, I never knew who around me had read the

23   article.  And given the fact that so many had believed what

24   was written in it, would they be believing in it and just

25   there?  So, I mean, yeah, any gatherings that I might have

1    been in, especially clergy gatherings, because priests did

2    used to follow that website, the Church Militant website, but

3    parishioners and so on, and so, I mean, I never knew if

4    somebody was looking at me with what sort of questions or

5    whatever motive they may have.  Did I look in my rear-view

6    mirror every time I was on the back roads of Amherst going

7    home?  Yes.  I still do.

8           So much of -- I refused to go to the Canon Law

9    Society of America and show my face.  I mean, after all,

10   somebody had written that I was incompetent and that I was

11   corrupt and had ill motives for doing what I was doing.  So

12   why would I go and put myself in that sort of environment?

13       Q.   I'm sorry.  Is it your testimony that you have not

14   attended Canon Law Society of America events since the article

15   was published?

16       A.   I did not from the convention of 2018 until this

17   past October.  That is correct.  So I started to attend again

18   this year, well, this past October, after some of the

19   processes of this suit were brought to an end.  So when I

20   settled with Mr. Voris and with Church Militant.  Their public

21   assertions at the time of the settlements made it clear that

22   all of it had been fabricated and so on, and I felt that I

23   could show up again.

24           THE COURT:  Counsel, how much more direct do you

25   have?  No rush from me.  I'm just asking.

 1            MS. ELOVECKY:  I only have two more pages in my

 2    outline.  I have one, maybe two more exhibits.

 3            THE COURT:  All right.  The court reporter has been

 4    going for 90 minutes, and I want to take a break.  So we'll

 5    take a fifteen minute break and resume.

 6            MS. ELOVECKY:  Great.  Thank you, your Honor.

 7            THE COURT:  We're in recess.

 8            (RECESS)

 9            THE COURT:  All right, Father, you're still under

10    oath.

11            You may proceed.

12            MS. ELOVECKY:  Thank you, your Honor.

13            May I approach with the next proposed exhibit?

14            THE COURT:  You may approach throughout your

15    examination.

16            MS. ELOVECKY:  Thank you, your Honor.

17            THE COURT:  That goes for you, too, Mr.

18    Balestrieri.  You may approach the witness whenever you need

19    to to provide documents or whatever.

20            MR. BALESTRIERI:  Thank you, your Honor.

21            MS. ELOVECKY:  I have a copy for yourself as well.

22            THE COURT:  Thanks.  Do you have one for the law

23    clerk?

24            MS. ELOVECKY:  I have one for the law clerk and

25    you.

1          THE COURT:  Thanks.

2     Q.    Father de Laire, I've handed you what has been

3     marked for identification as Exhibit B.  Can you just take a

4     look through the various pages, there's about 18 pages here,

5     and let me know when you're done with that review?

6          (Pause)

7     A.    Yes.  All set.

8     Q.    Okay.  Father de Laire, you had testified

9     previously that you had received a voicemail, correct, at your

10    diocese phone number on the day the article was published; is

11    that correct?

12    A.    Yes.  That is correct.

13    Q.    Were there any other contacts that were made to you

14    by the public separate from the voicemail, separate from the

15    comments that we've looked at, and separate from the in-person

16    interactions that you've testified about?

17    A.    So for weeks both at the parish and at the tribunal

18    offices members of the public made phone calls seeking to

19    speak with me or just to insult whoever answered the telephone

20    call.  And other than the use of the telephone, e-mails were

21    sent to me directly to my -- both my e-mail addresses, the

22    e-mail address I used for the Diocese of Manchester and the

23    e-mail address I used for the parish, as well as members of

24    the public used the diocesan website contact form to contact

25    the diocese about the article and about me.

1      Q.    And the contacts that came through the website,

2  were those provided to you at any point in time?

3      A.    The webmaster -- so it was decided with in-house

4  counsel that all -- or most often there would be just one

5  e-mail from the webmaster with whatever e-mails they had

6  received that day that would be forwarded to me as opposed to

7  whenever they just came in.

8      Q.    And did you review those e-mails when they were

9  forwarded to you?

10     A.    Yes, I did.

11     Q.    And can you tell me, Father de Laire, what is

12 Exhibit B?

13     A.    Exhibit B appears to be a whole variety of e-mails

14 sent to me to my e-mail addresses, to the Director of

15 Communications for the Diocese of Manchester, to the website

16 or through the website of the diocese.  Yeah, all -- yeah,

17 they're all e-mails sent to either -- through the website or

18 through the Director of the Office of Communications for the

19 Diocese of Manchester or to e-mail addresses.

20     Q.    And if you look at the bottom right corner of this

21 document, it says in very small letters deLaire0001; is that

22 correct?

23     A.    Yes.  I see that.

24     Q.    And do you agree with me that that represents that

25 you produced these documents in discovery in this matter?

1       A.    I don't know that I can answer that

2   authoritatively.

3       Q.    Okay, but you do recognize the document and the

4   various e-mails?

5       A.    They were either provided by me or by the Diocese

6   of Manchester.

7             MS. ELOVECKY:  Your Honor, I would move what's been

8   marked Exhibit B into evidence.

9             THE COURT:  There's no objection.  It's admitted.

10            (Plaintiff's Exhibit B Admitted)

11            MS. ELOVECKY:  Thank you.

12            Your Honor, I am able to walk through each of these

13  e-mails, but I'm also happy to do a summary and leave this

14  exhibit for the record.

15            THE COURT:  When you say do a summary, what do you

16  mean?

17            MS. ELOVECKY:  I will ask him some general

18  questions.

19            THE COURT:  That's fine.

20      Q.    Father de Laire, you testified that you received

21  multiple e-mails, correct?

22      A.    Yes, I did.

23      Q.    Were those e-mails favorable toward you?

24      A.    Some e-mails sought for me to be fired, pushing the

25  Bishop to fire me.  Some -- no.  Not one e-mail -- I'm sorry.

1    Not one e-mail was favorable to me.

2        Q.    And so there were several e-mails that were sent to

3    you after January 17, 2019, that were disfavorable to you?

4        A.    There were attacks about my knowledge, attacks

5    about my motives, attacks about my ethics, attacks on a whole

6    variety of things, yes, my character.

7        Q.    How many people at the diocese saw those e-mails?

8        A.    To my knowledge the webmaster, the person

9    responsible for monitoring the website of the diocese, the

10   Director of the Office of Communications, the Chancellor of

11   the diocese, the Vicar General of the diocese, and the Bishop,

12   and myself.

13       Q.    Okay.  And how -- what impact, if any, did those

14   e-mails have on you?

15       A.    Well, it reaffirmed that lots of people read the

16   article and took it at face value and believed whatever was

17   asserted about me and my work ethics, work product,

18   capacities, my mental state, all the things that were put into

19   question or maligned by the article itself.

20       Q.    So just by way of example, if you could just look

21   at the first page of Exhibit B, this is an e-mail where the

22   e-mail address is identified at the top of the page, correct?

23   I could spell it, but I think it's in evidence so I'll skip

24   that.

25       A.    Yes.

1          Q.    And right after the e-mail information block it

2    says:  Kind attention of Father George de Laire, correct?

3          A.    Yes, it does.

4          Q.    And then when you go past the address, it says:

5    Dear Padre, the reports which now circulate on the net about

6    you and your "work" (i.e., imposing unwarranted "precepts"

7    upon the members of the Saint Benedict Center are indeed

8    disturbing and wholly wrong.

9              Did I read that correctly?

10          A.    Yes, you did.

11          Q.    And then it says:  Shameful!  Reprehensible!

12    Please comment particularly on this piece which -- rightfully

13    or wrongfully -- has you as the prime actor.

14              Did I read that correctly?

15          A.    Yes, you did.

16          Q.    And then there's a quote from the Church Militant

17    article, correct?

18          A.    It appears that way.

19          Q.    And then after that there's another sentence that

20    says:  There is more on the website quoted below.  It is a

21    dreadful disgrace.

22              Did I read that correctly?

23          A.    Yes, you did.

24          Q.    Okay.  Father de Laire, you testified that you were

25    originally appointed as both the Judicial Vicar and the Vicar

1    of Canonical Affairs by the Bishop in 2013, correct?

2         A.   Yes, I did.

3         Q.   Was that appointment at any point renewed?

4         A.   By canon law the appointment is made for a defined

5    term.  The Bishop gets to define what that term is.

6              Until -- so I was renewed in both capacities in

7    2018, it was a five-year appointment, and then I was appointed

8    again for five years, and without grave cause the Bishop could

9    not remove me from that office.

10             In 2023 though the Bishop appointed me for just one

11   year, and he explained to me that it was because of what was

12   going on with the lawsuit.

13             And this past July the Bishop reappointed me for a

14   term of three years.

15             MR. BALESTRIERI:  Uh --

16             THE COURT:  If you disagree, you can cross-examine.

17             MR. BALESTRIERI:  No, it's more of a question for

18   clarification.

19             THE COURT:  Okay.

20             MR. BALESTRIERI:  Father de Laire, you mentioned --

21             THE COURT:  Wait a minute.  Just tell me what

22   the --

23             MR. BALESTRIERI:  I'm unclear as to what

24   appointments were renewed specifically since he enjoyed two

25   according to Attorney Elovecky.

1      Q.    Father de Laire, I believe that you testified to

2  this already, but can you just specify for the Court and for

3  the record, were those reappointments for both of your vicar

4  positions or only one?

5      A.    It's one appointment letter appointing me to both

6  positions, as Vicar for Canonical Affairs and Judicial Vicar.

7  Yeah, those are the appointment letters that I received in --

8  the appointment letter I received in 2013, the reappointment

9  in 2018, reappointment in 2023, and, again, reappointment July

10  1st of 2024.

11      Q.    Okay.  And so you were initially appointed for five

12  years, correct?

13      A.    That is correct.

14      Q.    For both positions, correct?

15      A.    For both positions, correct.

16      Q.    And then renewed for five years, correct?

17      A.    That is correct.

18      Q.    For both positions?

19      A.    For both positions.

20      Q.    But then renewed for one year?

21      A.    That is correct.

22      Q.    For both positions?

23      A.    For both positions.

24      Q.    Okay.  And so when you were renewed for one year,

25  that was in 2023, correct?

1      A.    Yes.  That is correct.

2      Q.    So that was the first appointment that postdated

3  the January 17, 2019, article, correct?

4      A.    That is correct.

5      Q.    And that was the first time that you were appointed

6  only for one year, correct?

7      A.    Yes.  That is correct.

8      Q.    Okay.  Father de Laire, in your role as Vicar of

9  Canonical Affairs have you worked at all with any clergy at

10  the Vatican?

11      A.    So every year from 2012 onward until 2019 I went to

12  the Vatican to meet with the various offices that I had

13  dealings with to address one-on-one with the various officials

14  cases that might be pending within their own dicasterys or

15  congregations.

16           So, yes, I had regular contact with officials of

17  the Holy See of the Vatican yearly until 2019.

18      Q.    What changed in 2019?

19      A.    An article that was printed that said that there

20  were people at the Vatican that thought me to be a

21  troublemaker, and supposedly I was known as somebody who was

22  incompetent and having botched cases and embarrassed my

23  bishop, and so it made it a little difficult for me just to go

24  and show my face and make appointments with officials after

25  such was claimed.

1    Q.    Were you at any time told that you were not

2    welcome?

3    A.    I would say no, but I would also say that that

4    would not be a practice of the Holy See.

5    Q.    Prior to 2019 had you ever been told -- strike

6    that.  Prior to 2019 were you aware of any criticisms of you

7    by any clergy at the Vatican?

8    A.    No.  Certainly not to my knowledge.  And since I

9    had a very good rapport with all the English speakers of the

10   various congregations that I had dealings with, I mean, yeah,

11   meeting yearly or exchanges via e-mails, going out for meals

12   or coffee, I don't believe that they would take the time,

13   their free time, to interact with me if I was indeed

14   considered a troublemaker or somebody who had ill intentions

15   or ethics or reputations or so on.

16   Q.    Did you have any understanding prior to January 17,

17   2019, of what reputation you might have had with clergy at the

18   Vatican?

19   A.    I don't think I had any reason to think that my

20   reputation was in any way damaged or not good in the sense

21   that I was always welcomed at the lowest level of the

22   officials to the heads of dicasterys, bishops and cardinals

23   that met with me, some of which I met every single time that I

24   went to Rome whether there was a case before them or not.

25   Q.    Okay.  Father de Laire, in this litigation you're

1    claiming that you suffered emotional distress as a result of

2    the article, correct?

3        A.    Yes, I do.

4        Q.    Can you please explain to the Court how that

5    emotional distress has manifested?

6        A.    So from the day of the publication of the article

7    until following that publication, I became prone to anxiety

8    attacks beyond the fact that I was treated for anxiety and

9    depression for about nine years prior to the article, but

10   panic attacks, anxiety attacks became way too common in my

11   life at that time.

12       Q.    When you say at that time, what do you mean?

13       A.    During the months that followed the publication of

14   the article, because ultimately Church Militant picked up the

15   topic again four months later by publishing videos, and then

16   another journalist at Church Militant published an article I

17   want to say June or July of that year, and so plenty of

18   renewed triggers for the attacks and for the feelings that the

19   attacks created or caused.

20       Q.    Did you seek any medical treatment for emotional

21   distress that you experienced after January 17th of 2019?

22       A.    So, as I've stated, right, I was already under the

23   care of a psychiatrist prior to the article of 2019, and I

24   continued to meet with my psychiatrist according to the

25   schedule that had been established for the two of us.  And

1    during some of those meetings post the articles we certainly

2    discussed the impact of the article upon my welfare, my

3    psychological welfare.

4        Q.    And you testified that prior to January 17th of

5    2019, you had been experiencing anxiety, correct?

6        A.    So, yes, that is correct, I have been experiencing

7    anxiety and depression and had been treated for both since

8    2008 I believe.

9        Q.    And were you prescribed medications for those

10   diagnoses?

11       A.    I was prescribed a medication that I took daily at

12   just about the same time every day that addressed the overall

13   mood impacts, I guess, or imbalances let's say, but I was also

14   prescribed a medication for any spikes in anxiety or panic

15   attacks, anxiety attacks.  Another medication that I was

16   prescribed for that that was therefore prescribed as needed

17   depending on when an attack would come.

18       Q.    And so your psychiatrist -- well, strike that.

19            Did your psychiatrist prescribe medication

20   concerning any spikes for anxiety to be taken at a specific

21   time?

22       A.    My psychiatrist has been prescribing medication for

23   anxiety attacks that were to be -- the medication was to be

24   taken at the time or whenever I felt the attack coming and

25   just for those instances until the attack had ceased.

1        Q.    And how often -- strike that.

2              As of beginning in 2019, how often were you meeting

3    with your psychiatrist?

4        A.    On average I was meeting with my psychiatrist every

5    three months.

6        Q.    And who was -- what psychiatrist were you seeing at

7    that time?

8        A.    My psychiatrist was Dr. Amy Lister until her death

9    last -- I guess it's now a year and a half in January.

10       Q.    And so Dr. Lister is no longer living, correct?

11       A.    That is correct.

12       Q.    Okay.  And when you would meet with Dr. Lister, did

13   you have conversations about the level of medication you were

14   taking?

15       A.    Part of -- every single meeting with my doctor

16   addressed the dosage frequency of the medication, yes.

17       Q.    Did you ever take medication outside of her advice?

18       A.    No, I did not.  I personally do not like to take

19   medications.  Unfortunately, that is part of my life.

20       Q.    And so after January 17th of 2019, what changed in

21   your medication?

22       A.    The medication that I was prescribed for --

23             MR. BALESTRIERI:  Objection.  Leading question.

24             What changed?  That implies that something changed.

25             THE COURT:  That's permissible, though.  What, if

1    anything, changed?

2            THE WITNESS:  The frequency with which I was taking

3    the medication that was prescribed as needed, which is in

4    response to the increased amount of triggers to my anxiety

5    leading to anxiety attacks.  So there was an increase in my

6    taking the medication for those.

7            THE COURT:  For how long?

8            THE WITNESS:  I'm going to say until my meeting

9    with her the following November.  So from January to November.

10   So that's 8, 9, 10 months.

11           THE COURT:  All right.

12       Q.   Other than frequency of panic attacks, did you have

13   any other symptoms of emotional distress after January 17th of

14   2019?

15       A.   After, yes.  Well, I mean, the impact upon my

16   sleep, obviously.  Although I have been also prescribed a

17   sleep aid medication for years before all of this, but I would

18   have to supplement it with antihistamines or Nyquil or

19   otherwise to help with my sleep.

20           I'm a French -- I know.  Yes, I'm going to say it

21   that way.  I'm a Frenchman, and therefore I have a weakness

22   for food, and so food became a tool for dealing with my stress

23   and anxiety and all that was piling up at that time.

24       Q.   So is it your testimony that your appetite was

25   impacted following the article that was published on January

1  17th of 2019?

2       A.   I don't mean to be sarcastic, but it's more than

3  the appetite because ultimately it means that suddenly you

4  have to wear pants that have elastics on the side.  I know,

5  but those were all the practical realities that I had to face,

6  but increase and decrease in weight, for instance.

7       Q.   Is it your testimony that you had an increase in

8  weight because you like food?

9       A.   I had an increase in weight because I was now

10  regularly overeating and compensating or starving because I

11  was unable to eat due to my nerves.  So I yo-yoed.

12       Q.   Other than Dr. Lister, did you speak with any other

13  medical professionals about your emotional distress?

14       A.   I did with my primary care physician because she is

15  the one that prescribed the sleep aid.  It was not my

16  psychiatrist that prescribed the sleep aid.  I was under that

17  sleep aid medication way before I started with my psychiatrist

18  on the issues of anxiety and depression.  So, yes, I discussed

19  it with my primary care doctor.

20            MS. ELOVECKY:  Your Honor, at this time I would

21  like to offer as evidence excerpts from Dr. Lister's medical

22  records.

23            At this point Dr. Lister is no longer alive.  These

24  were produced in connection with this litigation, they are

25  medical records, and I'm offering them into evidence.

 1                    I am not able to call Dr. Lister to the stand.

 2                    THE COURT:  I understand.  They were produced in

 3    discovery, though?

 4                    MS. ELOVECKY:  They were.  They are Bates stamped

 5    with Dr. Lister's name, and they also were submitted to the

 6    Court in connection with our briefing on this matter.

 7                    THE COURT:  Right.

 8                    So Mr. Balestrieri has copies as far as you know?

 9                    MS. ELOVECKY:  I'm sorry?

10                    THE COURT:  He has copies?

11                    MS. ELOVECKY:  He had a copy of that, and I'm happy

12    to present him with one.

13                    THE COURT:  Do you need another copy or do you have

14    a copy?

15                    MR. BALESTRIERI:  I don't know.  I haven't seen it.

16                    What were you referring to?

17                    MS. ELOVECKY:  It was attached to Father de Laire's

18    --

19                    MR. BALESTRIERI:  I'm happy to take an extra copy.

20                    Thank you.

21                    THE COURT:  Yeah, you know, that's his medical

22    records, though.

23                    THE WITNESS:  Precisely.

24                    THE COURT:  You're going to offer those into

25    evidence?

1          MS. ELOVECKY:  It's already on the record.  We had

2    that discussion.

3          THE COURT:  Wait a minute.  It's already on the --

4    I guess it is already on the record.

5          MS. ELOVECKY:  Yes.

6          THE COURT:  If you want to after this, you can move

7    to seal it.  No one is going to object to that.

8          But it's fair game for the hearing.  So go ahead.

9          MS. ELOVECKY:  And so if they're admitted, I will

10   provide a copy to the clerk, and not ask Father de Laire to

11   review them.

12         THE COURT:  Okay.  You can submit them.

13         MS. ELOVECKY:  Your Honor, may I ask if you would

14   entertain an oral motion to seal this at this time?

15         THE COURT:  Mr. Balestrieri, what she means is --

16   she's introduced these medical records, right?  Normally all

17   our medical records are private, but you have access to it.

18   If it's sealed, all it means is the public won't have access

19   to it but the parties and counsel will.

20         MR. BALESTRIERI:  So it won't be entered online,

21   for instance, in Pacer or anything like that?

22         THE COURT:  If it is, it will be in a sealed way

23   that people can't access, but you'll be able to deal with it.

24   You could ask any questions you want.

25         MR. BALESTRIERI:  Then I have no objection.

```
 1                    THE COURT:  Okay.  It's allowed.

 2                    MS. ELOVECKY:  Thank you, your Honor.

 3                    THE COURT:  And it's sealed at level 1.

 4                    Level 1 means, Mr. Balestrieri, you get to have

 5    access.

 6                    MR. BALESTRIERI:  Thank you.

 7                    THE COURT:  But it also means you can't disseminate

 8    it elsewhere.

 9                    MR. BALESTRIERI:  That's a federal violation.  I

10    know.  Thank you.

11        Q.    Father de Laire, did you experience any depression

12    as a result of the article?

13        A.    I'm having a hard time answering the question in

14    the sense that it's difficult to separate at times the

15    depression from the anxiety and the anxiety from the

16    depression.

17                    So I would say that I primarily experienced anxiety

18    attacks as a result of the article as opposed to depression,

19    which would imply I guess other sorts of symptoms.

20        Q.    Did you at any time have any difficulty engaging

21    with your work after the article came out, in the aftermath of

22    the article?

23        A.    Well, it certainly became more difficult to focus,

24    and my productivity certainly went down the tube.  So it's --

25    yes, I had a harder time engaging in my work and even in --
```

1    not just with the tribunal or the administration but also in

2    the parish.

3        Q.    Father de Laire, you also claim damages for

4    reputational harm, correct?

5        A.    Yes, I did.

6        Q.    And why is that?

7        A.    It's, well, as a priest, as a Catholic priest at

8    least, a sense of personal integrity, a sense of truthfulness,

9    a sense of, yeah, honesty, are I think associated with the

10   position of a priest.  People come to share their problems

11   whether it is within the sacrament of confession or not.

12   People invite clergy into their lives not when life is

13   fantastic.  People invite us into their lives when things get

14   tough and they need to find a way to get renewed in hope or

15   other things.

16            And so, yes, my reputation is essential to what I

17   do as a priest.  Of course.  Did it impact my work and the

18   amount of work at the tribunal?  Not really because crises

19   happened in the church daily in one way or another, and so

20   those were not affected by the articles, but my -- yeah, as a

21   person, as a priest -- and my priesthood is my life,

22   obviously.  I mean, I gave up quite a bit from my own family

23   to follow this calling.  It's -- so, yes.  I'm sorry.  That

24   was long-winded.  I apologize.

25       Q.    Did your family read -- strike that.

1          Do you know if your family read the article that

2    was published on January 17th of 2019?

3          A.    I know that my three siblings read the article, and

4    I know that my uncle -- at least one of my uncles in France

5    did as well.

6          THE COURT:  Where are your siblings?

7          THE WITNESS:  One sibling is in Massachusetts just

8    south of here, one is in France, and one is in Thailand.

9          THE COURT:  Thank you.

10         Q.    What did it mean to you, if anything, that your

11   family saw these words that were written about you?

12         A.    Okay.  That's -- part of the issue is there's only

13   one de Laire family in the world.  That's not my doing.

14   That's just the way it is.  It's a name in French history that

15   goes back to 1192, and, therefore, to have my name on the

16   Internet maligned in one way or another addressing my

17   integrity and to have the name de Laire associated with all

18   sorts of wrongdoings was quite perturbing to my uncle, and on

19   top of things my namesake, George de Laire, who was the

20   founder of the family business.  A man who today still people

21   post about him on the Internet about his contributions to

22   chemical engineering and so on.  For my uncle it was very

23   difficult for him, and he asked me what was I going to do

24   about it to correct the errors.  He has since passed, but it

25   was very, very difficult for him.

1        Q.    When did your uncle pass?

2        A.    He passed on Palm Sunday of 2020.

3        Q.    Okay.  Okay.

4              Do you know if your uncle believed those statements

5   that were made about you?

6        A.    I believe that my uncle loved me and was supportive

7   of me.  I think he was much more horrified by the attack to

8   the name.

9              It's difficult to explain I guess when you come

10  from an aristocratic family where a name throughout French

11  history had a certain value associated with it, that suddenly

12  for the first time it suddenly appears in ways that are

13  disgraceful.

14       Q.    Father de Laire, do you take pride in the work that

15  you do?

16       A.    I take tremendous pride in the work that I do.  I

17  mean, I believe that the gifts that I have to do what I do are

18  not mine, and so it's for me to give expression to them to the

19  best of my ability.  And so, yes, I take a lot of pride in the

20  work I do across, you know, the spectrum, not just canon law,

21  anything that I would give myself to.

22       Q.    And do you consider yourself to be an honest

23  person?

24       A.    I'm sorry.  I'm going to correct that.

25              I don't consider myself to be an honest person.  I

1    know I am.

2        Q.    Do you believe that you have a reputation as an

3    honest person?

4        A.    Yes, I certainly do believe so.

5        Q.    Do you believe that that reputation was harmed as a

6    result of the article?

7        A.    Without -- I do believe without a question that

8    that reputation was harmed because of the article, yes.

9        Q.    Do you consider yourself to be a fair jurist?

10        A.    I think I have been even commended for being fair

11    and unbiased even in matters where I might not be adjudicating

12    but having to walk the tight line of prosecuting and at the

13    same time assuring that the rights of the clergy were being

14    protected even though I was also seeking -- being the one to

15    discipline them.  So, yes, I know that I have that reputation.

16        Q.    When you say you've been commended to be a fair

17    jurist, as being a fair jurist, who commended you for that?

18        A.    Some of the comments that I have received from

19    officials in Rome in response to some of the cases that I have

20    presented and some of the priests that I dealt with on

21    disciplinary matters.  Unfortunately, those are the priests

22    that are not going to say anything about it publicly because

23    they don't want it known that they had issues.

24        Q.    And do you believe that your reputation as a fair

25    jurist was impacted by this article?

1      A.   Well, it certainly put it into question, yes.

2      Q.   Okay.

3           MS. ELOVECKY:  Your Honor, I rest at this time, and

4  I would like to reserve the right to call him back for any

5  further direct following cross.

6           THE COURT:  You can have redirect, sure.

7           MS. ELOVECKY:  Thank you.

8           THE COURT:  You may proceed.

9           MR. BALESTRIERI:  Thank you, your Honor.

10          And in case I was supposed to say something but I

11  didn't, for the record, I respectfully object to the motion

12  for a continuance being denied.  I'm only saying that because

13  I didn't say it before.

14          THE COURT:  Just by moving you've preserved it.

15          MR. BALESTRIERI:  Thank you.

16          Do I address Father de Laire from here?

17          THE COURT:  You can address him from there or you

18  can move to the podium if you like.  Wherever you're more

19  comfortable.

20          MR. BALESTRIERI:  If you can hear me, Father de

21  Laire?

22          THE WITNESS:  I can hear you fine, sir.  Thank you.

23                        CROSS-EXAMINATION

24  BY MR. BALESTRIERI:

25      Q.   Father de Laire, have you ever filed a false report

1    to the Federal Bureau of Investigation?

2         A.    No, I have not.

3         Q.    Have you ever made a report of kidnapping to anyone

4    employed in law enforcement?

5         A.    No, I have not.

6         Q.    Did you post any of the comments attached to the

7    Church Militant article that was entered on CM -- I think it's

8    document 289-1?

9         A.    I'm sorry.  I do not know what you're asking.

10        THE COURT:  I think he's asking you -- there's a

11   lot of comments after, none of them bear your name, but I

12   think he's asking you if you're the one that posted some of

13   those.

14        MR. BALESTRIERI:  Effectively.

15        A.    No, I did not.

16        Q.    Did you discuss with anyone who shared with you, if

17   that was the case, that they had posted comments on the Church

18   Militant article?

19        A.    I did with one person.

20        Q.    And can you expand upon that?  What did that person

21   say?

22        A.    One person contacted me after posting on the

23   website saying that they had posted on the website because

24   they were troubled by what they had read.

25        Q.    Regarding the comments referenced by Attorney

1    Elovecky, how do you know that the negative comments were not

2    principally motivated by any other conduct or work product on

3    your part and not based upon the article?

4        A.    The comments are in response to the article and are

5    directly attached to the article and are presented as comments

6    based upon the article, so I -- as to speculating beyond that,

7    I'm sorry, I can't.

8        Q.    And on what date did your legs allegedly shake

9    after the encounter with the individual you mentioned in

10   church?

11       A.    I believe it was within two weeks of the article

12   being published.  I do not recall right now from where I am,

13   but there are court documents that were filed with the case

14   that specify exactly when it happened because associated with

15   that was my conversation with the chief of police in Amherst,

16   for instance.  So I know that it's in the record.  I apologize

17   for not remembering at this point.

18       Q.    And do you know whether that individual was

19   identified subsequently by name?

20       A.    I do not know that, no.

21       Q.    Do you know if that individual had a psychological

22   history prior to approaching you?

23       A.    I have no idea.

24       Q.    In 2018 in a vestibule of the annual -- the hotel

25   conference center of the annual canon law conference, do you

1    recall both of us speaking for about 20 minutes on the margin?

2         A.    So I believe it was actually in the back of the

3    room where the last of the presentation was happening as

4    people were making their way out, taking their suitcases.  So

5    it was not in the lobby of the hotel, but it was actually in

6    the conference center while the conference was being given,

7    and we both stood, yes, in the back of that room.

8         Q.    I'm glad you recall those details, Father.

9               I make reference to the affidavit that I filed,

10   document 292-1.

11              Do you need to have that in front of you, Father?

12        A.    If you're going to ask me to comment on it, I would

13   like to have a copy.  Yes, please.

14              MS. ELOVECKY:  Your Honor, I'm going to object to

15   this line of questioning inasmuch as it's referenced already

16   in the affidavit.  It's clear that this goes to liability and

17   the truth of the statements that were made.  I don't see how

18   this is related to damages, and I, therefore, object to this

19   line of questioning.

20              MR. BALESTRIERI:  My response, your Honor, is that

21   the plaintiff has asserted under penalty of perjury in his

22   affidavit, as well as here on the stand I presume, I don't

23   recall him being given the oath, but I presume he's still

24   under oath, that --

25              THE COURT:  Did we not swear him in?

1          THE CLERK:  He was sworn in.

2          THE COURT:  He was sworn in.

3          MR. BALESTRIERI:  He was sworn in.  Thank you.

4          That he never -- I mean, this is an admission

5    against himself that he made to me in person that is a direct

6    interaction that we both had, plaintiff and defendant, and I

7    consider it to be an admission against himself.  He recognized

8    his errors.  He apologized subsequently to a complaint being

9    received by his bishop by him.  That is very material because

10   it's a recognition of the errors that he committed and the

11   consequences arising from them.

12         THE COURT:  The consequences.

13         Understood.  Go ahead.

14         MS. ELOVECKY:  I think that the response makes

15   clear that this goes to liability and the truth of the

16   statements made in the article and are not at all related to

17   damages.

18         THE COURT:  See, here's the problem.  Normally I

19   would say you're right, but you asked him questions during

20   your direct that went to liability.  You asked him things

21   about -- and only as it relates to damages, but you asked him

22   questions like, had anybody ever questioned you before, had

23   anybody ever accused you before.  You really opened the door

24   to that type of questioning.

25         MS. ELOVECKY:  Your Honor, those questions were

1   actually going to his reputation prior to the time of the

2   article.  It established a strong reputation prior to the

3   article.  That was the intent of those questions, and they did

4   not go to liability.

5           In order to assert harm to reputation we have to

6   assert a strong reputation prior to the defamatory statements,

7   and that is what we did.

8           THE COURT:  Well, here's the problem.  I'm the

9   judge of what you did.

10           MS. ELOVECKY:  Okay.

11           THE COURT:  I understand your intent, but the way

12   you went about it --

13           I'm not going to let you go crazy with this, Mr.

14   Balestrieri, I'm not going to let you go on and on.

15           But I do think the door has been opened a bit to

16   whether the damages -- like, I mean, if you're saying -- it's

17   one thing to say I had a good reputation before this, and I

18   don't question that you did, Father, but you got specific

19   about it.

20           So I'm going to give him a little latitude.

21           MS. ELOVECKY:  Okay, your Honor.  Thank you.

22           MR. BALESTRIERI:  Thank you.

23   Q.    Father de Laire, on that occasion just referenced

24   do you recall having --

25           THE COURT:  But I need to caution you, also.  You

1   need to understand a judgment of defamation has been entered

2   against you.  That presumes the falsehood of some statements.

3               I understand what you're trying to establish here,

4   but we're not going to retry the defamation case.  So don't be

5   deceived by my ruling.

6               MR. BALESTRIERI:  I'm not deceived, but at the same

7   time I concur with your Honor that counsel for the plaintiff

8   reopened that box by asking a number, and I took them down,

9   they're in the transcript, a number of questions that went way

10  beyond did you have a good reputation prior to 2019.

11              THE COURT:  Go ahead.

12              MR. BALESTRIERI:  Thank you.

13     Q.    Father de Laire, do you recall on that occasion

14  having said to me, "I never wanted to become a canon lawyer.

15  I did what I did because I was ordered to do so by my

16  bishop."?

17     A.    I do not recall saying that, no.

18     Q.    And do you recall apologizing to me for the

19  "errors" that you committed?

20     A.    That I do remember.  Yes, I did.

21     Q.    What errors were you referring to?

22     A.    In specifics, I do not recall.  I'm sorry.

23     Q.    But you do recall having asserted that you

24  committed errors regarding the cases?

25     A.    I remember thanking you, Mr. Balestrieri, for

1  bringing to the attention of the tribunal clerical errors that

2  were made during the proceeding of one case and thanking you

3  for that because that made me aware of the fact that errors

4  were being made that I now as Judicial Vicar needed to address

5  with the staff to make sure that those errors were not made

6  again.

7          So, yes, I absolutely do remember thanking you for

8  bringing those errors to my attention.

9      Q.   And by clerical errors, do you mean those committed

10 by clerics or minor administrative errors or any other errors?

11 What do you mean by clerical errors?

12     A.   By clerical errors, I -- if I remember correctly

13 the case, there were issues as to when certain -- the

14 erroneous dating on some of the documents that were entered

15 into what we call the acts of the case, the documents that are

16 part of a case.

17     Q.   And would those errors -- would one of them be, for

18 instance, the fact that a summons was issued to a plaintiff to

19 appear prior to that plaintiff having introduced a bill of

20 complaint seeking anything from the Tribunal of Manchester?

21     A.   I do not remember any of the specifics, sir.

22          The Tribunal of the Diocese of Manchester processes

23 more cases than the Archdiocese of Boston.  For me to remember

24 what cases and the specifics of cases on which I was not even

25 serving as a judge, so I was not even adjudicating that case,

1    for me to remember specifics, I apologize.  I guess my memory

2    is not that good.

3              THE COURT:  Just let me interrupt for a second.

4              You know, when you talked about some of your work

5    before, it actually sounded to me as if the Diocese of

6    Manchester had sort of a slow docket, but you're telling me

7    it's got a very busy docket?

8              THE WITNESS:  We have a -- it's a slow docket from

9    the perspective that processing takes a while, but the volume,

10   the volume is at times 30 percent more than that of the

11   Archdiocese of Boston.

12             THE COURT:  Really?

13             THE WITNESS:  With triple the -- quadruple the size

14   of the Catholic population.

15             THE COURT:  And less staff, I assume.

16             THE WITNESS:  I do not know the staffing situation

17   in Boston.  I don't.

18             THE COURT:  What do you attribute that to, the high

19   volume?

20             THE WITNESS:  The current bishop has made it an

21   effort in response to Pope Francis's call to be more pastoral

22   and to reach out to the faithful and provide the faithful

23   avenues for them to be reconciled in the church or to have

24   their status clarified in the church, and clergy throughout

25   the Diocese of Manchester have been encouraged to work with

 1     their parishioners.

 2              THE COURT:  That has generated more canon

 3     litigation?

 4              THE WITNESS:  Yes.  Marital cases are trials in the

 5     church.

 6              THE COURT:  Are marital cases what is driving the

 7     numbers?

 8              THE WITNESS:  That is.  It's purely marital,

 9     annulment cases, yes.

10              THE COURT:  Thank you.

11              Sorry for that diversion.  I was just sort of

12     intrigued.  Go ahead.

13         Q.   Father de Laire, do you recall an exception of

14     suspicion raised on the 2nd of November 2016 against a certain

15     Monsignor Gilbert, a judge of your tribunal, as well as a

16     complaint about your conduct in that case that was produced in

17     document 292-2?

18         A.   If you are making reference to the complaint you

19     raised as to the case for which you were the advocate or

20     procurator for one of the parties, I believe that ultimately

21     is the only instance in my time as Judicial Vicar that such a

22     complaint came through.

23              So if that is the one that you're making reference

24     to, yes, I do recall the complaint being made.

25         Q.   Do you only recall one complaint pertaining to a

1    marriage nullity case?

2        A.    I just identified it as -- you identified the

3    complaint with specific terminology, sir.

4        Q.    And that was against Monsignor Gilbert, the

5    exception of suspicion.

6              I'm referring to page 2.

7        A.    I do not have the document in front of me, sir.

8        Q.    Right.  So page 2 -- pardon me, 3 of 5, document

9    292-2, if I can read what I submitted?

10             THE COURT:  Counsel, can you give him a copy?

11             MS. ELOVECKY:  Me?

12             THE COURT:  Yeah.

13             MS. ELOVECKY:  I didn't prepare this exhibit.

14             THE COURT:  No, but you have a copy, don't you?

15             MS. ELOVECKY:  I do.

16             THE COURT:  He's your client.

17             I guess if you prefer he not see what --

18             MS. ELOVECKY:  Can I see what you're talking about?

19    Because my copy does not have the ECF numbers on it.

20             So it's this?

21             MR. BALESTRIERI:  It's the same thing.  292 ---

22             MS. ELOVECKY:  And are you only going over these as

23    well or should I only give him this one?

24             MR. BALESTRIERI:  Well, okay.  Yes, you can give

25    them all to him.

1          THE COURT:  You may as well give it all to him.

2          MS. ELOVECKY:  Yeah, but once again, my copy does

3    not have the same page numbers across the top as yours so

4    you're going to have to use something else.

5          THE COURT:  To refer him use -- is there anything

6    at the bottom of the page or anything, page numbers, anything?

7          MR. BALESTRIERI:  No, your Honor, but this is a

8    document he has already seen.  He's already in possession of

9    it.

10          THE COURT:  I know, but that doesn't mean he's

11    going to know where to look on a page when you start --

12          MR. BALESTRIERI:  I'll indicate.

13    Q.    Father de Laire, if you're looking here at the

14    exception of suspicion dated 24 November 2015, I'm referring

15    to the second page of that document and the paragraph

16    beginning, quote, Sixth, and most gravely, the testimony

17    of --"

18          THE COURT:  Slow down.

19    Q.    Quote, one of the parties, already collected by the

20    Court as of 24 November 2015 was withheld from examination by

21    the undersigned Procurator-Advocate of the (party redacted)

22    during his visit to the Tribunal of the Diocese of Manchester

23    --

24          THE COURT:  You've got to slow down.  The reporter

25    can't keep up with you when you read fast.  It happens every

1    day in court.  You've got to slow it down.

2            MR. BALESTRIERI:  Pardon me, your Honor.

3        Q.    -- during his visit to the Tribunal of the Diocese

4    of Manchester, in grave violation of the norm of Articles 157

5    paragraph 2, 159 paragraph 1, section 2, DC," referring to

6    Dignitas Connubii, the instruction, taken together with --

7    Canon 1678 paragraph 1, section 1, of the Code of Canon Law.

8            Do you recall what those canons refer to

9    specifically?

10       A.    I recall the fact that this complaint was filed as

11   part of the appeal raised by the party to the Roman Rota, the

12   highest appellate court in Rome, and how the Rota adjudicated

13   irrelevant the points that are raised in this document.

14       Q.    Father de Laire, I'm asking you if you recall --

15           THE COURT:  We're too far in the weeds now.  We're

16   too far in the weeds.

17           MR. BALESTRIERI:  I'm sorry.  Say again?

18           THE COURT:  We're too far in the weeds now.  This

19   is a damages hearing.

20           MR. BALESTRIERI:  Your Honor, Father de Laire has

21   admitted on the stand that he committed errors.

22           THE COURT:  Yeah, sure.

23           MR. BALESTRIERI:  And I'm trying to --

24           THE WITNESS:  No.  I'm sorry.  I did not.  I did

25   not.

1          MR. BALESTRIERI:  You did not?

2          THE WITNESS:  I testified that --

3          THE COURT:  That he apologized to you.

4          THE WITNESS:  For errors committed by the tribunal.

5          I did not testify -- I mean, we can -- maybe the

6   court reporter --

7          THE COURT:  Say what you want to say.

8          THE WITNESS:  I did not --

9          THE COURT:  He's not accepting your premise that he

10  admitted to errors, but I'm telling you, all right, counsel

11  did open this door a little bit, but in a general way, right?

12  What you need to establish is that the damages -- what I'm

13  going to allow you to do is that the damages that he's

14  alleging and that they are proving in this hearing are

15  attributable to something different than the defamation.

16  That's the -- if she's opened the door at all, and I think she

17  has a little bit, that's what she's opened, but not to

18  relitigate the falsehood of the ten statements because that's

19  been adjudicated.  That's over.

20          MR. BALESTRIERI:  Your Honor, I would concede that

21  point but for one point.

22          THE COURT:  I'm listening.

23          MR. BALESTRIERI:  That is that Father de Laire

24  wrote an affidavit rehashing a number of factual allegations

25  denying the factual allegations.  No one compelled him to

1   submit an affidavit under the penalties of perjury making

2   allegations of fact or denying certain allegations of fact,

3   the fact that he ever botched any cases, that there were no

4   complaints sent to the Holy See to the Roman Curia.  He opened

5   up that box.

6           Secondly, his counsel here today spent 45 minutes

7   going through a number of points which you recognized yourself

8   as opening up a certain box again.

9           THE COURT:  I get it.

10          MS. ELOVECKY:  I'm sorry, your Honor.  The

11  affidavit that was submitted with this proceeding -- in

12  connection with this proceeding listed what the defamatory

13  statements were.  It did not go through defenses to those

14  statements.  It was focused on damages.

15          I don't know what affidavit would be relevant other

16  than the one that was appended to the brief seeking damages.

17          THE COURT:  That would be the only one.

18          MS. ELOVECKY:  Correct.  And that focused on

19  damages.  It did list defamatory statements, but it didn't

20  list defenses to such.

21          THE COURT:  Understood, counsel.

22          Oh, counsel -- I mean, Mr. Balestrieri, the

23  affidavit you're referring to, I assumed it was the damages

24  affidavit, but you're saying, counsel, it's a different

25  affidavit?

1          MS. ELOVECKY:  Yes.

2          MR. BALESTRIERI:  That's a lack of clarity.

3          I'm referring to this one which was filed on

4    February 4, 2025, document 289-2.

5          THE COURT:  Well, that's the damages affidavit.

6          MS. ELOVECKY:  Yes.  And what I'm seeing that he

7    has highlighted is the list of defamatory statements that says

8    these were untrue.

9          MR. BALESTRIERI:  It says, "When I reviewed the

10   article, I identified several untrue statements."

11         He didn't simply repeat what your Honor had

12   decided.  He said, "I identified several untrue statements

13   about me, including, but not limited to, the following."

14         He was not quoting.  Those are new assertions under

15   penalties of perjury.

16         THE COURT:  Yeah, but -- so what are you saying,

17   this goes to his credibility?

18         MR. BALESTRIERI:  Yes, sir.

19         THE COURT:  As a witness in the damages hearing?

20         MR. BALESTRIERI:  As the alleged victim.

21         THE COURT:  Well, no.  His damages as the alleged

22   victim are all we're here to decide.

23         His credibility -- all right.  His credibility --

24   he doesn't have credibility as a victim.  The victim has

25   already been established.

1          MR. BALESTRIERI:  Forgive me.

2          As the plaintiff seeking a certain award of

3     damages, he is saying all of this to bolster his claim for

4     $100,000 in damages.

5          THE COURT:  Yeah.

6          MR. BALESTRIERI:  He obviously thought it was

7     relevant because he made those new assertions.

8          THE COURT:  Hold on a minute.

9          A lot of this I think was just laid out as sort of

10    background foundation in his affidavit.

11          See, I'm not focused on the affidavit really.  I'm

12    focused on the fact that -- she did ask him some questions

13    about whether certain -- and they were more reputational, his

14    standing, right?  Had you ever been accused of this before?

15    Were you aware anybody ever said this of you, that you were a

16    troublemaker?  Things of that nature, right?

17          So my view is if he had been called a troublemaker

18    before, that could cause emotional distress separate and apart

19    from or in addition to your defamatory conduct.  So it's

20    relevant in this hearing, you're right, but those are --

21    that's the kind of thing you can get into.  I don't want to go

22    hammer and tongs through the ten statements.  Those have been

23    adjudicated as defamatory.

24          MR. BALESTRIERI:  I'm not going through any number

25    of statements.  I'm going through what he asserted in an

1    affidavit in support of damages.

2         Now, if they're not relevant, then why did he make

3    those assertions in his affidavit?  Why did he submit that

4    affidavit as it is?  He brought up the relevance of those

5    facts.

6         THE COURT:  I think he was ordered to submit an

7    affidavit, actually.

8         MS. ELOVECKY:  He was ordered to submit an

9    affidavit.  And, again, the affidavit lists as subparagraphs

10   (a) through maybe (h) what the defamatory statements were

11   without putting forward any defense concerning -- or

12   allegation that they were untrue.

13        MR. BALESTRIERI:  I'm sorry.  He says right here,

14   "I identify --"

15        THE COURT:  Don't interrupt her.  Hey, hey, hey,

16   don't interrupt her.

17        MR. BALESTRIERI:  Pardon me.

18        MS. ELOVECKY:  Following the summary of the

19   statements the affidavit does not continue to say this

20   statement was untrue for this reason, this statement was

21   untrue for this reason.  It simply lays them out as

22   foundational as to what's before the Court.

23        THE COURT:  Yeah.  All right.

24        Anyway, look, we're not relitigating the defamation

25   trial here.  What you need to focus on are what he said about

1   his damages and the source of those damages.

2          If you can show that the damages he's claiming were

3   not caused by the defamatory conduct, I'll let you cross on

4   it, I'll let you inquire on it, but that's what you're allowed

5   to do.

6          MR. BALESTRIERI:  Your Honor, it's my premise, my

7   representation that the causation for the damages he suffered

8   is not the published article.  It's his own bad conduct, his

9   own errors.

10          I brought here upon request two witnesses, parties

11   to these cases, who agreed to testify to this particular kind

12   of causation where these parties were involved in these cases.

13          THE COURT:  All right.  Look, it's 5 o'clock.  So

14   obviously you have a long way to go.  In other words, you want

15   to cross-examine the plaintiff and you want to present

16   evidence.  You have witnesses.

17          MR. BALESTRIERI:  I've had my time cut short

18   dramatically compared to plaintiff's counsel, your Honor, and

19   I need to make my case.

20          THE COURT:  Of course.  You're not hearing me out.

21   I'm not telling you you're done.  I'm telling you it's

22   5 o'clock and I've got staff here that's got to go home.

23          MR. BALESTRIERI:  Of course.

24          THE COURT:  So we're going to have to continue the

25   hearing another day.  That's what I'm telling you.

1                Do you know of some other magic way we can do this?

2                MR. BALESTRIERI:  No, your Honor.

3                I'm frustrated in having to spend more limited cash

4       in order to return here, but I understand the need to do so.

5                THE COURT:  Yeah.  Okay.

6                So, look, here's what we're going to do.  We've got

7       to suspend for today.

8                What I want you to do since you're both here, all

9       right, is with Kellie I want you to pick a new date for the

10      next hearing because he's entitled to defend himself at this

11      hearing.

12               MS. ELOVECKY:  Oh, I'm not objecting.

13               THE COURT:  So we've got to find a day that you can

14      come back.  And I realize it's burdensome so I'm not saying

15      you've got to come back next week, but try to figure out a day

16      that you can travel back and we'll continue the proceeding.

17               MR. BALESTRIERI:  I'm grateful for your

18      understanding and decision.

19               Thank you, your Honor.

20               THE COURT:  And the one thing I guess I would

21      suggest to you, you know, given that you've got a little time

22      here, is perhaps rethink our conversation at the beginning

23      because you're going to have some time here.

24               MR. BALESTRIERI:  Which means you're suggesting

25      that I endeavor to --

1          THE COURT:  Well, I'm saying that if an attorney --

2     I would at least consider an attorney representing you.

3     Although, for what it's worth, you apparently know what you're

4     doing in a courtroom.

5          MR. BALESTRIERI:  No, your Honor.

6          THE COURT:  You don't think you do, but I'm telling

7     you that you do.  Anyway, at least from what I'm seeing.  I

8     know you feel like you probably don't know the rules that

9     well, but you know how to question a witness, that's clear,

10    and that's really what we're doing here.

11         Look, it's going to be up to you.  I'm just

12    reminding you.  That's all.

13         MR. BALESTRIERI:  Thank you, your Honor.

14         THE COURT:  Okay.  So don't leave until you tell

15    Kellie -- until you figure out a date.  If you can't figure

16    out a date because it's too hard right now, we'll have to do

17    it on the phone later, but take a shot.

18         MR. BALESTRIERI:  Understood.  Thank you.

19         THE CLERK:  Your Honor, could I ask that they file

20    a witness list so I know the names for the next hearing?

21         THE COURT:  Yeah.

22         Before the next part of the hearing you can tell us

23    who your witnesses are going to be.

24         MR. BALESTRIERI:  Thank you.

25         MS. ELOVECKY:  I would appreciate the same.  Thank

1    you.

2            THE COURT:  Yeah, that's true.  She's supposed to

3    know who you're going to call so she can prepare.

4            MR. BALESTRIERI:  No one ever told me.  No one

5    asked me any questions about this.

6            Again, I'm pro se.  That's why I need counsel, your

7    Honor.

8            THE COURT:  Okay.  We are in recess.

9            (Hearing adjourned at 5:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4        I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate transcription of

6    the within proceedings to the best of my knowledge, skill,

7    ability and belief.

8

9

10   Submitted:  5-12-25    /s/   Susan M. Bateman _____
                            SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25